Leon Dayan, SBN 153162
Abigail V. Carter*
Ramya Ravindran*
Lane M. Shadgett*
J. Alexander Rowell*
**BREDHOFF & KAISER P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com
*Pro hac vice* application pending

Daniel Feinberg, SBN 135983
Catha Worthman, SBN 230399
Anne Weis, SBN 336480
**FEINBERG, JACKSON, WORTHMAN
& WASOW, LLP**
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Attorneys for Plaintiffs* (Additional Counsel on signature page)

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No.: 3:25-cv-03070-JD <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> **EXPEDITED HEARING REQUESTED** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

    A.    Plaintiffs Have Publicly Spoken Out Against President Trump's Executive Actions, and the Administration Has Taken Notice ....................................................... 2

    B.    In Response to "Hostile Unions," President Trump Issues the Exclusion Order ........... 5

    C.    Civil Servants at Excluded Agencies Have Served Their Country and Collectively Bargained for Decades ..................................................................... 9

    D.    President Trump's Exclusion Order Has Harmed Plaintiffs and Their Members ......... 13

LEGAL STANDARD .......................................................................................................... 14

ARGUMENT ...................................................................................................................... 14

    I.    Plaintiffs are Likely to Succeed on the Merits .................................................. 15

        A.   Plaintiffs Have Article III Standing ................................................................... 16

        B.   The Exclusion Order Violates the First Amendment ............................................ 18

            1.   The Exclusion Order Retaliates Against Plaintiffs for Constitutionally Protected Speech and Petitioning. ........................................................ 18

            2.   The Exclusion Order Is Impermissible Viewpoint Discrimination. ...................... 24

        C.   The Exclusion Order's Attempt to Carve Out Most Federal Workers from Bargaining Rights is *Ultra Vires* ................................................................... 25

        D.   The Exclusion Order Violates the Fifth Amendment ............................................ 31

            1.   The Exclusion Order Violates the Fifth Amendment Because the Federal Government Cannot Make and then Repudiate a Binding Contract. ................... 31

            2.   The Exclusion Order Violates the Fifth Amendment Because Plaintiffs and Their Members Did Not Receive Procedural Due Process. ............................... 35

         E.   This Court has Jurisdiction to Hear Union Plaintiffs' Claims.................................. 36

    II.    Plaintiffs and Their Members Are Suffering Irreparable Injury Due to the Exclusion Order and its Implementation ........................................................... 37

    III.    The Balance of Equities and Public Interest Favor Preliminary Injunctive Relief ........ 39

CONCLUSION ................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE Local 446 v. Nicholson,*
    475 F.3d 341 (D.C. Cir. 2007) ..................................................................37

*AFGE v. Trump,*
    No. 1:25-cv-00264 (D.D.C.) ......................................................................2

*AFGE v. U.S. Off. of Pers. Mgmt.,*
    2025 WL 820782 (N.D. Cal. Mar. 14, 2025) .........................................3, 22

*AFL-CIO v. DOL,*
    No. 1:25-cv-00339 (D.D.C.) ......................................................................3

*AFSCME v. SSA,*
    2025 WL 868953 (D. Md. Mar. 20, 2025) ..................................................3

*AFT v. Bessent,*
    2025 WL 895326 (D. Md. Mar. 24, 2025) ..................................................3

*Al Haramain Islamic Found., Inc. v. Bush,*
    507 F.3d 1190 (9th Cir. 2007) ..................................................................16

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
    686 F.3d 965 (9th Cir. 2012) ....................................................................35

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) (per curiam) ............................................................38

*All. for Retired Ams. v. Bessent,*
    No. 1:25-cv-00313 (D.D.C.) ......................................................................3

*Am. Foreign Service Ass'n v. Trump,*
    No. 1:25-cv-00352 (D.D.C.) ......................................................................3

*Aptheker v. Sec'y of State,*
    378 U.S. 500 (1964) .................................................................................15

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents,*
    824 F.3d 858 (9th Cir. 2016) ........................................................18, 19, 22

*Askins v. Dep't of Homeland Sec.,*
    899 F.3d 1035 (9th Cir. 2018) ..................................................................16

*Ballentine v. Tucker,*
    28 F.4th 54 (9th Cir. 2022) .......................................................................18

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963)...........................................................................................................24

*BATF v. FLRA,*
    464 U.S. 89 (1983)...........................................................................................................10

*BE&K Constr. Co. v. NLRB,*
    536 U.S. 516 (2002).........................................................................................................18

*Biden v. Sierra Club,*
    142 S. Ct. 46 (2021).........................................................................................................26

*Borough of Duryea, Pa. v. Guarnieri,*
    564 U.S. 379 (2011).........................................................................................................19

*Boumediene v. Bush,*
    553 U.S. 723 (2008).........................................................................................................15

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011).........................................................................................................25

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
    29 F.4th 468 (9th Cir. 2022)............................................................................................37

*Cefalo v. Moffett,*
    1971 WL 797 (D.D.C. June 28, 1971)............................................................................37

*Cole v. Young,*
    351 U.S. 536 (1956).............................................................................................27, 28, 29

*Coszalter v. City of Salem,*
    320 F.3d 968 (9th Cir. 2003) ......................................................................................21, 22

*Ctr. for Biological Diversity v. Mattis,*
    868 F.3d 803 (9th Cir. 2017) ..........................................................................................15

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) ........................................................................................26

*Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Loc. R5-181,*
    4 FLRA 644 (1980)....................................................................................................28, 30

*Dorr LLP v. Exec. Office of the President,*
    Case 1:25-cv-00917-RJL,2025 WL 946979 (D.D.C. Mar. 28, 2025) ..........................22, 23

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) ................................................................16, 17, 38, 39

*Ex parte Endo,*
    323 U.S. 283 (1944)..........................................................................................................15

iii

*Entler v. Gregoire*,
  872 F.3d 1031 (9th Cir. 2017) ...................................................................................19

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ...............................................................................................16

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...............................................................................................26

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) (en banc) ..............................................................17, 37

*Fishman v. Clancy*,
  763 F.2d 485 (1st Cir. 1985) ..................................................................................19

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) .................................................................................................19

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ...............................................................................................15

*Havens Realty Corp v. Coleman*,
  455 U.S. 363 (1982) ...............................................................................................16

*Heffernan v. City of Paterson*,
  578 U.S. 266 (2016) ...............................................................................................23

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ..................................................................................37

*Hoffman v. Parksite Grp.*,
  596 F. Supp. 2d 416 (D. Conn. 2009) ....................................................................38

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934) ...............................................................................................15

*Int'l Union, United Gov't Sec. Officers of Am. v. Clark*,
  706 F. Supp. 2d 59 (D.D.C. 2010) ..........................................................................32

*Janus v. AFSCME Council 31*,
  585 U.S. 878 (2018) ...............................................................................................31

*Jenner & Block LLP v. U.S. Dep't of Just.*,
  2025 WL 946993 (D.D.C. Mar. 28, 2025) ..............................................................23

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951) ...............................................................................................18

*Kashem v. Barr*,
  941 F.3d 358 (2019) ..........................................................................................35, 36

MEM. OF POINTS & AUTHORITIES ISO MOT. FOR TRO Case No. 3:25-cv-03070-JD

*Larionoff v. United States,*
    533 F.2d 1167 (D.C. Cir. 1976)............................................................................32

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001)......................................................................................25

*Lozman v. City of Riviera Beach,*
    585 U.S. 87 (2018)........................................................................................18

*Lynch v. United States,*
    292 U.S. 571 (1934)..................................................................................32, 34

*Madera Irrigation. Dist. v. Hancock,*
    985 F.2d 1397 (9th Cir. 1993)......................................................................32

*Media Matters for Am. v. Bailey,*
    No. 24-CV-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024)..................21

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012)........................................................................39

*Members of City Council v. Taxpayers for Vincent*
    466 U.S. 789 (1984)......................................................................................25

*Murphy Co. v. Biden,*
    65 F.4th 1122 (9th Cir. 2023).......................................................................26

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    585 U.S. 755 (2018)......................................................................................22

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,*
    470 U.S. 451 (1985)......................................................................................33

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024)............................................................................20, 23, 24

*NFFE v. McDonald,*
    128 F. Supp. 3d 159 (D.D.C. 2015)..........................................................26, 27

*NTEU v. Chertoff,*
    452 F.3d 839 (D.C. Cir. 2006)......................................................................17

*NTEU v. Trump,*
    No. 1:25-cv-00420 (D.D.C.)............................................................................3

*Ohio Adjutant Gens. Dep't v. FLRA,*
    598 U.S. 449 (2023)......................................................................................10

*OPM v. FLRA,*
    864 F.2d 165 (D.C. Cir. 1988)......................................................................27

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    25-716 (BAH), 2025 WL 782889 (D.D.C. Mar. 12, 2025) ...................................................23

*Perry v. Sindermann*,
    408 U.S. 593 (1972)...................................................................................................32, 34

*Perry v. United States*,
    294 U.S. 330 (1935)...........................................................................................32, 33, 34

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ................................................................................35, 36

*Ray v. Lara*,
    31 F.4th 692 (9th Cir. 2022) ...................................................................................26, 27

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .........................................................................................39

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)...................................................................................................24, 25

*Schwartz v. Franklin*,
    412 F.2d 736 (9th Cir. 1969) ..........................................................................................32

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ..........................................................................................26

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ...........................................................................17, 37, 38

*Thorpe v. Hous. Auth. of Durham*,
    393 U.S. 268 (1969) ........................................................................................................32

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ........................................................................................................36

*Twitter, Inc. v. Garland*,
    61 F.4th 686 (9th Cir. 2023) ..........................................................................................15

*U.S. Att'ys Off. S. Dist. of Texas & AFGE Loc. 3966*,
    57 FLRA 750 (2002).......................................................................................................37

*U.S. Dep't of Def. v. Am. Fed'n of Gov't Emps., AFL-CIO, Dist. 10*,
    No. 6:25-cv-119 (W.D. Tex. Mar. 27, 2025)..................................................................8

*United States v. Robel*,
    389 U.S. 258 (1967)...................................................................................................15, 16

*United States v. Winstar Corp*,
    518 U.S. 839 (1996)........................................................................................................32

W. *Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ....................................................................................24

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ..............................................................15, 16

*Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*,
   850 F. Supp. 1388 (E.D. Cal. 1994) ............................................................32

*Widakuswara v. Lake*,
   2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) ..............................................3, 5

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024) .......................................................................14

**Statutes & Regulations**

5 U.S.C. § 7101 .................................................................................... *passim*

5 U.S.C. § 7102 ...............................................................................10, 33

5 U.S.C. § 7103 .................................................................................... *passim*

5 U.S.C. § 7106 ...............................................................................11, 31

5 U.S.C. § 7111 ............................................................................................10

5 U.S.C. § 7112 ...............................................................................11, 27

5 U.S.C. § 7114 .......................................................................10, 11, 17

5 U.S.C. § 7115 ...............................................................10, 11, 14, 38

5 U.S.C. § 7121 ..............................................................................................8

5 U.S.C. § 7301 ............................................................................................30

5 U.S.C. § 7311 ............................................................................................11

5 U.S.C. § 7701 ............................................................................................30

38 U.S.C. § 301 .............................................................................................30

38 U.S.C. § 7422 ..........................................................................................30

5 C.F.R. § 110 *et seq.* ..................................................................................11

85 Fed. Reg. 10033 (Feb. 21, 2020) .........................................................12

**Other Authorities**

124 Cong. Rec. 29186 (Sept. 13, 1978) ....................................................................................10, 27

## INTRODUCTION

On March 27, 2025, President Trump issued an Executive Order entitled "Exclusions from Federal Labor-Management Programs" (Exclusion Order), eliminating federal labor rights for nearly 800,000 federal employees represented by Plaintiffs, and putting countless more on notice that they could be next. According to the Fact Sheet accompanying the Order, President Trump issued the Order in response to "hostile Federal unions" who had "declared war on [his] agenda." The Fact Sheet referenced an article by Plaintiff AFGE outlining the various constitutionally protected ways it was "fighting back" against Trump administration policies, including by filing lawsuits in federal court. Finally, in a clear message to any federal employees or unions who might continue to oppose his policies, the President offered these words: "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions."

Plaintiffs American Federation of Government Employees (AFGE), American Federation of State, County, and Municipal Employees (AFSCME), National Nurses Organizing Committee/National Nurses United (NNOC/NNU), Service Employees International Union (SEIU), National Association of Government Employees (NAGE), and National Federation of Federal Employees (NFFE), hereby request emergency relief against the Exclusion Order and the irreparable harms it is causing Plaintiffs and their members on the following grounds:

*First*, the Exclusion Order, according to the Administration's own words that accompanied the Order in real time, stripped Plaintiffs and their members of their collective bargaining rights in retaliation for protected First Amendment activity. Further, by (a) delegating authority to the Secretaries of Defense and Veterans Affairs to restore bargaining rights to chosen divisions within 14 days, and (b) encouraging *all agencies* to submit additional subdivisions for rights removal, the Exclusion Order has created a massive chilling effect that discourages federal unions and their members from voicing opposition to President Trump's policies. The message could not be clearer: the President will selectively grant federal labor law rights to employees whose unions "work with him" and eliminate them for unions who are "hostile" to his agenda. This blatant form of retaliation and viewpoint-based discrimination is anathema to the First Amendment.

*Second*, even setting aside the (admitted) retaliatory motive, the Exclusion Order is *ultra vires*. The purported basis for the Order was the President's authority granted by Congress, in limited circumstances, to exclude certain agencies from collective bargaining based on a finding that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that the employees in that division cannot engage in collective bargaining "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b). But the President's actions were not based on an actual finding that these prerequisites are present. The Exclusion Order sweeps in countless agencies and subdivisions whose primary function is not "intelligence, counterintelligence, investigative, or national security work," as those terms are understood in light of both the text and history of the Civil Service Reform Act of 1978 (CSRA), under which federal employees at each of the Excluded Agencies have been represented by unions for decades.

*Finally*, by taking action to nullify Plaintiffs' binding collective bargaining agreements (CBAs) with the government—including "just cause" job protections and grievance procedures that were lawfully negotiated on behalf of represented employees—the Exclusion Order has deprived Plaintiffs of a property right protected by the Fifth Amendment. Moreover, Plaintiffs received no notice, no access to evidence underlying the President's purported "determination," and no opportunity to be heard. These procedural defects violate the Due Process Clause.

Plaintiffs are likely to succeed on the merits of their claims, they face irreparable harm, and the balance of the equities and public interest favor relief. This Court should put a halt to the retaliatory Exclusion Order and grant Plaintiffs' motion for a Temporary Restraining Order.

## FACTUAL BACKGROUND

### A. Plaintiffs Have Publicly Spoken Out Against President Trump's Executive Actions, and the Administration Has Taken Notice

On the first day of his administration, President Trump issued an Executive Order that sought to eliminate civil service protections for "policy influencing" positions. Exec. Order 14171, 90 Fed. Reg. 8625 (Jan. 20, 2025). AFGE and AFSCME filed suit challenging the Order soon thereafter. *AFGE v. Trump*, No. 1:25-cv-00264 (D.D.C.). That same day, President Trump

announced the establishment of the "Department of Government Efficiency" (DOGE). Exec. Order 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). In the weeks that followed, DOGE personnel spread out across the government seeking access to government databases and other sensitive information. Plaintiffs responded by filing additional lawsuits to ensure that data relating to federal employees and the general public remain secure.[1] What is more, Plaintiffs have gotten results: NFFE obtained a preliminary injunction protecting their members' data at Education Department, Treasury Department, and OPM on March 24, while AFSCME and others obtained a TRO protecting personal data at the Social Security Administration on March 20.[2]

When the Trump Administration and DOGE targeted agencies to shut them down entirely, Plaintiffs have been prominent among those speaking out and fighting back. AFGE, together with an allied union, sued to stop the dismantlement of USAID on February 6, 2025. *Am. Foreign Service Ass'n v. Trump*, No. 1:25-cv-00352 (D.D.C.). The next month, AFSCME and AFGE joined journalists, other unions, and non-profit press freedom organizations to challenge the dismantlement of the U.S. Agency for Global Media and its Voice of America programming, which promotes free press and democracy abroad. *Widakuswara v. Lake*, No. 25-cv-02390 (S.D.N.Y.). They filed for a temporary restraining order, which was granted. *Widakuswara v. Lake*, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025). Finally, when the Trump administration sought to fire tens of thousands of federal workers, Plaintiffs took action. NFFE joined other unions to challenge the administration's actions in court. *NTEU v. Trump*, No. 1:25-cv-00420 (D.D.C.). And in a case brought by AFGE, AFSCME, and other organizations, a federal judge granted a preliminary injunction requiring reinstatement of thousands of fired probationary workers at the Departments of Veterans Affairs, Agriculture, Interior, Energy, Defense, and Treasury. *AFGE v. U.S. Off. of Pers. Mgmt.*, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025).

---

[1] For example, AFGE and SEIU sued the Treasury Department on February 3, 2025, to protect sensitive personal and financial data. *All. for Retired Ams. v. Bessent*, No. 1:25-cv-00313 (D.D.C.). Unions including AFGE, AFSCME, and SEIU sued the Department of Labor on February 5, 2025, to protect its sensitive data. *AFL-CIO v. DOL*, No. 1:25-cv-00339 (D.D.C.).

[2] *See AFT v. Bessent*, 2025 WL 895326 (D. Md. Mar. 24, 2025); *AFSCME v. SSA*, 2025 WL 868953 (D. Md. Mar. 20, 2025).

Plaintiffs' lawsuits have not gone unnoticed by the Trump administration. For instance, Elon Musk reposted on X (Twitter) a post attacking a coalition of organizations whose members filed suits challenging Trump administration policies. Kelley Decl. Ex. 5. That post directly named AFGE (first on the list), AFSCME (second), and NFFE, characterizing their legal filings as a "coordinated hit job" on President Trump's agenda. *Id.* Musk also reposted a story about a lawsuit successfully blocking cuts to National Institute of Health funding, asking "Which law firms are pushing these anti-democratic cases to impede the will of the people?" Kelley Decl. Ex. 6.

President Trump has also threatened law firms he perceives as hostile, stating "We have a lot of law firms that we're going to be going after"[3] and that "law firms have to behave themselves."[4] President Trump has followed through with those threats. He has issued multiple executive orders seeking to punish law firms because they represented clients or causes that he dislikes or disagrees with.[5] In one notable case, President Trump even revoked his punishment after the targeted firm "agreed to a number of policy changes," including dedicating "$40 million in pro bono legal services" to support causes favored by the President. Executive Order 14244, *Addressing Remedial Action by Paul Weiss*, 90 Fed. Reg. 13685 (Mar. 21, 2025).

The President has also put agency heads on notice of his disapproval of groups bringing lawsuits against his administration. *See* Memorandum, *Preventing Abuses of the Legal System and the Federal Court* (March 22, 2025) (directing the Attorney General to pursue Rule 11 and other

---

[3] Joe DePaolo, *'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'*, Mediaite, https://www.mediaite.com/news/we-have-a-lot-of-law-firms-were-going-after-trump-declares-plan-to-target-law-firms-he-considers-very-very-dishonest/ (Mar. 9, 2025, 11:21 am).

[4] Michael Birnbaum, *Law firms refuse to represent Trump opponents in the wake of his attacks*, Washington Post, https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/ (Mar. 25, 2025).

[5] *See, e.g.,* Exec. Order 14230, *Addressing Risks from Perkins Coie LLP* (Mar. 6, 2025) (ordering agencies to terminate contracts with law firm that Trump claimed "worked…to judicially overturn…election laws"); Exec. Order 14237, *Addressing Risks from Paul Weiss* (Mar. 14, 2025) (same regarding law firm that "brought a pro bono suit against individuals" involved in the January 6 Capitol riot); Exec. Order 14246, *Addressing Risks from Jenner & Block* (Mar. 25, 2025) (same regarding law firm that Trump claimed "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States"); Exec. Order, *Addressing Risks from WilmerHale* (Mar. 27, 2025) (same).

professional sanctions against lawyers and law firms who bring election and immigration law challenges that "threaten[] our national security, homeland security, public safety, or election integrity"); Memorandum, *Ensuring the Enforcement of Federal Rules of Civil Procedure 65(c)* (March 11, 2025) (directing agencies to request that courts require security be posted by parties seeking injunctive relief because "[i]n recent weeks, activist organizations…have obtained sweeping injunctions…functionally inserting themselves into the executive policy making process and therefore undermining the democratic process"). The government has sought such a bond against AFGE, AFSCME, and others, requesting a $23.1 million bond in a case involving the dismantlement of the U.S. Agency for Global Media. The court denied the request, explaining that "[r]equiring that plaintiffs suing the government to vindicate constitutional and statutory rights post bonds of over $1 million a day would ensure that very few individuals could afford to sue the federal government." *Widakuswara*, 2025 WL 945869, at *11.

In addition to pursuing relief in federal courts, Plaintiffs have been outspoken in their public criticism of administration policies. *See* Ricci Decl. ¶¶ 7, 13-14, 18-22, 25-26, 37-38, 40-48; Huddleston Decl. ¶¶ 20, 22, 28, 33, 41, 50-57; Ury Decl. ¶¶ 15-18. They have also exercised their First Amendment rights by filing grievances against agencies when Trump administration policies violate the rights of covered employees. For example, at the VA, AFGE affiliates, NNOC/NNU, and NAGE have filed grievances on administration policies including the "5 points" email and cancellation of alternative workplace arrangements. Burke Decl. ¶ 8; Lanham Decl. ¶ 12; Sutton Decl. ¶ 16. At least some of Plaintiffs' grievances have been officially suspended due to the Exclusion Order. *See, e.g.*, Lien Decl. Ex. 1; Radzai Decl. ¶ 11.

### B.  In Response to "Hostile Unions," President Trump Issues the Exclusion Order

The Exclusion Order. President Trump issued the Exclusion Order on the night of March 27, 2025. Exec. Order, *Exclusions from Federal Labor-Management Relations Programs* (Mar. 27, 2025) (attached as Ex. 1 to Kelley Decl.). The Order identified a broad array of agencies and subdivisions ranging from the Department of Veterans Affairs to the Environmental Protection Agency (the "Excluded Agencies"). After declaring that the Excluded Agencies "have as a primary function intelligence, counterintelligence, investigative, or national security work," the Order

stated that those agencies were no longer covered by Chapter 71 of Title 5, the component of the CSRA that provides collective bargaining rights to federal employees. *Id.* § 1. Although the Exclusion Order purported to promote intelligence and security interests, it *carved out* from the exclusion subdivisions of the U.S. Marshals Service, as well as "any agency police officers, security guards, or firefighters," *except* those working at the Bureau of Prisons. *Id.* § 2 (1-499(a)). Notably, AFGE represents all employees at the Bureau of Prisons. *See* B. White Decl. ¶ 5.

For most of the Excluded Agencies, the Exclusion Order eliminated employees' Chapter 71 rights definitively. But for a few, it injected additional uncertainty through an arbitrary system of delegation. The Exclusion Order permitted the Departments of Defense or Veterans Affairs— but only these Departments—to suspend the application of the Order to selected subdivisions and restore Chapter 71 coverage for those employees. Exclusion Order § 4. The Order required them to make that determination within 15 days and publish it in the Federal Register. *Id.* In contrast, the Exclusion Order delegated authority to the Department of Transportation to issue orders excluding its subdivisions, including the Federal Aviation Administration, from Chapter 71 coverage, which would strip collective bargaining rights from the affected employees. *Id.* § 5. The Exclusion Order also made clear that further action could be forthcoming to eliminate collective bargaining rights for more federal employees by instructing all agency heads to report within 30 days which additional subdivisions should be added to the list. *Id.* § 7.

The Exclusion Order directed agency heads, "upon termination of the applicable collective bargaining agreement," to terminate pending grievance proceedings, terminate proceedings before the Federal Labor Relations Authority (FLRA) involving exceptions or arbitral awards or unfair labor practices, and reassign employees conducting official time business. Exclusion Order § 6. Despite the far-reaching effects of the Exclusion Order, Plaintiffs received no notice of this impending decision, nor were Plaintiffs or their members accorded an opportunity to review the evidence against them or rebut the President's findings. *See, e.g.,* Lanham Decl. ¶ 17; Blake Decl. ¶ 11; Sutton Decl. ¶ 6; Kelley Decl. ¶ 12.

The Exclusion Memorandum. The sweeping effect of the Exclusion Order on employees' rights was made explicit by a memorandum issued the same night by Charles Ezell, Acting

Director of the Office of Personnel Management (OPM), to heads and acting heads of departments and agencies. OPM, Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* (Mar. 27, 2025) ("Exclusion Memorandum") (attached as Ex. 2 to Kelley Decl.). OPM's Exclusion Memorandum explained that, following the Exclusion Order, Chapter 71 and the Foreign Service Labor-Management Relations Statute "will no longer apply" to the Excluded Agencies and therefore "those agencies and subdivisions are no longer required to collectively bargain with Federal unions." *Id.* at 3. The Exclusion Memorandum further emphasized that the Order caused unions to "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" the Exclusion Order. *Id.*

The Exclusion Memorandum then outlined steps for eliminating employee rights pursuant to the Exclusion Order. OPM declared that "[t]o implement [the Exclusion Order], agencies should cease participating in grievance procedures after terminating their CBAs." *Id.* at 5. Highlighting that the Exclusion Order is intended to make it easier to fire workers en masse, OPM also directed agencies to "Disregard Contractual RIF Articles," such that "After terminating their CBAs," they "should conduct RIFs…without regard to provisions in terminated CBAs that go beyond" statutory and regulatory requirements. *Id.* The Exclusion Memorandum described additional steps for firing employees, instructing agencies that after they "terminate CBAs that require [Performance Improvement Plans ("PIPs")] of more than 30 days, they should take prompt action to reduce PIPs for former bargaining unit employees to no more than 30 days" and directing agencies "that have terminated their CBAs" to "thereafter use chapter 75 procedures to separate underperforming employees without PIPs in appropriate cases." *Id.* at 4. Following issuance of the Exclusion Memorandum, several agencies began implementing its instructions. *See, e.g.,* Bunn Decl. at ¶¶ 4-6 (58 federal agencies have refused to process dues withholding); Lanham Decl. ¶ 18 (attaching FLRA notice postponing hearings at all agencies "indefinitely"); Lien Decl. ¶ 7 (GSA notifying union that CBA was terminated); J. White Decl. ¶ 8 (ceasing to process grievances at VA); Hinton Decl. ¶ 8 (State Dept terminating CBA, ceasing dues deductions, canceling official time, and refusing office space); Niemeier-Walsh Decl. ¶ 10.

The Fact Sheet. A White House Fact Sheet issued the same night as the Exclusion Order

laid bare the true reason for the Order: retaliating against Plaintiffs for opposing "President Trump's agenda." The White House, Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025) ("Fact Sheet") (attached as Ex. 3 to Kelley Decl.). The Fact Sheet referred to "hostile Federal unions" and asserted they "have declared war on President Trump's agenda." *Id.* It complained that "[t]he largest Federal union"—Plaintiff AFGE—"describes itself as 'fighting back' against Trump. It is widely filing grievances to block Trump policies," and that "VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration – an average of over one a day." *Id.* Finally, leaving no doubt that President Trump was targeting unions based on their viewpoint, the Fact Sheet stated that "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." *Id.*

<u>The Waco Lawsuit</u>. The same night that the Exclusion Order, Exclusion Memorandum, and Fact Sheets were issued, the Departments of Defense, Agriculture, Homeland Security, Housing and Urban Development, Justice, and Veterans Affairs, along with the Environmental Protection Agency and Social Security Administration, filed suit in the Western District of Texas at Waco against a collection of AFGE-affiliated local unions and councils.[6] In the Waco lawsuit, the Trump administration attacks core tenets of the collective bargaining framework Congress established in the CSRA. For example, it decries that CBAs include provisions related to "unaccountable private arbitrators in the form of grievance adjudication," Waco Compl. ¶ 3, despite the fact that Congress provided that all CBAs "shall provide procedures for the settlement of grievances, including questions of arbitrability" and that grievance procedures in federal CBAs "shall be subject to binding arbitration," 5 U.S.C. § 7121(b)(1)(C)(iii); *see also* Waco Compl. ¶ 104 (noting that a CBA requires an agency "to arbitrate grievances at the union's request").

The Waco lawsuit directly targets Plaintiff AFGE's First Amendment-protected activity. The complaint underscores that AFGE has published an article on its website stating it is "fighting

---

[6] *U.S. Dep't of Def. v. Am. Fed'n of Gov't Emps., AFL-CIO, Dist. 10*, No. 6:25-cv-119 (W.D. Tex. Mar. 27, 2025) ("Waco Compl.") (attached as Ex. 4 to Kelley Decl.).

back" against the Trump administration's "Attacks on Civil Service." Waco Compl. ¶ 172. That article, published March 3, 2025, catalogued an extensive list of First Amendment-protected activities in which AFGE was engaged in response to executive actions taken by the Trump administration. AFGE, *What AFGE Is Doing: A Recap of AFGE's Major Actions Against Trump's Attacks on Civil Service* (Mar. 3, 2025) (attached as Ex. 1 to Huddleston Decl.). It described AFGE's involvement in seven lawsuits against the administration in federal court. *Id.* It stated that AFGE "continues to educate the public about the impact of these anti-worker policies on federal employees and the American people who rely on them to provide the services they have paid for and deserve" and its "leaders have been giving interviews to the media and have been quoted extensively on the danger of these policies." *Id.* And it explained that it was "working with councils and locals in drafting local and national grievances against actions that violated our contracts." *Id.*

In summary, the Exclusion Order terminated employee rights at a broad expanse of agencies, sweeping aside protections entirely at some agencies while enabling others to grant or deny such rights based on whether a union is sufficiently "work[ing] with" the President. As the Exclusion Memorandum sets out, these changes eliminate grievance procedures, end payroll deductions for voluntary union dues, and eliminate protections against individual and mass firings. The White House's Fact Sheet declares that the purpose of the Exclusion Order is to target so-called "hostile Federal unions" for "fighting back" against administration policies and incursions on their rights. The Administration reiterated this purpose in the Waco Lawsuit, expressly targeting Plaintiff AFGE for its engagement in lawsuits and public communications about those efforts.

### C. Civil Servants at Excluded Agencies Have Served Their Country and Collectively Bargained for Decades

From the beginning of federally-recognized collective bargaining rights, civilian employees at agencies across the government exercised their rights to join together in unions. In 1961, Secretary of Defense Robert F. McNamara served as one of the six members of President John F. Kennedy's "Task Force on Employee-Management Relations in the Federal Service." Report of the President's Task Force on Employee-Management Relations in the Federal Service ("Task Force Report") (Nov. 30, 1961), at 1182. That Task Force concluded "that the public

interest calls for a strengthening of employee-management relations within the Federal Government." Task Force Report at 1190. In response, President Kennedy issued Executive Order 10988, which established a system where employee organizations could be recognized as exclusive representatives to collectively bargaining with agencies. Subsequent Presidents built on this collective bargaining framework through Executive Orders of their own. *See, e.g.,* Exec. Order 11491, 34 Fed. Reg. 17605 (Oct. 28, 1969); Exec. Order 11838, 40 Fed. Reg. 5743 (Feb. 7, 1975).

In 1978, Congress enacted the CSRA, which "established a comprehensive framework governing labor-management relations in federal agencies," codified at Chapter 71 of Title 5 of the U.S. Code. *Ohio Adjutant Gens. Dep't v. FLRA*, 598 U.S. 449, 452 (2023). The CSRA set forth "[a] statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. 29186 (Sept. 13, 1978) (statement of Rep. Clay). It "significantly strengthened the position of public employee unions while carefully preserving the ability of federal managers to maintain 'an effective and efficient Government.'" *BATF v. FLRA*, 464 U.S. 89, 92 (1983) (quoting 5 U.S.C. § 7101(b)). In enacting the CSRA, Congress recognized that collective bargaining "safeguards the public interest, contributes to the effective conduct of public business, and facilitates and encourages the amicable settlements of disputes," and that therefore "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). To further that public interest, the CSRA guaranteed employees "the right to form, join, or assist any labor organization, or to refrain from any such activity" and to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." 5 U.S.C. § 7102.

As part of that bargaining framework, agencies are required to grant exclusive recognition to labor organizations that are selected by the majority of employees in a particular bargaining unit. *Id.* § 7111(a). If a labor organization is so certified, Chapter 71 of the CSRA places certain obligations on its conduct: among other things, it must act for "all employees in the unit" and is required to represent their interests "without discrimination and without regard to labor organization membership." *Id.* § 7114(a). Also, federal employees are never required to join a union; they may voluntarily choose to join and pay membership dues, or decline to do so. *Id.* §

7115. If an employee so chooses and provides a written authorization, Chapter 71 requires agencies to deduct membership dues from an employee's pay and transmit those dues to the union. *Id.*

Chapter 71 of the CSRA requires agencies and exclusive representatives to meet in good faith to reach a binding CBA governing conditions of employment. *Id.* § 7114(a)(4), (b). "[I]f agreement is reached," agencies and exclusive representatives are required "to execute on the request of any party to the negotiation a written document embodying the agreed terms, and to take such steps as are necessary to implement such agreement." *Id.* § 7114(b). Upon approval of the agency head, or failure to act within 30 days, this contract "shall take effect and shall be binding on the agency and the exclusive representative." *Id.* § 7114(c).

To ensure that "the special requirements and needs of the Government," are met, *id.* § 7101(b), federal sector collective bargaining is more constrained than in the private sector in several important ways. First, Chapter 71 contains an enumeration of broad "management rights" that are reserved for the agency and excluded from bargaining. *Id.* § 7106. Those management rights include the authority "to determine the mission, budget, organization, number of employees, and internal security practices of the agency," and to, "in accordance with applicable laws…hire, assign, direct, layoff, and retain employees in the agency,…or take other disciplinary action against such employees." *Id.* Chapter 71 also prohibits bargaining over employment terms that are set by statute or government-wide regulation. *Id.* § 7103(a)(14); 7117(a)(1). In practice, that means that for most federal employees and unions, negotiations are not permitted with respect to matters pertaining to, among other things, wages and benefits. *See generally* 5 C.F.R. § 110 *et seq.* Finally, members of federal sector unions (like all federal employees) are strictly prohibited from participating in a strike against the government. *Id.* § 7311.

Like the Executive Orders that came before, Chapter 71 contains several provisions intended to insulate sensitive intelligence and national security functions from the collective bargaining process. For example, no bargaining unit (in any agency) may include "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." 5 U.S.C. § 7112(b)(6). Chapter 71 also expressly excludes certain agencies from its scope that are wholly dedicated to intelligence and/or national security, such as the CIA, NSA

(subcomponent of DOD), and U.S. Secret Service (subcomponent of Treasury). *Id.* § 7103(a)(3). Finally, in limited circumstances, the President is permitted to issue orders excluding other agencies or subdivisions from coverage under Chapter 71. The President may only do so after determining (1) that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) that "the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1). Decades of practice demonstrate the limited scope of this provision: it has never been used to exclude an entire Cabinet-level department from Chapter 71, but instead specific sub-department agencies or subdivisions thereof. *See, e.g.,* Executive Order 12171, 44 Fed. Reg. 66565 (Nov. 20, 1979) (excluding, *inter alia*, six intelligence-focused "[a]gencies or subdivisions of the Department of the Army, Department of Defense"). After nearly five decades with this statutory framework in place, the vast majority of federal agencies (and their employees) remained covered by Chapter 71.

Notably, in President Trump's first term, he never excluded an entire Department-level agency from Chapter 71 coverage. In early 2020, he issued a memorandum that purported to delegate his authority under 5 U.S.C. § 7103(b)(1) to "issue orders excluding Department of Defense agencies or subdivisions thereof" from Chapter 71 to the Secretary of Defense. 85 Fed. Reg. 10033 (Feb. 21, 2020). Then-Secretary of Defense Mark Esper testified before Congress that he did not request the authority from the President and could not recall a time in the past where using this authority would have been warranted. Secretary Esper explained he would wait to see what his staff recommended "and make an assessment from there." Mark Esper Testimony, House Armed Services Committee, (Feb. 27, 2020). After a bipartisan group of senators pushed back on this effort, explaining that "exemptions permitted by the process are not meant to be given widely to an entire department as a sweeping declaration, but to be carefully considered, " Erich Wagner, "Senators from Both Political Parties Urge Trump to 'Reconsider' Defense Union Memo," *Government Executive* (Feb. 28, 2020), Secretary Esper never exercised this authority. The delegation was rescinded on February 24, 2021. Executive Order 14018 § 1, 86 Fed. Reg. 11855 (Mar. 1, 2021). The next attempt to invoke Section 7103(b)(1) was the Exclusion Order.

### D.  President Trump's Exclusion Order Has Harmed Plaintiffs and Their Members

Plaintiffs, on their own and in conjunction with affiliated subordinate bodies, represent hundreds of thousands of members and bargaining unit employees working for Excluded Agencies across the government. AFGE represents approximately 660,000 civilian employees working in Excluded Agencies, including DOD, Treasury, VA, DOJ, HHS, DHS, Interior, Energy, USDA, EPA, USAID, and GSA. Kelley Decl. ¶ 8. AFSCME represents approximately 2,700 civilian employees working in Excluded Agencies, including DOD, VA, and DOJ. Blake Decl. ¶ 3. NNU represents approximately 15,800 civilian employees working at the VA, an Excluded Agency. Lanham Decl. ¶ 7. NAGE represents approximately 62,400 civilian employees working in Excluded Agencies, including DOD, VA, and EPA. Sutton Decl. ¶¶ 6-8. SEIU and/or its affiliates represents approximately 28,000 civilian employees working at the VA. Ury Decl. ¶ 8. And NFFE represents approximately 37,900 civilian employees working in Excluded Agencies, including DOD, VA, Interior (BLM), USDA (APHIS), State, and GSA. Erwin Decl. ¶ 11.

The Exclusion Order, as implemented by the Excluded Agencies, is rendering it impossible for Plaintiffs to provide core services to their members. These core services include negotiating over changes to terms and conditions of employment, representing members during investigatory interviews, and bringing grievances and arbitrations on members' behalf to enforce their contractual and statutory rights. *See, e.g.,* Sutton Decl. ¶ 3; Rice Decl. ¶ 5; B. White Decl. ¶ 5; Radzai Decl. ¶ 6; Cameron Decl. ¶ 6; Fornnarino ¶¶ 7-12. Excluded Agencies are following the Exclusion Order and Exclusion Memorandum and prohibiting Plaintiffs from representational activities, such as pursuing pending grievances for contract violations that occurred prior the Exclusion Order, holding representation elections on pending petitions, and engaging in collective bargaining negotiations. Lanham Decl. ¶ 18 (canceling pending representation case); Fragomene Decl. ¶¶ 7-8 (refusing to process representation petitions and unfair labor practice charges); Sutton Decl. ¶ 20 (cancelling negotiations over contractual provisions); J. White Decl. ¶ 8 (failing to process grievances); Lien Decl. ¶ 7 (terminating CBA and pending grievances); Kim Decl. ¶ 8 (same). These actions are blocking Plaintiffs' ability to become, or to exercise the responsibilities of, an exclusive representative.

The Exclusion Order is also causing substantial and continuing financial harm to Plaintiffs. Membership in Plaintiffs is voluntary, and their activities are funded by their members through voluntary dues. *See, e.g.,* Kelley Decl. ¶ 10; Erwin Decl. ¶ 33; Sutton Decl. ¶¶ 17-18; Blake Decl. ¶ 7. The majority of dues from federal employees for each Plaintiff are deducted from members' pay pursuant to 5 U.S.C. § 7115. *Id.* However, the Exclusion Memorandum instructs agencies to end payroll deductions for voluntary union dues after terminating Plaintiffs' contracts. Exclusion Memorandum at 6. Agencies are already beginning to do so. Indeed, on April 3, 2025, the National Finance Center informed AFGE that it had refused to process dues payments to AFGE from union members at approximately 64 federal agencies, resulting in hundreds of thousands of dollars of member money the government refused to transmit. Bunn Decl. ¶¶ 4-9. Membership dues are the funding source for unions, and termination of the primary method by which members currently pay their dues will dramatically reduce Plaintiffs' resources and cripple their ability to serve their members. Kelley Decl. ¶ 10; Erwin Decl. ¶¶ 33-34; Sutton Decl. ¶ 18; Blake Decl. ¶ 12.

## LEGAL STANDARD

To obtain a temporary restraining order, a movant must show (1) "a likelihood of success on the merits," (2) "irreparable harm in the absence of preliminary relief," (3) a "favorable balance of the equities," and (4) that an injunction is in the public interest. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). The "last two factors merge" when the government is a party. *Id.*

## ARGUMENT

Plaintiffs are entitled to a temporary restraining order enjoining the implementation of the Exclusion Order. As described below, Plaintiffs are likely to succeed on the merits of their claims that the Exclusion Order violates the First and Fifth Amendments and is *ultra vires*. Plaintiffs are suffering and will continue to suffer irreparable harm absent injunctive relief as a result of both the ongoing constitutional injury as well as the harms that flow from the Exclusion Order's elimination of Plaintiffs' statutory rights as exclusive bargaining representative, termination of contractual rights and protections, and financial injury. And the equities decidedly favor preserving the status quo while the parties litigate the constitutionality of the Exclusion Order.

## I. Plaintiffs are Likely to Succeed on the Merits

Plaintiffs' challenges to the Exclusion Order have a substantial likelihood of success on the merits. First, by retaliating against them for their speech and discriminating against them based on their viewpoints, the Exclusion Order violates the First Amendment. Second, the Order is *ultra vires* because it ignores the careful limitations that Congress placed on exclusions from Chapter 71 of Title 5 and instead seeks to carve out entire departments without regard to the statutory criteria and based on the extent to which a union's political views align with the President's agenda. And third, Defendants' termination of binding collective bargaining agreements pursuant to the Order violates Plaintiffs' and their members' Fifth Amendment rights.

At the outset, Plaintiffs note that the fact that the Exclusion Order purports to invoke "national security" does not salvage it from judicial scrutiny. As the Supreme Court has held, even "a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Hamdi v. Rumsfeld,* 542 U.S. 507, 536 (2004); *see also Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("even the war power does not remove constitutional limitations safeguarding essential liberties"). As a result, "federal courts routinely review the constitutionality of—and even invalidate—actions taken by the executive to promote national security, and have done so even in times of conflict." *Washington v. Trump*, 847 F.3d 1151, 1163 (9th Cir. 2017) (citing *Boumediene v. Bush*, 553 U.S. 723 (2008); *Aptheker v. Sec'y of State*, 378 U.S. 500 (1964); *Ex parte Endo*, 323 U.S. 283 (1944)). The same is true for statutory claims: "When confronting a statutory question touching on subjects of national security and foreign affairs, a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir. 2017).

Thus, while a bona fide national security concern may justify narrowly drawn impingements on constitutional rights, *see*, *e.g.*, *Twitter, Inc. v. Garland*, 61 F.4th 686, 699 (9th Cir. 2023), it "cannot be invoked as a talismanic incantation to support any exercise" of government power that abridges core constitutional rights. *United States v. Robel*, 389 U.S. 258, 264 (1967) ("[T]his concept of 'national defense' cannot be deemed an end in itself, justifying any

exercise of legislative power designed to promote such a goal."); *Askins v. Dep't of Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018) ("general assertions of national security" insufficient to justify content-based restrictions on speech); *Al Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("Simply saying 'military secret,' 'national security' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the [state secrets] privilege."). As the *Robel* Court emphasized: "Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment." 389 U.S. at 264. Thus, any assertion by the government that courts lack authority to evaluate whether the President's action "potentially contravene[s] constitutional rights and protections" because it was "motivated by national security concerns" is both contrary to law and "runs contrary to the fundamental structure of our constitutional democracy." *Washington*, 847 F.3d at 1161.

### A. Plaintiffs Have Article III Standing

Plaintiffs have standing to bring these claims as organizations and in their representational capacity. Organizations have standing to sue when government actions "perceptibly impaired their ability to perform the services they were formed to provide." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663, 677 (9th Cir. 2021); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (acknowledging that under *Havens Realty Corp v. Coleman*, 455 U.S. 363 (1982), injury that "directly affected and interfered with [an organization's] core business activities" provided standing). The Exclusion Order goes well beyond "perceptibly impair[ing]" Plaintiffs' missions to improve the working conditions of their member. It applies directly to the Plaintiffs and eliminates their rights at the Excluded Agencies and, as discussed above, renders it impossible for them to provide their core services to their members working there.

Plaintiffs have been directly injured by the Exclusion Order. The Exclusion Memorandum states that "unions lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" the Order. Exclusion

Memorandum at 3. This status brings with it statutory rights, 5 U.S.C. § 7114, which have now been stripped away from Plaintiffs. For example, Plaintiffs are no longer entitled to be present at formal discussions about grievances or in disciplinary interviews. *Id.* § 7114(a)(2). And they no longer have the right to negotiate with agencies to reach new binding CBAs. *Id.* § 7114(b). Government action which "fundamentally diminishe[s]" union bargaining power by barring the ability to reach a binding CBA is a sufficient injury to provide standing. *NTEU v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006); *see also Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011) (refusal to bargain with union likely to cause irreparable harm).

Furthermore, Plaintiffs also face direct pecuniary harm from the elimination of payroll deductions from members due to the Exclusion Order. The Exclusion Memorandum instructs agencies to end these deductions—the main way that federal employees pay their voluntary union dues to each Plaintiffs—after terminating Plaintiffs' contracts. Exclusion Memorandum at 6. And agencies are already beginning to do so. *See supra* at 14. If not enjoined, the elimination of payroll dues deduction will dramatically reduce the resources available to each Plaintiff to serve their members—in other words, the "funding on which the [o]rganizations critically depend is also jeopardized by" the Exclusion Order. *E. Bay Sanctuary Covenant*, 993 F.3d at 663.

Each of these harms are directly caused by the Exclusion Order and Defendants' implementation thereof, and would be redressed by enjoining its unlawful removal of Chapter 71 protections from those working at the Excluded Agencies. Plaintiffs also have standing to challenge the Exclusion Order on their members' behalf because those members would have standing to do so, the interests protected "are germane to the organization's purpose," and these claims do not require individual member participation. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681 (9th Cir. 2023) (en banc). Like the Plaintiffs themselves, their members working at Excluded Agencies have lost their protections guaranteed by Chapter 71, as well as their collective bargaining agreements, a concrete injury which would be redressed by the requested injunctive relief. *See, e.g.*, Lien Decl. Ex. 1; Soldner Decl. Ex. 1; Radzai Decl. ¶ 11.

**B. The Exclusion Order Violates the First Amendment**

When the government "effectively punishes many organizations and their members merely because of their political beliefs and utterances," this "smacks of a most evil type of censorship" that "cannot be reconciled with the First Amendment." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143 (1951) (Black, J. concurring). The Exclusion Order smacks of precisely this type of censorship and is squarely prohibited by the First Amendment.

**1. The Exclusion Order Retaliates Against Plaintiffs for Constitutionally Protected Speech and Petitioning.**

"[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) it engaged in "constitutionally protected activity"; (2) it was "subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) there was a "substantial causal relationship" between the protected activity and the adverse action. *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022). A plaintiff need only show an intention to interfere with First Amendment rights and "some injury as a result"—it need not demonstrate actual suppression of speech. *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Plaintiffs are likely to succeed in establishing these elements.

*First*, there is no question that Plaintiffs have engaged in activity protected by the First Amendment. As discussed above, Plaintiffs have repeatedly engaged in public speech and petitioning activity that has been critical of many aspects of President Trump's agenda, including making public statements, filing lawsuits challenging the validity of executive actions, and filing grievances to enforce the terms of existing contractual agreements. *See* Facts § A *supra*; *see generally* Ricci Decl. ¶¶ 5-48; Huddleston Decl. ¶¶ 5-57; Ury Decl. ¶¶ 15-24; Burke Decl. ¶ 8.

These actions are indisputably protected by the First Amendment. Filing lawsuits against the government and "criticisms of public officials" are "high in the hierarchy of First Amendment values." *Lozman*, 585 U.S. at 101; *see also BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) ("right to petition" is "one of the most precious of the liberties safeguarded by the Bill of Rights");

*Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."); *Entler v. Gregoire*, 872 F.3d 1031, 1042 (9th Cir. 2017) (threatening to sue the government is protected First Amendment activity, as is "*actually* suing"). The First Amendment's petitioning clause also protects the right to seek redress through administrative and other processes established by the government. *See*, *e.g.*, *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) ("This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."); *Fishman v. Clancy*, 763 F.2d 485, 487 (1st Cir. 1985) (grievances filed by teacher are "First Amendment activities"). Thus, Plaintiffs will be able to establish they have engaged in activity protected by the First Amendment.

*Second*, the Exclusion Order clearly constitutes an adverse action that serves to chill protected speech. The Exclusion Order eliminates statutory labor law rights that Plaintiffs and their members have enjoyed for decades. Pursuant to the Exclusion Order, the Office of Personnel Management immediately instructed the heads of all departments and agencies that all covered agencies "are no longer required to collectively bargain with Federal unions" and that the unions representing employees at the covered agencies, which includes all Plaintiffs, immediately "lose their status" as the exclusive bargaining representative for those employees. Kelley Decl. Ex. 2. The harm flowing from the Exclusion Order has been both swift and substantial. *See* Facts § D *supra*. In some instances, the Exclusion Order threatens the very existence of the union in its current form. Kelley Decl. ¶¶ 8-11; Holway Decl. ¶ 4.

The significant damage that the Exclusion Order has caused and will continue to cause to Plaintiffs and their members would certainly "chill a person of ordinary firmness" from engaging in speech and petitioning activity that is critical of President Trump's agenda. *Ariz. Students' Ass'n*, 824 F.3d at 868-70 (eliminating fee collection and remittance in response to First Amendment activity chills speech). This is further heightened by the fact that it is the President himself who has taken the retaliatory action. "The power that a government official wields" is a relevant factor in assessing the deterrence effect of the adverse action. And as the Court has explained, "the greater and more direct the government official's authority, the less likely a person

will feel free to disregard a directive from the official." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191-92 (2024). The coercive effect is thus at its apex here.

Indeed, the chilling effects of the Exclusion Order cannot be overstated. The Order eliminates collective bargaining rights at the Department of Defense and Department of Veterans Affairs effective immediately but then simultaneously delegates to the Secretaries of Defense and Veterans Affairs the authority to "suspend[]" the application of the Exclusion Order at "any subdivisions of the departments they supervise." Exclusion Order, § 4. It also delegates authority to the Secretary of Transportation to *eliminate* bargaining rights at subdivisions of the Department of Transportation, which was not among the initial list of Excluded Agencies. *Id.* § 5. And the Order also directs the head of every agency at which bargaining rights remain to submit a report to the President within 30 days that identifies additional agency subdivisions that should be added to the Exclusion Order. *Id.* § 7. Critically, however, there is a price that must be paid by a union that seeks to either regain or maintain labor law protections for themselves and their members. As the White House Fact Sheet expressly states: "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." Thus, the message is clear that to avoid the draconian effects of the Exclusion Order, unions must fall in line with the President's agenda, cease all efforts to speak out against or challenge in court the President's policies, and demonstrate to the President's satisfaction that they will "work with him" in the future. Soriano Decl. ¶ 10 ("I am reluctant to criticize the administration or voice political views the administration may not approve of, for fear of further retaliation."); *see also, e.g.*, Robinson Decl. ¶ 23; Sung Decl. ¶ 8; Ruddy Decl. ¶ 13; Barclay Decl. ¶ 11. The Fact Sheet sends an equally clear message to those unions not yet fully covered by the Order: refrain from engaging in speech or petitioning activity that is critical of the President or else suffer the same fate as Plaintiffs. Ronnenberg Decl. ¶ 15 ("This fear is heightened by the fact that the FAA is among a small number of agencies specifically named in the EO as agencies that may have collective bargaining rights stripped away.").

*Finally*, Plaintiffs will be able to establish the requisite causal relationship between the exercise of their First Amendment rights and the adverse action in the Exclusion Order because

that retaliatory motive is expressly stated in the Fact Sheet accompanying the Exclusion Order. The White House Fact Sheet declares that "certain Federal unions have declared war on President Trump's agenda" and then specifically calls out AFGE, the "largest Federal union," for "'fighting back' against Trump." Kelley Decl. Ex. 3. The AFGE statement quoted by the White House in the Fact Sheet is taken from an article published by AFGE on its website in which it detailed numerous actions it had taken in opposition to many aspects of President Trump's agenda, including making public statements, lobbying members of Congress, and filing lawsuits challenging various executive actions. Huddleston Decl. Ex. 1; *see also* Waco Compl. ¶ 172.

The Fact Sheet then goes on to specifically call out the "VA's unions" because they have been filing "national and local grievances over President Trump's policies since the inauguration." Kelley Decl. Ex. 3. The "VA's unions" referenced include NNOC/NNU and NAGE, as well as affiliates of AFGE, who have been active in exercising their legal right to challenge through the grievance process actions that violate their rights under existing collective bargaining agreements. *See supra* at 5. And immediately following issuance of the Exclusion Order, a White House spokesperson confirmed that the Order was designed to attack unions who were opposing the President's agenda: "The goal [of the Exclusion Order] is to stop employees in certain security-related agencies from unionizing *in ways that disrupt the president's agenda*."[7]

Thus, by the White House's own statements, it is clear that the Exclusion Order targets federal unions because they have engaged in speech and petitioning activity critical of President Trump's agenda. Indeed, the Fact Sheet states that it is "hostile Federal unions" that necessitated the action taken in the Exclusion Order. Kelley Decl. Ex. 3 ("The CSRA enables hostile Federal unions to obstruct agency management."). This "expressed opposition" to Plaintiffs' speech is clear evidence that retaliation was a "substantial or motivating factor" behind the adverse action. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003); *see also Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024), *appeal*

---

[7] Rebecca Davis O'Brien, *Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts*, New York Times, https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html (Mar. 29, 2025) (emphasis added).

*dismissed sub nom. Media Matters for Am. v. Paxton*, No. 24-7141, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025) (the government's "public statements are direct evidence of retaliatory intent"); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, Case 1:25-cv-00917-RJL,2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) (relying on White House statements in the "Fact sheet published the same day" in finding executive order was retaliatory).

The President's retaliatory motive is further reinforced by both the content of the Order and its timing. The Exclusion Order was issued two weeks after a federal court granted a motion for preliminary injunction in a lawsuit brought by AFGE, AFSCME, and other unions and non-profit organizations requiring reinstatement of thousands of fired probationary workers at the Departments of Veterans Affairs, Agriculture, Interior, Energy, Defense, and Treasury. *See AFGE v. OPM*, No. C-25-01780-WHA, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025). Each of the departments or subdivisions listed in the Exclusion Order are staffed by employees on whose behalf Plaintiff litigated. Plaintiffs had obtained additional court victories in other lawsuits challenging the legality of President Trump's actions in the days leading up to issuance of the Exclusion Order. *See supra* at 3; *see also Ariz. Students' Ass'n*, 824 F.3d at 870 ("[T]emporal proximity between the protected activity and alleged retaliatory conduct" is evidence of retaliatory motive.). And although purporting to exclude agencies on national security grounds, the Order expressly retains collective bargaining rights for "police officers, security guards, or firefighters" at those very same agencies *except* "the Bureau of Prisons," whose employees lose their labor law rights. Exclusion Order, § 1-499(a). The wholesale exclusion of the Bureau of Prisons while otherwise retaining collective bargaining rights for other law enforcement and security guard employees can only plausibly be explained by the fact that AFGE and its affiliated subordinate bodies represent all bargaining unit employees at the Bureau of Prisons. B. White Decl. ¶ 5. Such incongruities "raise[] serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 774 (2018); *see also Coszalter*, 977-78 (retaliation can be shown by evidence that proffered reasons for the adverse action were "false and pretextual").

MEM. OF POINTS & AUTHORITIES ISO MOT. FOR TRO Case No. 3:25-cv-03070-JD

Indeed, the Exclusion Order Fact Sheet is not the first time AFGE has been called out by name for engaging in speech and petitioning activity opposing President Trump's policies. In February 2025, Elon Musk, who runs the President's Department of Government Efficiency, reposted on X a post attacking a coalition of organizations who have filed legal challenges to various Trump Administration policies, characterizing the group as conducting a "coordinated hit job" on President Trump's agenda. Kelley Decl. Ex. 5. The post called out AFGE, AFSCME, and NFFE directly by name and claimed "[a]lmost every single lawsuit that has been filed against the second Trump administration has come from this group." *Id.*

The Exclusion Order follows a pattern by the Trump Administration to target those who engage in politically disfavored speech or associate with people the President dislikes. For example, President Trump issued punitive Executive Orders targeting law firms because they represented clients or causes disfavored by President Trump. *See supra* at 4 n.5. As the court found in granting WilmerHale's motion for temporary restraining order, "[t]here is no doubt this retaliatory action chills speech and legal advocacy, or that it qualifies as constitutional harm." *Wilmer*, 2025 WL 946979, at *1.[8] The Trump administration's desire to retaliate against and suppress speech and petitioning activity critical of its policies is further demonstrated by its rescission of the Paul Weiss executive order. The rescission was conditioned on an agreement by Paul Weiss to spend $40 million on pro bono work that aligns with the Administration's views, *see* Exec. Order, *Addressing Remedial Action by Paul Weiss* (Mar. 21, 2025)—chillingly similar to the directive in the Exclusion Order Fact Sheet that "President Trump welcomes partnerships with unions who work with him." *See Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) (retaliation against one employee tells "others that they engage in protected activity at their peril").

\* \* \*

The First Amendment "prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored

---

[8] Courts similarly enjoined the Perkins Coie and Jenner & Block executive orders. *Perkins Coie LLP v. U.S. Dep't of Just.*, 25-716 (BAH), 2025 WL 782889 (D.D.C. Mar. 12, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, 2025 WL 946993 (D.D.C. Mar. 28, 2025).

speech." *Vullo*, 602 U.S. at 189 (cleaned up). The Exclusion Order is a quintessential example of coercive government action aimed at suppressing constitutionally-protected speech and petitioning activity with which the President disagrees. Such an action is antithetical to the First Amendment.

### 2. The Exclusion Order Is Impermissible Viewpoint Discrimination.

The Exclusion Order violates the First Amendment in another way as well because it discriminates against federal unions based on viewpoint. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. As the Supreme Court has long held, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." W. *Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Viewpoint discrimination is "an egregious form of content discrimination," and thus the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

As discussed above, the Fact Sheet accompanying the Exclusion Order expressly acknowledges that it is targeting federal unions based on their viewpoint. The Fact Sheet takes aim at "hostile" federal unions who have "declared war on President Trump's agenda." Fact Sheet. It specifically targets AFGE for "describ[ing] itself as 'fighting back' against Trump." *Id*. And it makes clear that unions can avoid the punitive measures in the Exclusion Order if they choose to "work with" President Trump. *Id.* Thus, it is undeniable that the Exclusion Order targets unions who have been critical of President Trump's agenda and have publicly expressed those views through constitutionally-protected speech and petitioning activity.

The Supreme Court has repeatedly held that the government "cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Such actions are even more problematic where, as here, the viewpoint discrimination is directed at those who have challenged the legality of the President's expansive assertions of executive authority through normal constitutionally-protected channels. As the Court has cautioned, "[w]e must be vigilant"

when the government takes coercive action to "in effect insulate its own laws from legitimate judicial challenge." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001).

By the White House's own statements, the Exclusion Order strips collective bargaining rights from those federal unions that have been "fighting back" against the President's agenda while "welcom[ing] partnerships" with unions who align their views with the President. Such action is a "blatant" violation of the First Amendment. *Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.").[9]

## C. The Exclusion Order's Attempt to Carve Out Most Federal Workers from Bargaining Rights is *Ultra Vires*

The President's issuance of the Exclusion Order and its implementation by Agency Defendants is *ultra vires* because President Trump's Exclusion Order far exceeds the narrow limits that Congress authorized for removing agencies and subdivisions from federal labor law protections. Congress established two prerequisites for when the President can exclude agencies or subdivisions from Chapter 71 and therefore exclude those agencies' employees from the federal labor protections that Congress provided them: there must be a determination (1) that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) that Chapter 71 "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b). If the President could use this as a fig leaf to strip bargaining rights from most federal workers, it would wrest power from Congress, undermine Congress's judgment that "the statutory protection of the right of employees to organize [and] bargain collectively…safeguards the public interest," 5

---

[9] Viewpoint discrimination is generally "forbid[den]" under the First Amendment, *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984), and in any event the government will not be able to establish that the Exclusion Order is narrowly tailored to serve a compelling interest. The President has no authority under Ch. 71 of the CSRA to eliminate collective bargaining rights based on a union's hostility towards the President's agenda. And the Exclusion Order is both vastly overinclusive, *see infra* at 29-30, and notably underinclusive, *see supra* at 6, which raises "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

U.S.C. § 7101(a), and allow this narrow exception to destroy the rule. The White House has already made clear that the Exclusion Order was issued to retaliate against hostile unions instead of serve national security interests. *See* §I.B *supra*. But even if that were not the case, the overbreadth of the Exclusion Order further shows that the President did not in fact comply with Congress's carefully prescribed requirements to remove agencies and subdivisions from coverage of the federal collective bargaining framework.

To start, this Court has jurisdiction to ensure the President's compliance with Chapter 71. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)), *vacated and remanded on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021). This is true even when challenging action taken by the President. *Murphy Co. v. Biden*, 65 F.4th 1122, 1128-32 (9th Cir. 2023).

*First*, the Exclusion Order contravenes the requirements of Chapter 71 because its wide breadth eliminates rights at countless agencies and subdivisions that do not have as their primary function "intelligence, counterintelligence, investigative, or national security work." *Id.* § 7103(b)(1). Statutory context and decades of consistent practice confirms that this definition is a narrow one. And even a glance at the agencies contained within the Exclusion Order shows that this determination was not—and could not be—actually made for each.

Determining the meaning of statutory exceptions requires examining "the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Ray v. Lara*, 31 F.4th 692, 701 (9th Cir. 2022) (internal quotations omitted); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (the "words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Here, permitting Section 7103(b) to allow the removal of bargaining rights from most federal workers would "allow[] the exception to swallow the rule, thereby undermining the purpose of the statute itself." *See NFFE v. McDonald*, 128 F. Supp. 3d 159, 172 (D.D.C. 2015) (cautioning against "overly broad constructions of 'direct patient care'" exclusion for VA bargaining). In *McDonald*, this meant that a provision governing topics excluded from

collective bargaining for certain VA employees should be read narrowly, in light of the fact that Congress enacted the overall act to clarify that VA medical professionals had collective bargaining rights. As the court explained, "[i]f any proposal touching on how nurses do their job would be excluded from collective bargaining, then what would be left for unions and the VA to bargain over?" *McDonald*, 128 F. Supp. 3d at 172.

By enacting Chapter 71, Congress intended to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. 29186 (Sept. 13, 1978) (statement of Rep. Clay). When read in context with Congress's federal bargaining framework—finding that bargaining "safeguards the public interest," 5 U.S.C. § 7101, reserving extensive management rights to agencies including the right to "take whatever actions may be necessary to carry out the agency mission during emergencies," excluding agencies like the CIA and NSA, and excluding employees "engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security" from bargaining units *id.* § 7112(b)(6)—it is clear that Section 7103(b)'s position "as an *exception* to the rule . . . indicates that Congress intended [it] to apply narrowly." *Ray*, 31 F.4th at 700. Here, Congress "could not have meant this narrow exception to swallow the rule" that employees throughout the government should have bargaining rights. *Id.* at 701. And Chapter 71 must be read to avoid granting "management the protection that it was unable to secure from Congress" and "not to impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." *OPM v. FLRA*, 864 F.2d 165, 168 (D.C. Cir. 1988) (internal quotations omitted).

Indeed, the Supreme Court recognized that a "national security" exception to generally applicable labor protections for federal employees must be read narrowly, explicitly rejecting a broad reading that would destroy the federal employment framework. In *Cole v. Young*, the Court considered an act which permitted agency heads to, in their "absolute discretion and when deemed necessary in the interest of national security" suspend employees, and ultimately terminate them "whenever [they] shall determine such termination necessary or advisable in the interest of the national security of the United States." 351 U.S. 536, 541 (1956). The Court concluded that the statutory context called for a "narrow meaning," that included "only those activities of the

Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the nation only through their impact on the general welfare." *Id.* at 544. The Court rejected the government's effort to put forward an "indefinite and virtually unlimited meaning" for national security, and it cautioned that an overly broad meaning would result in the "1950 Act, though in form but an exception to the general personnel laws" being "utilized effectively to supersede those laws." *Id.* at 547.

The Exclusion Order instructed agencies to "apply[] the definition of 'national security' set forth by the Federal Labor Relations Authority in *Department of Energy, Oak Ridge Operations, and National Association of Government Employees Local R5-181*, 4 FLRA 644 (1980)" when determining if other subcomponents should be excluded from Chapter 71. That very case confirms that "national security" must be read narrowly because Congress has determined "collective bargaining in the civil service . . . to be 'in the public interest,'" defining the term as "only those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the [U]nited [S]tates, including the security of the government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense." *Oak Ridge*, 4 FLRA at 655-56. The Fact Sheet accompanying the Exclusion Order shows this definition was not applied: the mere fact that an agency "collects the taxes that fund the government and ensures the stable operations of the financial system" does not show it acts to protect the nation's strength from espionage and the like.

The exception's narrow scope is confirmed by decades of practice. While multiple presidents have used their authority under 5 U.S.C. § 7103(b), they have never used it to exclude an entire Cabinet-level agency, but instead have carefully selected subdivisions thereof. *See, e.g.,* Exec. Order 12171, 44 Fed. Reg. 66565 (Nov. 19, 1979) (excluding, *inter alia*, six intelligence-focused "[a]gencies or subdivisions of the Department of the Army, Department of Defense"); Exec. Order 12410, 48 Fed. Reg. 13143 (Mar. 28, 1983) (excluding the Joint Special Operations Command, a subdivision under the jurisdiction of the Joint Chiefs of Staff); Exec.

Order 13039, 62 Fed. Reg. 12529 (Mar. 11, 1997) (excluding the Naval Special Warfare Development Group, a subdivision of the Department of the Navy, Department of Defense).

The White House stated the President exercised his authority "to end collective bargaining with Federal unions in the following agencies with national security missions." Fact Sheet. But even a cursory examination of which agencies were excluded shows that the Order was not based on an actual determination of which agencies had a primary function of national security.[10] For example, consider USDA's Animal Care Program, contained within the excluded Animal and Plant Health Inspection Service. Plaintiff NFFE represents workers in two areas within the program: Animal Welfare Operations, which inspects commercial facilities including breeders, zoos, and research facilities to ensure animal welfare, and Horse Protection, which examines whether horses have been subjected to "soring," where painful substances are applied to exaggerate their gait. Radzai Decl. ¶ 4. While the Animal Care Program has a valuable mission, it cannot seriously be contended that its primary function is national security.

Likewise, Plaintiffs AFGE and NAGE represent employees working at the Environmental Protection Agency in positions including program analysts, biologists, chemists, and lawyers. Powell Decl. ¶ 4. EPA's mission is to "protect human health and the environment." Waco Compl. ¶ 110. While the work done at EPA is critical to improving the "general welfare," *Cole,* 351 U.S. at 544, its primary function is not national security. *See also, e.g.*, Taylor Decl. ¶ 3 (explaining that the Exclusion Order removed bargaining rights from thousands of federal employees who work at the grocery stores on military bases); Garvey Decl. ¶ 4 (employees working in real estate management for the GSA, including "historic preservation specialists").

Furthermore, the Exclusion Order's inclusion of the VA shows that no actual determination of primary agency function was made as required by 5 U.S.C. § 7103(b). Each Plaintiff represents members at the VA, with employees spread across the agency serving veterans in roles including

---

[10] Indeed, the government's own words again belie their national security rationale. Federal employees represented by Plaintiffs at Excluded Agencies were offered the government's "Deferred Resignation Program," *see* Cameron Decl. ¶ 6, which was not available for employees in "positions related to…national security." *See* https://www.opm.gov/fork/original-email-to-employees/.

pharmacists, chaplains, claim examiners, canteen staff, registered nurses, food service workers, groundskeepers, and cemetery workers. *See* Burke Decl. ¶ 4; Sutton Decl. ¶ 10; Blake Decl. ¶ 8; Lanham Decl. ¶ 7; Shapiro Decl. ¶ 3.

Congress plainly dictated the primary function of the VA and its biggest subcomponents, and "national security work" is nowhere to be found. The purpose of the VA "is to administer the laws providing benefits and other services to veterans and the dependents and the beneficiaries of veterans." 38 U.S.C. § 301. The VA's Veterans Health Administration has the "primary function…to provide a complete medical and hospital service for the medical care and treatment of veterans." *Id.* § 7301. And the "primary function" of the Veterans Benefits Administration "is the administration of nonmedical benefits programs . . . which provide assistance to veterans and their dependents and survivors." *Id.* § 7701(a). The VA and its employees do crucially important work for our nation's veterans, but this is not a "sensitive activit[y]" protecting the nation's strength against "foreign aggression" or the like. *Oak Ridge*, 4 FLRA at 655-56. The government's contention that the VA "serves as the backstop healthcare provider for wounded troops in wartime," Fact Sheet, is clearly not a *primary* function of the agency in light of Congress's express language and common sense.[11]

*Second*, the Exclusion Order exceeds the President's statutory authority because the administration has admitted that agencies are being excluded not because Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements and considerations," but instead due to the President's disapproval of the very concept of collective bargaining and his efforts to punish unions who will not "work with him."

Congress has granted much discretion to agency management: statutory management rights include *inter alia* determining the agency's "mission" and "internal security practices," as well as

---

[11] Congress's intention to permit collective bargaining at the VA is further affirmed by a 1991 law clarifying that VA medical and scientific professionals hired under an alternative hiring authority have the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by them in accordance with chapter 71 of title 5." 38 U.S.C. § 7422. This would be rendered a nullity if the President was permitted to exclude the VA on pretextual national security grounds.

the right "to take whatever actions may be necessary to carry out the agency mission during emergencies." 5 U.S.C. § 7106. The President's supposed determination that Chapter 71 cannot be applied consistent with national security considerations is belied by decades of past practice, including during President Trump's last term, where workers at the Excluded Agencies have retained their statutory rights and CBAs without harming national security.

This incongruity is explained by the Fact Sheet accompanying the Exclusion Order. The Fact Sheet makes clear that the Exclusion Order is based not on the President's analysis of whether Chapter 71 is compatible with national security at a particular agency, but instead whether unions are "work[ing] with him." Indeed, the Fact Sheet not only demonstrates the Exclusion Order's retaliatory animus against Plaintiffs based on their speech and petitioning activity, *see* § I.B *supra*, but it also shows that the Exclusion Order is hostile to the policy of the CSRA itself. Kelley Decl. Ex. 3 ("The CSRA enables hostile Federal unions to obstruct agency management."). The CSRA expresses Congress' judgment that the public interest in an efficient, competent civil service that attracts and retains the best employees is served by a system in which there is a balance of power between agency management and *independent* employee representatives, not employee representatives in name only who are in fact beholden to management and must toe the Administration's line. *See Janus v. AFSCME Council 31*, 585 U.S. 878, 910 (2018) (rejecting argument that public sector union's speech "is really the employer's speech" because otherwise "the employer could dictate what the union says" which "distorts" the collective bargaining process "beyond recognition").

In short, neither of the two determinations that Congress required for exclusion have been made, and Congress did not permit exclusions based on the union's political views or opposition to the President's agenda. The Order is therefore *ultra vires*.

**D. The Exclusion Order Violates the Fifth Amendment**

### 1. The Exclusion Order Violates the Fifth Amendment Because the Federal Government Cannot Make and then Repudiate a Binding Contract.

The repudiation of Plaintiffs' collective bargaining agreements also violates the Fifth Amendment rights of Plaintiffs and their members. When the United States enters into a contract,

"its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *United States v. Winstar Corp*, 518 U.S. 839, 895 (1996) (citing *Lynch v. United States*, 292 U.S. 571, 579 (1934)). Accordingly, when the government repudiates a contract, it "is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." *Lynch*, 292 U.S. at 580 (quoting *The Sinking Fund Cases*, 99 U.S. 700, 719 (1878)). Because valid government contracts are "property and create vested rights," *id*. at 577, "rights against the United States arising out of a contract with it are protected by the Fifth Amendment," *id*. at 579.[12] As such, "sovereign authority cannot be exercised to invalidate, release or extinguish" government contracts, or to take action "which without destroying [the] contracts derogate[s] from substantial contractual rights." *Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*, 850 F. Supp. 1388, 1402 (E.D. Cal. 1994) (citing *Thorpe v. Hous. Auth. of Durham*, 393 U.S. 268, 279 (1969)); *see also Madera Irrigation. Dist. v. Hancock*, 985 F.2d 1397, 1401 (9th Cir. 1993).

Collective bargaining agreements are legitimate and binding contracts that cannot be repudiated by the government.[13] That is true even if the terms of the agreement constrains the exercise of an otherwise legitimate—even constitutionally protected—power. In *Perry v. United*

---

[12] Any doubt that the CBAs here are the type of contract that creates a property right is dispelled by the separate proposition that government employees have a property interest in their employment, the subject matter of the CBAs. *See Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *Int'l Union, United Gov't Sec. Officers of Am. v. Clark*, 706 F. Supp. 2d 59, 65 (D.D.C. 2010), *aff'd sub nom. Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25 (D.C. Cir. 2014) (determining that the just cause provision in a federal sector CBA constituted a property interest, even when the CBA also significantly limited the scope of that protection).

[13] There are only two potential exceptions to that rule, neither of which applies. *Lynch* suggested, without elaborating, that the government may be able to repudiate a contract if its action "falls within the federal police power or some other paramount power." 292 U.S. at 579. The Exclusion Order does not purport to invoke either of these exceptions. "[F]ederal police power" has no application here. As for "paramount power," federal courts appear to have only applied that exception to the Congressional "War Powers" under Article I, Section 8. *See, e.g., Schwartz v. Franklin*, 412 F.2d 736, 738 (9th Cir. 1969) ("[T]he Congressional War Powers permit at least the minimal breach of [an] enlistment contract."); *Larionoff v. United States*, 533 F.2d 1167 (D.C. Cir. 1976). In *Larionoff*, the D.C. Circuit rejected the government's argument that a statute depriving plaintiffs of their reenlistment bonuses was constitutional because it was meant to "fill critical and shortage skill requirements in the armed services," concluding instead that "Congress was primarily concerned with reducing government expenditures." 533 F.2d at 1180.

*States*, Congress passed a law to substitute the currency with which a previously issued government bond would be paid, thus lessening the value of the bond. 294 U.S. 330, 347 (1935). The government defended the statute, characterizing the change as a lawful exercise of its constitutional authority to "regulate the value of money, borrow money, or regulate foreign and interstate commerce." *Id.* at 350. The government further argued that an earlier Congress had no authority to bind a future Congress as to the exercise of its enumerated powers. *Id*. The Court soundly rejected those arguments. It reasoned that "the right to make *binding* obligations is a competence attaching to sovereignty," *id.* at 353 (emphasis added), and that it would fundamentally betray that sovereignty were the government permitted to "ignore" its earlier commitments, a power that would render all such commitments "illusory." *Id.* at 350.[14]

Here, it is important to be clear about the nature and provenance of the agreements at issue. Congress, finding that federal sector bargaining was "in the public interest," passed a statute giving the vast majority of federal employees the right to collectively bargain through an elected union representative. 5 U.S.C. §§ 7101-7102. That statute included a narrow "carve-out" by which the President could determine that certain groups of employees whose primary national security role was incompatible with collective bargaining could be excluded from that right. 5 U.S.C. § 7103(b). Since 1979, many (but not all) included federal workers have organized, elected representatives, and negotiated and entered into binding contracts with the *President and his designees*—contracts that set certain terms and conditions of employment, established procedures for resolving disputes, and obligated both parties to abide by those agreements for their negotiated terms. Hundreds of CBAs have been negotiated, altered, and ratified by the Executive Branch over the nearly five decades since Chapter 71 was passed.

---

[14] Importantly, this is not necessarily true for federal interference with contracts between private parties. *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 472 & n.24 (1985) ("There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements.") (quoting *Perry v. United States*, 294 U.S. 330, 350-51 (1935)).

Critically, neither the Exclusion Order nor the accompanying Fact Sheet asserts that an emergency or other compelling need exists to immediately terminate existing contracts or retroactively close off remedies for prior contract violations through the established grievance process. Rather, President Trump now claims the authority to simply tear up CBAs he does not like. But just like in *Perry*, in which Congress was bound by the commitments of an earlier Congress it disagreed with, President Trump is also bound by the commitments of his predecessor, even if he finds them "inconvenient." 294 U.S. at 350. He certainly cannot repudiate them in retaliation for Plaintiffs' protected speech. *See* § I.B *supra*. Moreover, even setting aside the President's retaliatory motive, his pretextual rationale also falls short. *Lynch* and *Perry* are clear that the government may not forego its contractual obligations to "reduce expenditures." *Lynch*, 292 U.S. at 580; *Perry*, 294 U.S. at 352. Likewise, the President cannot nullify a contract (let alone hundreds) in the name of an "Effective and Efficient Government." Exclusion Memorandum at 5. President Trump may feel that the CBAs in this case are "onerous," Waco Compl. at 15, or that the inevitable push and pull between management and labor thwarts his political "agenda."[15] But the Fifth Amendment dictates that he cannot respond by rescinding those contracts. That rule applies even if the President believes that a nimbler, more malleable bureaucracy would be good for the country, and even if he rebrands the centralization of his authority across the broad swath of the federal government as "national security." There are no magic words that let one administration repudiate the commitments of the last. Although Congress gave the President the power to exclude some federal employees from the *process* of collective bargaining, it did not (and could not) give him the power to abrogate the binding contracts entered into by his predecessor.

Finally, it is important note that none of this leaves the President without recourse to manage Executive Branch employees. Federal bargaining is far more limited in scope than its private sector equivalent, and the CBAs at issue reserve a broad array of management rights, including the authority to hire and fire public employees in accordance with law and take necessary

---

[15] Rebecca Davis O'Brien, *Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts*, New York Times, https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html, Mar. 29, 2025.

actions to carry out agency missions during emergencies. *See supra* at 11. The processes for doing those things have, in one form or another, persisted across hundreds of contracts spanning a half-century, all of which were negotiated and ratified by the Executive. Further, every CBA expires and must be renegotiated. President Trump is equally empowered to negotiate contracts that bind his successor as was his predecessor. As the Supreme Court has recognized for nearly a century, that is how it must be if the government is empowered to enter into binding agreements at all.

### 2. The Exclusion Order Violates the Fifth Amendment Because Plaintiffs and Their Members Did Not Receive Procedural Due Process.

The Exclusion Order is also illegal because it rescinded property rights without providing Plaintiffs or their members notice of the decision and an opportunity to respond, in violation of the Due Process Clause of the Fifth Amendment. In *Kashem v. Barr*, plaintiffs claimed the government violated their Due Process rights when it placed them on the "no-fly list." 941 F.3d 358, 364 (2019). Both the district court and the Ninth Circuit agreed that the government was constitutionally required to "follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests." *Id.* 364-65 (quoting *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012)).

Relying in part on case law from both the Supreme Court and the D.C. Circuit, the Ninth Circuit held that the Due Process clause requires, even in a national security context, that the "affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied[,] and be afforded an opportunity to rebut that evidence." *Kashem*, 941 F.3d at 384 (quoting *Ralls Corp. v. Comm. on Foreign Inv. in the U.S. (CFIUS)*, 758 F.3d 296, 319 (D.C. Cir. 2014)); *see also id.* at 384 n.12 (collecting cases that the government is obligated to disclose unclassified evidence even in national security scenarios). *Kashem* went on to hold that even the withholding of *classified* evidence must be accompanied by "reasonable measures" to mitigate any unfairness that might result, *id.* at 380, and that the invocation of national security to withhold that evidence was ultimately subject to judicial review, *id.* at 383. In *Ralls*, the plaintiff was granted the opportunity to present evidence as part of the review process; it answered questions from CFIUS and gave CFIUS a presentation about its transaction. 758 F.3d at 305. But

even that wasn't sufficient process, because the plaintiff "never had the opportunity to tailor its submissions to the [government's] concerns or rebut the factual premises underlying the President's action." *Id*. at 320. If those pre-decision interactions with CFIUS fell short of constitutionally-required due process, Plaintiffs' complete lack of notice of the President's impending decision or opportunity to be heard certainly fails to meet the standard.

Finally, to the extent that the government contends that an invocation of "national security" means that lesser process is due, *Kashem* and *Ralls* foreclose that argument. Like the present case, *Ralls* involved a presidential determination involving national security. 758 F.3d at 303 (evaluating statute authorizing President to "suspend or prohibit any covered transaction that threatens to impair the national security of the United States"). While that connection to national security supported the government withholding "the *classified* information," it did not "excuse the failure to provide notice of, and access to, the unclassified information" involved in the decision-making process. *Id*. at 320. Similarly, the stated rationale of national security here does not provide carte blanche to ignore constitutional due process requirements. As in *Ralls*, considering the process due "does not encroach on the prerogative of the political branches, does not require the exercise of non-judicial discretion and is susceptible to judicially manageable standards." *Id*. at 314.

### E. This Court has Jurisdiction to Hear Union Plaintiffs' Claims

As the government appears to concede (having sued AFGE affiliates in federal court in Texas seeking a declaration that certain Excluded Agencies may terminate their CBAs in the aftermath of the Exclusion Order), this is not the type of dispute that must be channeled to the administrative review process pursuant to *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).

The Exclusion Order carves out the Excluded Agencies from Chapter 71 in its entirety. Plaintiffs and their affiliates have lost their status as exclusive representatives of all bargaining unit employees at the Excluded Agencies. Exclusion Memorandum at 3; Lien Decl. Ex 1; Soldner Decl. Ex 1. Excluded Agencies are now refusing to participate in proceedings before the FLRA, Fragomene Decl. ¶¶ 7-10, as well as contractual grievance and arbitration procedures, J. White Decl. ¶ 8; Lien Decl. ¶ 7; Soldner Decl. ¶ 11. In short, the government has destroyed any administrative channel for relief that Plaintiffs may have had before the Exclusion Order. *See*

*AFGE Local 446 v. Nicholson*, 475 F.3d 341, 347-48 (D.C. Cir. 2007) (district court had jurisdiction because the challenged action was "expressly outside the FLRA's purview" and the union is "presumptively entitled to judicial review of its claim").

Here, the President's order excludes an agency "from coverage under this chapter." 5 U.S.C. § 7103(b)(1). The FLRA has held that it lacks jurisdiction to hear cases when such an exclusion occurs. *U.S. Att'ys Off. S. Dist. of Texas & AFGE Loc. 3966*, 57 FLRA 750 (2002). As such, this Court is the proper forum to challenge the Exclusion Order.

## II. Plaintiffs and Their Members Are Suffering Irreparable Injury Due to the Exclusion Order and its Implementation

Without an injunction, Plaintiffs face immediate irreparable harm due to the denial of their constitutional rights. "It is axiomatic that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fellowship of Christian Athletes*, 82 F.4th at 694; *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("Irreparable harm is relatively easy to establish in a First Amendment case. The plaintiff need only demonstrate the existence of a colorable First Amendment claim."). The chilling effect on the speech of unions and their members, especially as they now must lobby for restoration of bargaining rights from the VA and Defense Secretaries and convince the Secretary of Transportation (and other agency heads) that they will be cooperative with the President's agenda to maintain their bargaining rights, *see* Ronneberg Decl. ¶¶ 15-17 (describing chilled speech at FAA resulting from Order), cannot be remedied at the end of this litigation. Similarly, the deprivation of Fifth Amendment due process rights also "unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017) (internal quotation omitted).

Plaintiffs' members are also facing irreparable harm. The Exclusion Order has stripped them of their exclusive representative and CBA rights. "[T]he value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011); *see also Cefalo v. Moffett*, 1971

MEM. OF POINTS & AUTHORITIES ISO MOT. FOR TRO Case No. 3:25-cv-03070-JD

WL 797, at *3 (D.D.C. June 28, 1971) ("Ordinarily the loss of the rights, privileges and benefits of union membership constitutes irreparable harm sufficient to warrant injunctive relief.").

Plaintiffs' loss of bargaining power from the Exclusion Order will also cause irreparable harm. After losing exclusive representative status, they no longer can use the primary method by which they achieved gains for their members. Kelley Decl. ¶ 11; Ury Decl. ¶¶ 26-33; Cameron Decl. ¶ 8. Plaintiffs AFGE and NFFE also face losses of the majority of their membership from the Exclusion Order, which reduces their influence because a union's bargaining power is directly related to the number of employees that it represents. *See* Kelley Decl. ¶ 11. And even if bargaining rights are eventually restored to Plaintiffs' members, the unions will still have faced months or years of being blocked from providing their core services to its members, an injury which cannot be remedied at the conclusion of this litigation. The interim loss of bargaining power could manifest itself in making it more difficult to recruit members and bargain going forward. *See Small*, 661 F.3d at 1193 ("Whether or not the employer bargains with a union chosen by his employees is normally decisive of its ability to secure and retain its members.") (internal quotation omitted); *Hoffman v. Parksite Grp.*, 596 F. Supp. 2d 416, 423 (D. Conn. 2009) ("ongoing failure to recognize the union . . . could significantly damage employee confidence in the union and chill any effort to exercise their collective bargaining rights in the future").

And finally, Plaintiffs face irreparable harm due to their lost dues revenue. Agency implementation of the Exclusion Order will, and has already, directly cause the termination of voluntary dues deductions pursuant to 5 U.S.C. § 7115. While facts are rapidly developing, at least two Excluded Agencies have informed NFFE local unions that dues deduction is being stopped, Hinton Decl. ¶ 8; Radzai Decl. ¶ 11, and AFGE has yet to receive hundreds of thousands of dollars in dues that it would have ordinarily received on April 1. Bunn Decl. ¶¶ 4-6, Ex. 1. The Supreme Court has recognized that government impediments to payments with "no guarantee of eventual recovery" risks irreparable harm. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam). Because Plaintiffs "will suffer a significant change in their programs and a concomitant loss of funding absent a preliminary injunction," they have demonstrated injury for purposes of irreparable harm. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

## III. The Balance of Equities and Public Interest Favor Preliminary Injunctive Relief

When the government opposes injunctive relief, "the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant*, 993 F.3d at 668. In balancing the equities, there is no government harm to consider because the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And when it comes to the public interest, the Constitution and the CSRA are dispositive. As Congress recognized, "labor organizations and collective bargaining in the civil service are in the public interest," such that the President's attempt to strip away that right for most federal workers would clearly harm the public. 5 U.S.C. § 7101(a). "[T]he public has an interest in ensuring that the statutes enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant*, 993 F.3d at 679. And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their motion for temporary restraining order and enjoin the enforcement and implementation of the Exclusion Order.

DATED: April 7, 2025          Respectfully submitted,

*/s/ Leon Dayan*
Leon Dayan, SBN 153162
Abigail V. Carter*
Ramya Ravindran*
Lane M. Shadgett*
J. Alexander Rowell*
BREDHOFF & KAISER P.L.L.C.
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com
*Pro hac vice* application pending

Daniel Feinberg, SBN 135983
Catha Worthman, SBN 230399
Anne Weis, SBN 336480

FEINBERG, JACKSON, WORTHMAN
& WASOW, LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Attorneys for Plaintiffs American Federation of
Government Employees, AFL-CIO; American
Federation of State, County and Municipal
Employees, AFL-CIO; National Nurses Organizing
Committee/National Nurses United; Service
Employees International Union, AFL-CIO;
National Association of Government Employees,
Inc.; National Federation of Federal Employees,
IAM, AFL-CIO*

Rushab B. Sanghvi, SBN 302809
Andres M. Grajales*
American Federation of Government Employees,
AFL-CIO
80 F Street NW
Washington, D.C. 20001
Tel: (202) 639-6426
SanghR@afge.org
Grajaa@afge.org
*Application *pro hac vice* forthcoming

*Counsel for Plaintiff American Federation
of Government Employees (AFGE)*

Teague P. Paterson, SBN 226659
Matthew S. Blumin*
American Federation of State, County, and
Municipal Employees, AFL-CIO
1625 L Street NW
Washington, D.C. 20036
Tel: (202) 775-5900
Fax: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Pro hac vice* application pending

*Counsel for Plaintiff American Federation of State
County and Municipal Employees, AFL-CIO
(AFSCME)*

Nicole Daro, SBN 276948
National Nurses United
155 Grand Ave.
Oakland, CA 94612
Tel: (510) 207-8291
ndaro@calnurses.org

*Counsel for Plaintiff NNOC/NNU*

Steven K. Ury, SBN 199499
Service Employees International Union, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

*Counsel for Plaintiff Service Employees
International Union, AFL-CIO (SEIU)*

Sarah E. Suszczyk*
National Association of
Government Employees, Inc.
159 Thomas Burgin Parkway
Quincy, MA 02169
Tel: (617) 376-7239
ssuszczyk@nage.org
*Pro hac vice* application pending

*Counsel For Plaintiff National Association
of Government Employees (NAGE)*

Yvette M. Piacsek*
General Counsel
National Federation of Federal Employees, IAM,
AFL-CIO
1225 New York Avenue NW, Suite 450
Washington, D.C. 20005
Tel: (202) 216-4428
ypiacsek@nffe.org
*Pro hac vice* application pending

*Counsel for Plaintiff National Federation of
Federal Employees, IAM, AFL-CIO (NFFE)*