LEON DAYAN (State Bar No. 153162)
ABIGAIL V. CARTER*
RAMYA RAVINDRAN*
LANE M. SHADGETT*
J. ALEXANDER ROWELL*
**BREDHOFF & KAISER P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com
*Application *pro hac vice* forthcoming

Daniel Feinberg, SBN 135983
Catha Worthman, SBN 230399
Anne Weis, SBN 336480
**FEINBERG, JACKSON, WORTHMAN & WASOW, LLP**
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCICO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No.:  3:25-cv-03070-JD <br><br> **DECLARATION OF EVERETT KELLEY** |

**DECLARATION OF EVERETT KELLEY**

I, Everett Kelley, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the National President of the American Federation of Government Employees, AFL-CIO ("AFGE"), a labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.  AFGE federal employee members include nurses caring for our nation's veterans in the Department of Veterans Affairs, workers protecting human health and the environment, scientists conducting critical research, civilian employees in the Department of Defense supporting our military personnel and their families, correctional officers maintaining safety in federal facilities, health care workers serving on military bases, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

3.      I have been National President of AFGE since 2020.  Prior to that, I served in other national and local union leadership roles.  I was also a federal government employee for 34  years, working at Anniston Army Depot in Alabama.  I have been a proud member of AFGE since 1981.

4.      AFGE advocates on behalf of its members and seeks to promote dignity, safety, and fairness for all government employees. Our core functions include providing support, guidance, and resources to our affiliates, which are the officially recognized exclusive representatives of federal employees in various bargaining units.  AFGE is dedicated to fighting for dignity, safety, and fairness on the job for the workers in its bargaining units, and to promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

5.      AFGE represents more than 50,000 federal employees in the State of California, at agencies including, but not limited to, the Department of Veterans Affairs, the Small Business

Administration, the Environmental Protection Agency, and the Department of Defense. AFGE has several affiliates that represent employees in the San Francisco Bay Area, including employees at the San Francisco Veterans Health Care System, the Palo Alto VA Medical Center, and various Social Security Field offices and military installations.

6.     Membership in AFGE is voluntary.

7.     The March 27, 2025 Executive Order titled "Exclusions from Federal Labor Management Relations Programs" ("Executive Order") is causing harm to AFGE, AFGE's affiliated locals and councils, and AFGE's members.

8.     AFGE represents approximately 660,000 employees working in the agencies to which the Executive Order's restrictions on collective bargaining and exclusive union representation apply.  AFGE's affected members work in the Department of Health and Human Services, Department of Veterans Affairs, Department of the Interior, Department of Energy, Department of Agriculture, Department of Commerce, Environmental Protection Agency, National Science Foundation, United States Agency for International Development, Nuclear Regulatory Commission, International Trade Commission, General Services Administration, Department of Housing and Urban Development, Department of State, Department of Defense, Department of Homeland Security, Department of Justice, Department of Transportation, Office of Personnel Management, Department of Labor, Department of Education, and Social Security Administration.

9.     The Executive Order strips AFGE member workers in those agencies of fundamental collective bargaining rights, of their exclusive bargaining representatives, and of the rights and protections that are provided in their collective bargaining agreements.  By eliminating those rights and protections, the Executive Order cripples AFGE's ability to fulfill its mission of advocating for better working conditions for federal workers.

10.     AFGE's activities and staff are funded through our members' voluntary dues, most of which are paid through payroll deduction from their pay.  If AFGE can no longer receive dues through payroll deduction under the Executive Order, that will drastically reduce AFGE's

revenue and make it substantially more difficult for AFGE to advocate on behalf of its members and provide support, guidance, and resources to our affiliates

11. Under the Executive Order, numerous AFGE local unions or councils will likely cease to exist. Many other bargaining units will be eliminated or severely diminished in size. Based on decades of experience as a union leader, I know that a union's bargaining power derives from the number of employees it represents at an agency. Our voice as an organization is the collective voice of our members and the employees we represent. If a union cannot secure and defend a collective bargaining agreement on behalf of its members, it has very little ability to attract members and advocate effectively for workers at a given employer. By abolishing collective bargaining agreements and representational rights for almost all employees at these agencies, the Executive Order severely diminishes AFGE's and its affiliates' ability to represent workers at those agencies.

12. AFGE and its affiliates did not receive any prior notice, before the issuance of the Executive Order, of the Administration's intention to eliminate statutory collective bargaining rights from employees in the agencies listed above. Nor have AFGE or its affiliates received notice of the underlying unclassified evidence purportedly supporting the Administration's determination that those employees should be excluded from collective bargaining due to "national security" concerns. If AFGE and its affiliates had received notice, we would have objected and demonstrated why collective bargaining rights for these employees do not implicate national security concerns.

13. These injuries suffered by AFGE and its members are ongoing and imminent and will persist unless the Court intervenes.

14. AFGE has been a staunch opponent of the many actions taken by President Trump's Administration that harm federal workers, their families, and the public who rely on services provided by those workers. AFGE is a plaintiff in several recent and ongoing lawsuits challenging those actions. I am aware that these lawsuits have received national attention in the press.

Declaration of Everett Kelley                                                                 3
Case No. 3:25-cv-03070-JD

15.     AFGE has also issued many public statements that are critical of the current Administration's policies, including statements reported by the national media and in press releases on our website.  In my role as AFGE president, I have often provided quotes or otherwise participated in making these statements.  For instance, I am frequently quoted by nationwide press outlets; I regularly provide statements for AFGE's press releases; I have written an op-ed for a national publication and a letter to federal officials, all challenging the Administration's policies.

16.     I have also regularly appeared on national television, including on networks CNN, MSNBC, and CNBC, as well as on local stations, to discuss and criticize the Administration's policies.

17.     A true and correct copy of the March 27, 2025 Executive Order 14251 titled "Exclusions From Federal Labor-Management Relations Programs," which is available at and has been downloaded from the official U.S. government website of the White House at the following link, https://www.whitehouse.gov/presidential-actions/2025/03/exclusions-from-federal-labor-management-relations-programs/, is attached hereto as **Exhibit 1.**

18.     A true and correct copy of the March 27, 2025 memo by the U.S. Office of Personnel Management titled "Guidance on Executive Order *Exclusions from Federal Labor-Management Programs*," which is available at and has been downloaded from the official government website of the U.S. Office of Personnel at the following link, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf, is attached hereto as **Exhibit 2.**

19.     A true and correct copy of the March 27, 2025 White House publication titled "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirement," which is available at and has been downloaded from the official U.S. government website of the Whitehouse at the following link, https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-

Declaration of Everett Kelley                                                                                  4
Case No. 3:25-cv-03070-JD

agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/, is attached hereto as **Exhibit 3.**

20.     A true and correct copy of the complaint filed in the U.S. District Court for the Western District of Texas in the lawsuit captioned *United States Department of Defense, et al. v. American Federation of Government Employees* (W.D. Tex. No. 6:25-cv-119), which is available at and was downloaded from the official court website at https://ecf.txwd.uscourts.gov, is attached hereto as **Exhibit 4.**

21.     A true and correct copy of the post made by Elon Musk, @elonmusk, at 7:28 p.m. Pacific time on February 12, 2025, on X.com, which is available at and was downloaded from X.com at the link, https://x.com/elonmusk/status/1889879302965191056, and the embedded post from X user @DefiyantlyFree that Musk's post had reposted, which is available by clicking on Musk's post and was downloaded from X.com at the link, https://x.com/DefiyantlyFree/status/1889874712714416563, are attached hereto as **Exhibit 5.**

22.     A true and correct copy of the post made by Elon Musk, @elonmusk, at 10:24 a.m. Pacific time on February 11, 2025, which is available at and was downloaded from X.com at the link, https://x.com/elonmusk/status/1889380095015465272, attached hereto as **Exhibit 6.**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed April 3, 2025, in Washington, D.C.

*Everett B. Kelley*

Everett B. Kelley

EXHIBIT 1



⬉ PRESIDENTIAL ACTIONS

# EXCLUSIONS FROM FEDERAL LABOR–MANAGEMENT RELATIONS PROGRAMS

Executive Orders

March 27, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 7103(b)(1) of title 5 and 4103(b) of title 22, United States Code, to enhance the national security of the United States, it is hereby ordered:

Section 1. Determinations. (a) The agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations.

(b) The agency subdivisions set forth in section 3 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to these subdivisions in a manner consistent with national security requirements and considerations.

Sec. 2. Additional National Security Exclusions. Executive Order 12171 of November 19, 1979, as amended, is further amended by:

(a) In section 1–101, adding "and Section 1–4" after "Section 1–2" in both places that term appears.

(b) Adding after section 1–3 a new section 1–4 that reads:

"1–4. Additional Exclusions.

1-401.  The Department of State.

1-402.  The Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'

1-403.  The Department of the Treasury, except the Bureau of Engraving and Printing.

1-404.  The Department of Veterans Affairs.

1-405.  The Department of Justice.

1-406.  Agencies or subdivisions of the Department of Health and Human Services:

(a)  Office of the Secretary.

(b)  Food and Drug Administration.

(c)  Centers for Disease Control and Prevention.

(d)  Administration for Strategic Preparedness and Response.

(e)  Office of the General Counsel.

(f)  Office of Refugee Resettlement, Administration for Children and Families.

(g)  National Institute of Allergy and Infectious Diseases, National Institutes of Health.

1-407.  Agencies or subdivisions of the Department of Homeland Security:

(a)  Office of the Secretary.

(b)  Office of the General Counsel.

(c)  Office of Strategy, Policy, and Plans.

(d)  Management Directorate.

(e)  Science and Technology Directorate.

(f)  Office of Health Security.

(g)  Office of Homeland Security Situational Awareness.

(h)  U.S. Citizenship and Immigration Services.

(i)  United States Immigration and Customs Enforcement.

(j)  United States Coast Guard.

(k)  Cybersecurity and Infrastructure Security Agency.

(l)  Federal Emergency Management Agency.

1-408.  Agencies or subdivisions of the Department of the Interior:

(a)  Office of the Secretary.

(b)  Bureau of Land Management.

(c)  Bureau of Safety and Environmental Enforcement.

(d)  Bureau of Ocean Energy Management.

1-409.  The Department of Energy, except for the Federal Energy Regulatory Commission.

1-410.  The following agencies or subdivisions of the Department of Agriculture:

(a)  Food Safety and Inspection Service.

(b)  Animal and Plant Health Inspection Service.

1-411.  The International Trade Administration, Department of Commerce.

1-412.  The Environmental Protection Agency.

1-413.  The United States Agency for International Development.

1-414.  The Nuclear Regulatory Commission.

1-415.  The National Science Foundation.

1-416.  The United States International Trade Commission.

1-417.  The Federal Communications Commission.

1-418.  The General Services Administration.

1-419.  The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

(a)  Office of the Chief Information Officer.

(b)  any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.

1-499.  Notwithstanding the forgoing, nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code:

(a)  the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons;

(b)  subdivisions of the United States Marshals Service not listed in section 1-209 of this order; or

(c)  any subdivisions of the Departments of Defense or Veterans Affairs for which the applicable Secretary has issued an order suspending the application of this section pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'"

Sec. 3.  Foreign Service Exclusions.  Executive Order 12171, as amended, is further amended by:

(a)  In the first paragraph:

(i)  adding "and Section 4103(b) of Title 22," after "Title 5"; and

(ii)  adding "and Subchapter X of Chapter 52 of Title 22" after "Relations Program.".

Case 3:25-cv-03070-JD    Document 15-22    Filed 04/07/25    Page 11 of 71

(b)  Adding after section 1–102 a new section 1–103 that reads:

"1–103.  The Department subdivisions set forth in section 1–5 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work.  It is also hereby determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to those subdivisions in a manner consistent with national security requirements and considerations.  The subdivisions set forth in section 1–5 of this order are hereby excluded from coverage under Subchapter X of Chapter 52 of title 22, United States Code."

(c)  Adding after the new section 1–4 added by section 2(b) of this order a new section 1–5 that reads:

"1–5.  Subdivisions of Departments Employing Foreign Service Officers.

1–501.  Subdivisions of the Department of State:

(a)  Each subdivision reporting directly to the Secretary of State.

(b)  Each subdivision reporting to the Deputy Secretary of State.

(c)  Each subdivision reporting to the Deputy Secretary of State for Management and Resources.

(d)  Each subdivision reporting to the Under Secretary for Management.

(e)  Each subdivision reporting to the Under Secretary for Arms Control and International Security.

(f)  Each subdivision reporting to the Under Secretary for Civilian Security, Democracy, and Human Rights.

(g)  Each subdivision reporting to the Under Secretary for Economic Growth, Energy, and Environment.

(h)  Each subdivision reporting to the Under Secretary for Political Affairs.

(i)  Each subdivision reporting to the Under Secretary for Public Diplomacy.

(j)  Each United States embassy, consulate, diplomatic mission, or office providing consular services.

1–502.  Subdivisions of the United States Agency for International Development:

(a)  All Overseas Missions and Field Offices.

(b)  Each subdivision reporting directly to the Administrator.

(c)  Each subdivision reporting to the Deputy Administrator for Policy and Programming.

(d)  Each subdivision reporting to the Deputy Administrator for Management and Resources.".

Sec. 4.  Delegation of Authority to the Secretaries of Defense and Veterans Affairs.  (a) Subject to the requirements of subsection (b) of this section, the Secretaries of Defense and Veterans Affairs are delegated authority under 5 U.S.C. 7103(b)(1) to issue orders suspending the application of section 1-402 or 1-404 of Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute.

(b)  An order described in subsection (a) of this section shall only be effective if:

(i)   the applicable Secretary certifies to the President that the provisions of the Federal Service Labor-Management Relations Statute can be applied to such subdivision in a manner consistent with national security requirements and considerations; and

(ii)  such certification is submitted for publication in the *Federal Register* within 15 days of the date of this order.

Sec. 5.  Delegation of Authority to the Secretary of Transportation.  (a)  The national security interests of the United States in ensuring the safety and integrity of the national transportation system require that the Secretary of Transportation have maximum flexibility to cultivate an efficient workforce at the Department of Transportation that is adaptive to new technologies and innovation.  Where collective bargaining is incompatible with that mission, the Department of Transportation should not be forced to seek relief through grievances, arbitrations, or administrative proceedings.

(b)  The Secretary of Transportation is therefore delegated authority under section 7103(b) of title 5, United States Code, to issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration, from Federal Service Labor-Management Relations Statute coverage or suspending any provision of that law with respect to any Department of Transportation installation or activity located outside the 50 States and the District of Columbia.  This authority may not be further delegated.  When making the determination required by 5 U.S.C. 7103(b)(1) or 7103(b)(2), the Secretary of Transportation shall publish his determination in the *Federal Register.*

Sec. 6.  Implementation.  With respect to employees in agencies or subdivisions thereof that were previously part of a bargaining unit but have been excepted under this order, each applicable agency head shall, upon termination of the applicable collective bargaining agreement:

(a)  reassign any such employees who performed non–agency business pursuant to section 7131 of title 5 or section 4116 of title 22, United States Code, to performing solely agency business; and

(b)  terminate agency participation in any pending grievance proceedings under section 7121 of title 5, United States Code, exceptions to arbitral awards under section 7122 of title 5, United States Code, or unfair labor practice proceedings under section 7118 of title 5 or section 4116 of title 22, United States Code, that involve such employees.

Sec. 7.  Additional Review.  Within 30 days of the date of this order, the head of each agency with employees covered by Chapter 71 of title 5, United States Code, shall submit a report to the President that identifies any agency subdivisions not covered by Executive Order 12171, as amended:

(a) that have as a primary function intelligence, counterintelligence, investigative, or national security work, applying the definition of "national security" set forth by the Federal Labor Relations Authority in *Department of Energy, Oak Ridge Operations, and National Association of Government Employees Local R5-181*, 4 FLRA 644 (1980); and

(b)  for which the agency head believes the provisions of Chapter 71 of title 5, United States Code, cannot be applied to such subdivision in a manner consistent with national security requirements and considerations, and the reasons therefore.

Sec. 8.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,

   March 27, 2025.

Case 3:25-cv-03070-JD   Document 15-22   Filed 04/07/25   Page 14 of 71

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

  

WH.GOV

Copyright

Privacy

Style Guide

EXHIBIT 2



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

**TO:**                Heads and Acting Heads of Departments and Agencies

**FROM:**          Charles Ezell, Acting Director, U.S. Office of Personnel Management

**DATE**:            March 27, 2025

**RE**:                Guidance on Executive Order *Exclusions from Federal Labor-Management Programs*

---

On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).[1] The President's Executive Order directs that the FSLMRS will no longer apply to the following agencies and agency subdivisions (collectively, the "covered agencies and subdivisions"):

- The Department of Defense;

- The Department of State;

- The Department of the Treasury, except the Bureau of Engraving and Printing;

- The Department of Veterans Affairs (VA);

- The Department of Justice, except certain components of the U.S. Marshals Service;

- Subdivisions of the Department of Homeland Security:
  - Departmental Headquarters components;
  - U.S. Citizenship and Immigration Services;
  - Immigration and Customs Enforcement;
  - U.S. Coast Guard;
  - The Cybersecurity and Infrastructure Security Agency; and
  - The Federal Emergency Management Agency;

---

[1] These provisions are codified in chapter 71 of title 5, United States Code, and subchapter X of chapter 52 of title 22, United States Code.

- Subdivisions of the Department of Health and Human Services:
    - Office of the Secretary;
    - Office of the General Counsel;
    - Food and Drug Administration;
    - Centers for Disease Control and Prevention;
    - The Administration for Strategic Preparedness and Response;
    - The National Institute for Allergy and Infectious Diseases, National Institutes of Health; and
    - Office of Refugee Resettlement, Administration for Children and Families.

- The Department of Energy, except the Federal Energy Regulatory Commission;

- Subdivisions of the Department of the Interior:
    - Office of the Secretary;
    - Bureau of Land Management;
    - Bureau of Safety and Environmental Enforcement;
    - Bureau of Ocean Energy Management;

- Subdivisions of the Department of Agriculture:
    - The Food Safety and Inspection Service;
    - The Animal and Plant Health Inspection Service;

- The International Trade Administration within the Department of Commerce;

- The Environmental Protection Agency;

- The U.S. Agency for International Development;

- The Nuclear Regulatory Commission;

- The National Science Foundation;

- The International Trade Commission;

- The Federal Communications Commission;

- The General Services Administration; and

- The Office of the Chief Information Officer (CIO) in each Executive department, as well as the CIO offices for the U.S. Office of Personnel Management (OPM) and the Social Security Administration, and any other agency or subdivision that has information

resources management duties as the agency or subdivision's primary duty.[2]

By operation of 5 U.S.C. § 7103(b) and *Exclusions*, covered agencies and subdivisions are no longer subject to the collective-bargaining requirements of chapter 71 of part III, subpart F of title 5 (5 U.S.C. §§ 7101-7135). Consequently, those agencies and subdivisions are no longer required to collectively bargain with Federal unions. Also, because the statutory authority underlying the original recognition of the relevant unions no longer applies, unions lose their status as the "exclusive[ly] recogni[zed]" labor organizations for employees of the agencies and agency subdivisions covered by *Exclusions*.[3]

Agencies should consult with their General Counsels as to how to implement the President's directive in *Exclusions*. Agencies should also begin to consider and implement the changes described below and any others that agencies deem necessary, consistent with the President's national security determination. OPM highlights some common provisions of agency CBAs that may be inconsistent with the President's policies and management priorities.

## I.    Performance Accountability

Merit system principles codified at 5 U.S.C. § 2301(6) direct agencies to separate employees who cannot or will not improve their performance to meet required standards. This often does not occur. When asked what happens to poor performers in their work unit, a plurality of Federal employees respond that they "remain in the work unit and continue to underperform."[4] Only a quarter of agency supervisors report that they are confident they could remove a seriously underperforming employee.[5]

Strengthening performance accountability in the Federal workforce is a high priority of President Trump and his Administration. The President believes that he must be able to effectively supervise Federal employees to take care that the law is faithfully executed and to protect America's national security. Shortly after taking office the President issued multiple directives to facilitate the separation of underperforming employees.[6]

Agency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation. Covered agencies and subdivisions should seek to bring

---

[2] The Executive Order excludes the immediate employing offices of police and firefighters. It also provides a process for the Secretaries of Defense and Veterans Affairs to retain collective bargaining in subdivisions of their agencies if they certify that doing so does not impair national security.

[3] *Cf.* 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . ."), *id.* § 7114(a)(1) (authorizing the exclusively recognized labor organization to "negotiate collective bargaining agreements covering[] all employees in the unit.")

[4] https://www.opm.gov/fevs/reports/opm-fevs-dashboard/.

[5] U.S. Merit Systems Protection Board, *Remedying Unacceptable Employee Performance in the Federal Civil Service* (June 18, 2019), at p. 15.

[6] *See* Executive Order 14171 of Jan. 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*); Memorandum of January 20, 2025 (*Restoring Accountability for Career Senior Executives*); Executive Order 4211 of Feb. 12, 2025 (*One Voice for America's Foreign Relations*).

their policies into alignment with the specific Administration priorities below.

### A. Limit PIPs to 30 Days.

The Civil Service Reform Act (CSRA) requires agencies to provide underperforming employees with an opportunity to demonstrate acceptable performance before dismissing them under chapter 43 of title 5, United States Code.[7] These opportunity periods are commonly known as Performance Improvement Periods (PIPs). Executive Order 13839 of May 25, 2018. (*Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles*) generally standardized PIPs at 30 days. Executive Order 14003 of January 22, 2021 (*Protecting the Federal Workforce*) rescinded Executive Order 13839 and directed agencies to reverse policies effectuated under it. Under this directive, agencies increased PIPs from 30 days to 60 to 120 days. However, Executive Order 14171 of January 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*) revoked Executive Order 14003 and directed agencies to reverse disciplinary and unacceptable-performance policies effectuated pursuant to it.

Prior OPM guidance has explained that Executive Order 14171 now requires agencies to return to the policies of Executive Order 13839.[8] Agencies are accordingly required to, consistent with applicable law, return PIPs to 30 days. Where a CBA requires PIPs of more than 30 days, agencies must generally wait until such CBAs expire or otherwise terminate before shortening PIPs.[9] After covered agencies and subdivisions terminate CBAs that require PIPs of more than 30 days, they should take prompt action to reduce PIPs for former bargaining unit employees to no more than 30 days.

### B. Use Chapters 43 and 75 for Performance-Based Removals.

Covered agencies and subdivisions are required to revert their discipline and unacceptable performance policies to those set in the first Trump Administration under Executive Order 13839. This includes the directive to use the procedures of chapter 75 of title 5, United States Code, in addition to chapter 43 (discussed above), to separate employees for unacceptable performance in appropriate cases.[10]

Chapter 75 actions do not require a PIP but bear a higher burden of proof than chapter 43 actions. Many agency CBAs functionally prohibit using chapter 75 procedures by requiring PIPs for all performance-based separations. Covered agencies and subdivisions that have terminated their CBAs should thereafter use chapter 75 procedures to separate underperforming employees without PIPs in appropriate cases. Agencies may continue to use chapter 43 procedures in appropriate cases.

### C. VA Should Resume Use of Section 714.

---

[7] 5 U.S.C. 4202(c)(6).
[8] OPM, *Guidance on Revocation of Executive Order 14003* (Feb. 7, 2025).
[9] 5 U.S.C. 7116(a)(7).
[10] See section 2(h) of Executive Order 13839.

In 38 U.S.C. § 714, Congress gave VA special authority to remove some employees for poor performance without a PIP and with a lower burden of proof than chapter 43 actions. The Biden Administration discontinued use of section 714 authority after an arbitrator held that VA could not renegotiate its CBA to eliminate contractual PIPs. VA should, upon termination of its CBA, consider whether to resume use of section 714 authority in appropriate cases. Where facts and circumstances warrant, VA should cease providing covered employees with PIPs before separating them for poor performance under section 714.

### D. Discontinue Grievance Participation.

In keeping with the provisions of the FSLMRS, CBAs provide for binding arbitration of union grievances, including disputes over whether personnel actions were justified.[11] To implement *Exclusions*, agencies should cease participating in grievance procedures after terminating their CBAs. To the extent that covered agencies and subdivisions are litigating grievances before an arbitrator when they terminate their CBAs, they should discontinue participation in such proceedings upon termination. Agencies can and should compensate arbitrators for work performed prior to the termination of the CBA, but not for any work performed thereafter. Agencies should not participate in further grievance arbitration proceedings following termination of their CBAs.

## II.    Effective and Efficient Government

It is the policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently. Covered agencies and subdivisions should therefore take the following actions after terminating their CBAs.

### A. Disregard Contractual RIF Articles.

The President has directed agencies to prepare large-scale reductions in force (RIFs).[12] OPM previously provided guidance about agency collective bargaining obligations when undertaking RIFs.[13] Covered agencies and subdivisions that terminate their CBAs are advised that this guidance will no longer apply. After terminating their CBAs, covered agencies and subdivisions should conduct RIFs consistent with applicable statutory and regulatory requirements, but without regard to provisions in terminated CBAs that go beyond those requirements.

### B. Return to In-Person Work.

The President considers returning agency employees to in-person work necessary for effective and efficient agency operations. The President issued a memorandum generally requiring

---

[11] 5 U.S.C. § 7121.

[12] OPM, *Guidance on Agency RIF and Reorganization Plans Requested by  Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (February 26, 2025).

[13] OPM, *Guidance on Collective Bargaining in Connection with Reductions in Force* (March 12, 2025).

in-person work on the first day of his Administration.[14] OPM guidance has explained that substantive telework levels and the substantive determination of which positions are eligible for telework or remote work are non-negotiable management rights.[15] However, agency CBAs sometimes impose procedural restrictions on agency return to work policies that do not violate non-negotiable management rights. Upon termination of these CBAs, covered agencies and subdivisions should swiftly implement the President's directives in *Return to In-Person Work*.

### C.  Use Agency Resources for Agency Business.

The FSLMRS permits unions to negotiate to allow agency employees to perform union representational work instead of agency business during their official duty hours.[16] Contractual authorization for "taxpayer-funded union time" terminates when agency CBAs are terminated. Additionally, employees no longer have representational activities to conduct once their agency or subdivision has been excluded from the FSLMRS coverage. *Exclusions* requires agencies to promptly return such employees to performing solely agency business. Upon termination of any CBAs that require taxpayer-funded union time, agencies should reassign employees on union time to duties that solely include agency business.

Many agency CBAs similarly provide Federal unions with free use of agency resources (such as office space) or commit the agency to cover certain union expenses (such as the cost of travel and per diems). Following termination of CBAs that require such subsidies, covered agencies and subdivisions should promptly discontinue them and use agency resources only for agency business.

### D.  End Allotments Through Agency Payroll Systems.

The FSLMRS requires agencies to deduct union dues from employees' pay upon request.[17] Agency resources are expended to set up those payroll deductions and process payments, and many agency CBAs contractually commit agencies to making such allotments according to specified procedures. When a covered agency terminates its CBAs, those contractual commitments no longer apply, and the covered agency should terminate allotments except where required by statute. Agency employees may make other arrangements for dues payments if they wish to do so. However, agency resources ordinarily should not be expended to facilitate payment of union dues.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources Directors, and Chiefs of Staff

---

[14] Memorandum of January 20, 2025 (*Return to In-Person Work*).
[15] OPM, *Guidance on Collective Bargaining Obligations in Connection with Return to In-Person Work* (February 3, 2025).
[16] 5 U.S.C. 7131(d), 22 U.S.C. 4118(d)(4).
[17] 5 U.S.C. 7115, 22 U.S.C. 4118(a).

# EXHIBIT 3

Case 3:25-cv-03070-JD    Document 15-22    Filed 04/07/25    Page 24 of 71

*The* WHITE HOUSE

↖ **FACT SHEETS**

Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements

The White House

March 27, 2025

**PROTECTING OUR NATIONAL SECURITY:** Today, President Donald J. Trump signed an Executive Order using authority granted by the Civil Service Reform Act of 1978 (CSRA) to end collective bargaining with Federal unions in the following agencies with national security missions:

- **National Defense.** Department of Defense, Department of Veterans Affairs (VA), the National Science Foundation (NSF), and Coast Guard.
  - VA serves as the backstop healthcare provider for wounded troops in wartime.
  - NSF-funded research supports military and cybersecurity breakthroughs.

- **Border Security.** Department of Homeland Security (DHS) leadership components, U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, the Department of Justice's (DOJ) Executive Office of Immigration Review, and the Office of Refugee Resettlement within the Department of Health and Human Services (HHS).

- **Foreign Relations.** Department of State, U.S. Agency for International Development, Department of Commerce's International Trade Administration, and U.S. International Trade Commission.
  - President Trump has demonstrated how trade policy is a national security tool.

- **Energy Security.** Department of Energy, Nuclear Regulatory Commission, Environmental Protection Agency, and Department of Interior units that govern domestic energy production.

- The same Congress that passed the CSRA declared that energy insecurity threatens national security.

- ***Pandemic Preparedness, Prevention, and Response.*** Within HHS, the Secretary's Office, Office of General Counsel, Centers for Disease Control and Prevention, Administration for Strategic Preparedness and Response, Food and Drug Administration, and National Institute of Allergy and Infectious Diseases. In the Department of Agriculture, the Office of General Counsel, Food Safety and Inspection Service, and Animal and Plant Health Inspection Service.

  - COVID–19 and the recent bird flu have demonstrated how foreign pandemics affect national security.

  - VA is also a backstop healthcare provider during national emergencies, and served this role during COVID–19.

- ***Cybersecurity.*** The Office of the Chief Information Officer in each cabinet-level department, as well as DHS's Cybersecurity and Infrastructure Security Agency, the Federal Communications Commission (FCC), and the General Services Administration (GSA).

  - The FCC protects the reliability and security of America's telecommunications networks.

  - GSA provides cybersecurity related services to agencies and ensures they do not use compromised telecommunications products.

- ***Economic Defense.*** Department of Treasury.

  - The Federal Labor Relations Authority (FLRA) defines national security to include protecting America's economic and productive strength. The Treasury Department collects the taxes that fund the government and ensures the stable operations of the financial system.

- ***Public Safety.*** Most components of the Department of Justice as well as the Federal Emergency Management Agency.

- ***Law Enforcement Unaffected***. Police and firefighters will continue to collectively bargain.

**ENSURING THAT AGENCIES OPERATE EFFECTIVELY:** The CSRA enables hostile Federal unions to obstruct agency management. This is dangerous in agencies with

national security responsibilities:

- Agencies cannot modify policies in collective bargaining agreements (CBAs) until they expire.
  - The outgoing Biden Administration renegotiated many agencies' CBAs to last through President Trump's second term.

- Agencies cannot make most contractually permissible changes until after finishing "midterm" union bargaining.
  - For example, the FLRA ruled that ICE could not modify cybersecurity policies without giving its union an opportunity to negotiate, and then completing midterm bargaining.

- Unions used these powers to block the implementation of the VA Accountability Act; the Biden Administration had to offer reinstatement and backpay to over 4,000 unionized employees that the VA had removed for poor performance or misconduct.

**SAFEGUARDING AMERICAN INTERESTS:** President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.

- Certain Federal unions have declared war on President Trump's agenda.
  - The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
  - For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

4/2/25, 10:36 PM    Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requ…

Case 3:25-cv-03070-JD    Document 15-22    Filed 04/07/25    Page 27 of 71

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

  

WH.GOV

Copyright

4/2/25, 10:36 PM
Case 3:25-cv-02070-JD    Document 15-22    Filed 04/07/25    Page 28 of 71
Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requ…

Privacy

Style Guide

EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES DEPARTMENT OF AGRICULTURE; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES SOCIAL SECURITY ADMINISTRATION; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 6:25-cv-119 |
|  | ) |  |
| *Plaintiffs*; | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, DISTRICT 10; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL JOINT COUNCIL OF FOOD INSPECTION LOCALS; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES COUNCIL 238; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES COUNCIL 222; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES COUNCIL OF PRISON LOCALS C-33; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES VA COUNCIL; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCALS 779; 1004; 1033; 1364; 1367; 1920; 2142; 2356; 681; 1903; 2771; 3523; 3941; 1003; 3320; 1030; 1298; 1637; 2459; 3809; 3828; 4044; 1038; 1454; 1633; 1822; 1934; 2437; 2836; 3511; and 3922, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|  | ) |  |
| *Defendants*. | ) |  |

**COMPLAINT FOR DECLARATORY RELIEF**

**PRELIMINARY STATEMENT**

1.      Since taking office, two of President Trump's top priorities for his Administration have been to improve the efficiency and efficacy of the federal workforce, and to promote the national security of the United States.  Unfortunately, many Executive Branch departments and agencies have been hamstrung in advancing both of those important efforts by restrictive terms of collective bargaining agreements (CBAs), including those negotiated or amended in the waning days of the prior Administration to tie the new President's hands.

2.      These CBAs significantly constrain the Executive Branch.  Indeed, their content and timing indicate they were intended to do just that, extending for as long as five years and past the end of the President's term, signed just following an election loss to keep a new Administration from taking charge of union relations and agency supervision on its own terms.

3.      Some of these "midnight" CBAs restrict return-to-work policies.  Others effectively delegate important decision-making to unaccountable private arbitrators in the form of grievance adjudication.  Virtually all limit the power of the President and his Executive Branch officials to promptly identify and address underperformance, thus impeding the President's Take Care Clause responsibility under Article II of the Constitution.  And for agencies and employees that work on national security matters, these CBAs also impinge on the President's efforts to protect the United States from foreign and domestic threats.

4.      Public servants, appointees, and officials come to work every day advancing the public interest, serving the American people, and furthering the President's agenda with energy. Like every large workforce, they deserve strong leadership and accountability that recognizes great

performance and winnows out inefficiency. When inflexible CBAs obstruct presidential and agency head capacity to ensure accountability and improve performance, all citizens pay the price.

5.     And the price is particularly intolerable when national security is on the line. One of the President's most important responsibilities is to oversee national security, investigative, and intelligence efforts on behalf of the United States and the American public. *See* U.S. Const. art. II, §§ 1, 2, 3. The President commands our nation's defense and military capabilities. He necessarily does so through executive agencies and subdivisions that hold a primary function in supporting that important work, including by ensuring that our nation's economic, food supply, labor, transportation, trade, information and technology, and financial systems are not undermined by threats. In exercising those critical functions, the President and his senior Executive Branch officials cannot afford to be obstructed by CBAs that micromanage oversight of the federal workforce and impede performance accountability.

6.     Congress acknowledged as much. It acted to protect and preserve the Executive Branch's flexibility in these realms by including significant carveouts in the collective bargaining statutes administered by the Federal Labor Relations Agency (FLRA).

7.     In particular, Congress expressly excluded some agencies, including the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Secret Service, and certain others from collective bargaining. 5 U.S.C. § 7103(a)(3). But recognizing the President's broad discretion to promote and protect national security and the national interest, Congress further empowered the President to issue an order excluding "*any* agency or subdivision thereof" from collective-bargaining requirements if the President determines that the entity has intelligence, counterintelligence, investigative, or national security work as "*a* primary function," and that collective-bargaining requirements cannot be applied to the entity consistent with both national security "requirements and *considerations*." 5 U.S.C. § 7103(b)(1) (emphases added).

The statute, in other words, authorizes the President to exempt certain segments of the federal workforce from federal labor-law requirements.

8.      In an Executive Order entitled *Exclusions from Federal Labor-Management Relations Programs* signed earlier today, President Trump made those necessary determinations for several agencies and subdivisions, including Plaintiff agencies (and/or their components) here.

9.      The Office of Personnel Management (OPM), which coordinates federal workforce policy, has since issued guidance encouraging the agencies and subdivisions covered by the Executive Order to take appropriate steps toward terminating their previously negotiated CBAs— and, once they have done so, to adopt certain personnel policies that align with the President's priorities, including expediting procedures for removing underperforming employees.

10.     In light of the Executive Order and OPM guidance, Plaintiffs now respectfully seek a declaratory judgment from this Court that they have the power to rescind or repudiate certain specified CBAs, local supplemental agreements, and MOUs with Defendants, the American Federation of Government Employees District 10 and various of its local unions (together, AFGE).

11.     Plaintiffs wish to rescind or repudiate those CBAs, including so they can protect national security by developing personnel policies that otherwise would be precluded or hindered by the CBAs.  But to ensure legal certainty and avoid unnecessary labor strife, they first seek declaratory relief to confirm that they are legally entitled to proceed with doing so.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1331, because this dispute involves a question of federal law under federal statutes and the Executive Order.  *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014). This Court also has jurisdiction under 28 U.S.C. § 1345.

4

13.    In conjunction with their request for the remedy of a declaratory judgment, Plaintiffs assert that the Executive Order and its operation under the Federal Service Labor-Management Relations Statute and a similar statute that applies to the foreign service (together, the FSLMRS) vitiate their CBAs with Defendants.  Further, Plaintiffs' potential termination of the relevant CBAs—through implementation of the Executive Order and subsequent implementing steps as specified by OPM—create a conflict with continued federal union operation under the existing CBAs.  Plaintiffs consequently request a declaration from this Court that the President has lawfully, within the contours of his statutory discretion under 5 U.S.C. § 7103(b)(1), applied the national security exception through his expressed discretionary assessment and determination that the specified agencies and subdivisions are exempt from statutory CBA requirements.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant AFGE District 10 resides in this judicial district and represents over 90,000 federal workers in Texas, Mississippi, Louisiana, New Mexico, and Panama from its Killeen, Texas base of operations, and because relevant CBAs were ratified, managed, and/or performed within AFGE District 10, including in this judicial district.

15.    Plaintiff agencies employ and supervise employees covered by relevant CBAs for work performed within this judicial district and within the jurisdiction overseen by Defendant AFGE District 10.

**PARTIES**

16.    Plaintiff United States Department of Defense (DOD) is an executive agency headquartered at 1400 Defense Pentagon, Washington, DC 20301.

17.    Plaintiff United States Department of Agriculture (USDA) is an executive agency headquartered at 1400 Independence Ave. SW, Washington, DC 20250.

5

18.     Plaintiff United States Environmental Protection Agency (EPA) is an executive agency headquartered at 1200 Pennsylvania Ave. NW, Washington, DC 20004.

19.     Plaintiff United States Department of Homeland Security (DHS) is an executive agency headquartered at 1790 Ash St. SE, Washington, DC 20593.

20.     Plaintiff United States Department of Housing and Urban Development (HUD) is an executive agency headquartered at 451 7th St. SW, Washington, DC 20410.

21.     Plaintiff United States Department of Justice (DOJ) is an executive agency headquartered at 950 Pennsylvania Ave. NW, Washington, DC 20530.

22.     Plaintiff United States Social Security Administration (SSA) is an executive agency headquartered at 6401 Security Blvd., Baltimore, MD 21235.

23.     Plaintiff United States Department of Veterans Affairs (VA) is an executive agency headquartered at 810 Vermont Ave. NW, Washington, DC 20420.

24.     Defendant American Federation of Government Employees District 10 ("AFGE District 10") represents federal government employees in Louisiana, Mississippi, Texas, New Mexico, and Panama.  AFGE District 10 is headquartered at 2201 S. W.S. Young Dr, Suite 101-C, Killeen, Texas 76543.  AFGE District 10's headquarters are located within the Western District of Texas, Waco Division.

25.     Defendant American Federation of Government Employees Local 779 represents DOD employees at the Sheppard Air Force Base in Wichita Falls, Texas.

26.     Defendant American Federation of Government Employees Local 1004 represents non-professional DOD employees at Brooke Army Medical Center in Fort Sam Houston, Texas.

27.     Defendant American Federation of Government Employees Local 1033 represents DOD employees at Brooke Army Medical Center in Fort Sam Houston, Texas.

28.     Defendant American Federation of Government Employees Local 1364 represents DOD employees at the Naval Air Station Joint Reserve Base in Fort Worth, Texas.

29.     Defendant American Federation of Government Employees Local 1367 represents DOD employees at the Lackland Air Force Base in San Antonio, Texas.

30.     Defendant American Federation of Government Employees Local 1920 represents DOD employees in Fort Hood, Texas.

31.     Defendant American Federation of Government Employees Local 2142 represents DOD employees at Corpus Christi Army Depot in Corpus Christi, Texas.

32.     Defendant American Federation of Government Employees Local 2356 represents DOD employees at Dyess Air Force Base, Texas.

33.     Defendant American Federation of Government Employees National Joint Council of Food Inspection Locals represents employees at the USDA Food Safety and Inspection Service.

34.     Defendant American Federation of Government Employees Local 681 represents USDA employees in Dallas and Fort Worth, Texas.

35.     Defendant American Federation of Government Employees Local 1903 represents USDA employees in Dallas, Texas.

36.     Defendant American Federation of Government Employees Local 2771 represents USDA employees in Lubbock, Texas.

37.     Defendant American Federation of Government Employees Local 3523 represents USDA employees in Amarillo, Texas.

38.     Defendant American Federation of Government Employees Local 3941 represents USDA employees in Mt. Pleasant, Texas.

39.     Defendant American Federation of Government Employees Council 238 represents EPA employees.

40.     Defendant American Federation of Government Employees Local 1003 represents EPA employees in Region 6 in Dallas, Texas.

41.     Defendant American Federation of Government Employees Council 222 represents HUD employees.

42.     Defendant American Federation of Government Employees Local 3320 represents HUD employees in San Antonio, Houston, and Fort Worth, Texas.

43.     Defendant American Federation of Government Employees Council of Prison Locals C-33 represents DOJ employees in the Federal Bureau of Prisons.

44.     Defendant American Federation of Government Employees Local 1030 represents DOJ employees at the Federal Detention Center in Houston, Texas.

45.     Defendant American Federation of Government Employees Local 1298 represents DOJ employees at the Federal Correctional Institution in Fort Worth, Texas.

46.     Defendant American Federation of Government Employees Local 1637 represents DOJ employees at the Federal Correctional Institution in Seagoville, Texas.

47.     Defendant American Federation of Government Employees Local 2459 represents DOJ employees at the Federal Correctional Institution in Texarkana, Texas.

48.     Defendant American Federation of Government Employees Local 3809 represents DOJ employees at the Federal Correctional Institution in Fort Worth, Texas.

49.     Defendant American Federation of Government Employees Local 3828 represents DOJ employees at the Federal Correctional Institution in Bastrop, Texas.

50.     Defendant American Federation of Government Employees Local 4044 represents DOJ employees at the Federal Correctional Institution in Three Rivers, Texas.

51.     Defendant American Federation of Government Employees VA Council represents employees at the VA.

52.     Defendant American Federation of Government Employees Local 1038 represents VA employees at the Thomas E. Creek VA Medical Center in Amarillo, Texas.

53.     Defendant American Federation of Government Employees Local 1454 represents VA employees in the Veterans Benefits Administration Houston Regional Office in Houston, Texas.

54.     Defendant American Federation of Government Employees Local 1633 represents VA employees at the Michael E. DeBakey VA Medical Center in Houston, Texas.

55.     Defendant American Federation of Government Employees Local 1822 represents VA employees at the Doris Miller VA Medical Center in Waco, Texas.

56.     Defendant American Federation of Government Employees Local 1934 represents VA employees in Big Spring, Texas.

57.     Defendant American Federation of Government Employees Local 2437 represents VA employees in Dallas, Texas.

58.     Defendant American Federation of Government Employees Local 2836 represents VA employees at the Sam Rayburn Memorial Veterans Center in Bonham, Texas.

59.     Defendant American Federation of Government Employees Local 3511 represents VA employees at the Audie L. Murphy VA Medical Center in San Antonio, Texas.

60.     Defendant American Federation of Government Employees Local 3922 represents VA employees in El Paso, Texas.

## BACKGROUND

### I.      Statutory Background

61.     In 1978, Congress enacted the Federal Service Labor-Management Relations Statute ("Federal Service Statute").  *See* 5 U.S.C. § 7101 *et seq.*

62. Although the Federal Service Statute generally grants federal agency employees the right to organize and collectively bargain, it also provides that the President "may issue an order excluding any agency or subdivision thereof from coverage of this chapter [5 U.S.C. ch. 71] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b).

63. In 1980, Congress enacted the Foreign Service Act of 1980, chapter 10 of which concerns labor-management relations with regard to foreign service employees ("Foreign Service Statute"). Pub. L. No. 96-465, ch. 10, 94 Stat. 2071, 2128 (codified at 22 U.S.C. § 4101 *et seq.*).

64. The Foreign Service Statute applies only to the Department of State, the United States Agency for International Development, and a few other agencies. 22 U.S.C. § 4103(a).

65. The Foreign Service Statute allows the President to "exclude any subdivision of the Department from coverage under this subchapter if the President determines that—(1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (2) the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations." *Id.* § 4103(b).

66. Neither statute defines "national security work" or "investigative work" for purposes of the exemption, but the Federal Labor Relations Act (FLRA) has adopted plain text meanings and has provided some guidance in related contexts on the meaning of these terms.

67. In particular, a 2014 FLRA decision upheld the ruling of a regional director who applied a "standard dictionary definition" of "investigative work" to mean work that involves "search[ing] into so as to learn the facts; inquir[ing] into systematically."

68.     As to "national security work," FLRA precedent dating back to the Carter Administration defines national security as "those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense."

## II.     Executive Order and OPM Guidance

69.     On March 27, 2025, the President issued an Executive Order entitled *Exclusions from Federal Labor-Management Relations Program*.

70.     In Section 2 of the Executive Order, the President determined that certain agencies and subdivisions have as a primary function intelligence, counterintelligence, investigative, or national security work.  The President determined that the Federal Service Statute cannot be applied to these agencies and subdivisions in a manner consistent with national security requirements and considerations.

71.     The Section 2 agencies and agency subdivisions included, with limited exceptions:

   a.   Department of State

   b.   Department of Defense

   c.   Department of the Treasury, except the Bureau of Engraving and Printing

   d.   Department of Veterans Affairs

   e.   Department of Justice

   f.   Subdivisions of the Department of Health and Human Services

       i.   Office of the Secretary

       ii.   Food and Drug Administration

       iii.   Centers for Disease Control and Prevention

       iv.   Administration for Strategic Preparedness and Response

       v.   Office of the General Counsel

       vi.   Office of Refugee Resettlement, Administration for Children and Families

       vii.   National Institute for Allergy and Infectious Diseases, National Institutes of Health

       viii.   Office of the Chief Information Officer and all subordinate divisions

g.   Subdivisions of the Department of Homeland Security

       i.   Departmental Headquarters

       ii.   U.S. Citizenship and Immigration Services

       iii.   Immigration and Customs Enforcement (ICE)

       iv.   U.S. Coast Guard

       v.   Cybersecurity and Infrastructure Security Agency

       vi.   Federal Emergency Management Agency

       vii.   Office of the Chief Information Officer and all subordinate divisions

h.   Subdivisions of the Department of Interior

       i.   Office of the Secretary

       ii.   Bureau of Land Management

       iii.   Bureau of Safety and Environmental Enforcement

       iv.   Bureau of Ocean Energy Management

       v.   Office of the Chief Information Officer and all subordinate divisions

i.  Department of Energy

j.  Subdivisions of the Department of Agriculture

    i.  Food Safety and Inspection Service

    ii.  Animal and Plant Health Inspection Service

    iii.  Office of the Chief Information Officer and all subordinate divisions

k.  International Trade Administration, Department of Commerce

l.  Environmental Protection Agency

m.  U.S. Agency for International Development

n.  Nuclear Regulatory Commission

o.  National Science Foundation

p.  International Trade Commission

q.  Federal Communications Commission

r.  General Services Administration

s.  The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

    i.  Office of the Chief Information Officer; and

    ii.  Any other agency or subdivision that has information resource management duties as the agency or subdivision's primary duty.

72.  In Section 3 of the Executive Order, the President determined that certain subdivisions have as a primary function intelligence, counterintelligence, investigative, or national security work. The President determined that the Foreign Service Statute cannot be applied to

13

these agencies and agency subdivisions in a manner consistent with national security requirements and considerations.

73.    The Section 3 agencies and agency subdivisions include:

    a.   Subdivisions of the U.S. Department of State

        i.   Each subdivision reporting directly to the Secretary of State

        ii.   Each subdivision reporting to the Deputy Secretary of State

        iii.   Each subdivision reporting to the Deputy Secretary of State for Management and Resources

        iv.   Each subdivision reporting to the Under Secretary for Management

        v.   Each subdivision reporting to the Under Secretary for Arms Control and International Security

        vi.   Each subdivision reporting to the Under Secretary for Civilian Security, Democracy, and Human Rights

        vii.   Each subdivision reporting to the Under Secretary for Economic Growth, Energy, and Environment

        viii.   Each subdivision reporting to the Under Secretary for Political Affairs

        ix.   Each subdivision reporting to the Under Secretary for Public Diplomacy

        x.   Each United States embassy, consulate, diplomatic mission, or office providing consular services

        xi.   Each foreign embassy or mission

    b.   Subdivisions of the U.S. Agency for International Development

        i.   All Overseas Missions and Field Offices

ii. Each subdivision reporting directly to the Administrator

iii. Each subdivision reporting to the Deputy Administrator for Policy and Programming

iv. Each subdivision reporting to the Deputy Administrator for Management and Resources.

74. On March 27, 2025, OPM issued guidance regarding the Executive Order. In that guidance, OPM opined that the covered agencies "are no longer required to collectively bargain with Federal unions" and that "the statutory authority underlying the agency's original recognition of the relevant unions no longer applies," so those unions are no longer exclusive representatives of the agency employees. OPM directed covered agencies to "consult with their General Counsels as to how to implement the President's directive" in the Executive Order, and to consider and implement changes that are "consistent with the President's national security determination."

75. OPM also stated that, after terminating their CBAs, agencies should promptly align their workforce operations with President Trump's policies and management priorities, including strengthening performance accountability by making it easier to remove underperforming employees, imposing a return to in-office work, and more.

## III. Plaintiff Agencies and Their Restrictive and Onerous CBAs

76. Plaintiff agencies and/or their components are covered by the Executive Order.

77. Plaintiff agencies and/or their components have previously executed with Defendants, or other local unions under the auspices of Defendants, one or more CBAs (including local agreements and MOUs) that remain currently in effect and cover employees in the relevant components. The CBAs impose demanding burdens on Plaintiff agencies, and per the President's directive, undermine his authority to supervise and direct agencies with a primary function of

advancing the country's national security, intelligence, counterintelligence and investigative work. Plaintiff agencies therefore wish to rescind or repudiate them.

78.     As a general matter, and as discussed in more detail below, these CBAs give hostile unions powerful tools to prevent changes to agency operations they oppose. These CBAs likewise interfere with the President's ability to oversee the Executive Branch and limit his authority to oversee agents executing and implementing initiatives related to his core executive power, including as to national security.

79.     CBAs operate as binding legal instruments that take precedence over conflicting agency regulations. Agencies cannot even implement government-wide rules and regulations—including executive orders—that conflict with extant CBAs. Policies embedded in a CBA are thus locked in place until the agreement expires and, if it has a continuance clause, is fully renegotiated.

80.     The Biden Administration renegotiated many CBAs to last through most or all of President Trump's second term. This means the Trump Administration cannot alter agency policies on, *e.g.*, performance accountability, that are embedded in CBAs, even if the President believes they are a serious impediment to effective agency operations and thus national security.

81.     Bargaining obligations also stall many policy changes. Even if an agency wants to alter working conditions in ways that do not violate a CBA, it must give its union an opportunity to negotiate over the change. If the union chooses to bargain, the agency cannot make any changes until midterm bargaining concludes—a process that can easily take a year or more.

82.     FLRA case law is filled with decisions holding that agencies could not implement unilateral changes without seeking preclearance from union representatives or completing midterm bargaining. For example, the FLRA ruled that ICE committed an unfair labor practice by failing to bargain before changing cybersecurity practices (by cutting off access to personal e-mail accounts on work computers after learning that they were a vector for cyber attacks). The FLRA

16

similarly ruled that the VA could not use its new expedited removal procedures, granted by Congress under 38 U.S.C. § 714, without completing midterm bargaining with its unions. As a result, the VA had to offer reinstatement and backpay to over 4,000 AFGE-represented employees who had been removed.

83. In short, unions that oppose an administration's agenda can freeze the status quo in place for a year or more by demanding midterm bargaining and dragging it out. Unions hostile to the President's agenda can thus block or at least significantly delay the implementation of management policies that he considers necessary to ensure the effective and efficient operations of agencies—including, as relevant here, agencies with investigative and national security responsibilities. That, in turn, undermines the President's authority to supervise his agents and threatens our Nation's security.

84. The President cannot effectively execute the laws or promote national security if his supervision of agents engaged in national security, intelligence, counterintelligence, or investigative missions is stymied by intrusive bargaining agreements and continuous bargaining obligations. Congress therefore recognized the President's power to exempt agencies or sub-agencies from the statutes authorizing such bargaining agreements.

### A. Department of Defense

85. The Air Force Material Command (AFMC) is a component of DOD that is covered by the Executive Order. AFMC manages installation and mission support, discovery and development, test and evaluation, and life cycle management services and sustainment for every major Air Force weapon system.

86. The Army and Air Force Exchange Service is a component of DOD that is covered by the Executive Order. The Army and Air Force Exchange Service supports deployed troops with products and services.

17

87.     The Defense Commissary Agency (DeCA) is a component of DOD that is covered by the Executive Order.  DeCA operates a worldwide chain of commissaries and provides groceries in a safe and secure environment to military personnel and their families.

88.     The Defense Contract Management Agency is a component of DOD that is covered by the Executive Order.  The Defense Contract Management Agency provides contract administration services and ensures that the defense industry provides our nation's warfighters the equipment they need to fight, survive, and win.

89.     The Defense Finance and Accounting Service (DFAS) is a component of DOD that is covered by the Executive Order.  DFAS improves accounting and financial functions throughout DOD.

90.     The Defense Health Agency (DHA) is a component of DOD that is covered by the Executive Order.  DHA manages a global health system and integrates care delivered at military hospitals with a worldwide network of civilian health providers.

91.     The Defense Logistics Agency (DLA) is a component of DOD that is covered by the Executive Order.  DLA manages end-to-end global defense supply chain—from raw materials to end user disposition—for the five military services, eleven combat commands, and other federal, state and local agencies and partner and allied nations.

92.     The Marine Corps is a component of DOD that is covered by the Executive Order. The Marine Corps is responsible for delivering military task forces on land, at sea, and in the air.

93.     The United States Military Entrance Processing Command is a component of DOD that is covered by the Executive Order.  The United States Military Entrance Processing Command is dedicated to ensuring that each applicant for enlistment in our nation's volunteer force meets service-mandated aptitude, medical, and conduct qualifications standards.

94. DOD and/or its agencies or components have entered into CBAs with Defendants, including the Air Force Material Command Master Labor Agreement; the Army and Air Force Exchange Service Master Agreement; the Defense Commissary Agency Master Labor Agreement; the Agreement Between Defense Contract Management Agency and AFGE Council 170; the Defense Finance & Accounting Service Master Collective Bargaining Agreement; the Defense Health Agency Interim Master Labor Agreement; the Defense Logistics Agency Master Labor Agreement; the Consolidated Master Labor Agreement between the United States Marine Corps and the American Federation of Government Employees; and the United States Military Entrance Processing Command Collective Bargaining Agreement.

95. These CBAs include numerous terms that materially restrict the power of DOD and/or its agencies or components to govern and set policies for its own workforce.

96. For example, the Defense Contract Management Agency CBA requires it to "encourage … the use of telework"; to retain underperforming employees through a 90-day performance improvement plan, followed by 30 days' notice before a performance-based decision is made; and to notify employees of any reduction in force at least 60 days in advance. *Agreement Between Defense Contract Management Agency and AFGE Council 170*, 38, 102-04, 169, https://www.afge.org/globalassets/documents/cbas/dcma-cba-2019.pdf.

97. The Defense Finance & Accounting Service CBA requires it to spend taxpayer funds to provide union office space, furniture, workstations, and parking spaces at each of its five primary locations. *Master Collective Bargaining Agreement* 12, https://www.afge.org/globalassets/documents/cbas/c171---dfas-contract.pdf. The CBA also bars DFAS from denying telework to an employee even if the employee lacks "appropriate internet service" at his telework location and subjects denials of telework to grievance proceedings that can go to binding

arbitration. *Id.* at 25. And the CBA requires DFAS to retain underperforming employees through an extendable 90-day performance improvement period. *Id.* at 65.

98. The Defense Health Agency CBA requires DHA to "actively promot[e]" telework for its employees. *Interim Master Labor Agreement* 71, https://www.afge.org/globalassets/documents/generalreports/2024/interimconsolidatedmasteragr eement_4-19-24.pdf. It also imposes a lengthy performance improvement period for underperforming employees, typically 90 days. *Id.* at 68.

99. The Defense Logistics Agency CBA provides for a 90-day performance improvement plan before an underperforming employee can be removed using the procedures of chapter 43 of title 5, United States Code. *Master Labor Agreement* 65-66, 105, https://www.afge.org/globalassets/documents/cbas/2022afgecouncil169cba.pdf.

100. DOD and/or its agencies or components employ many workers in Texas who are part of Defendants' bargaining units and are covered by the CBAs, including: 917 AFMC employees; 444 DeCA employees; 836 Defense Contract Management Agency employees; 19 DFAS employees; 1063 DHA employees; and 321 DLA employees.

101. It should go without saying that DOD and its agencies and components have, as their primary purpose, "intelligence, counterintelligence, investigative, or national security work." Indeed, the overriding mission of DOD is to protect national security.

### B. Department of Agriculture

102. The Food Safety and Inspection Services (FSIS) is a component of USDA that is covered by the Executive Order. The FSIS protects public health by preventing illness and ensuring food safety and defense.

103. USDA and/or its agencies or components have entered into CBAs with Defendants, including the Food Safety and Inspection Service Collective Bargaining Agreement.

104. That CBA includes numerous terms that materially restrict the power of USDA and the FSIS to govern and set policies for its own workforce. For example, the FSIS CBA requires FSIS to arbitrate grievances at the union's request, Art. XXXIII; to apprise the union of any contemplated reductions in force "before any final decision has been made," Art. XXIII(A); to submit "proposed changes in conditions of employment" for its employees to the union for review before the changes can take effect; Art. VII(B), and to pay union representatives per diems and travel expenses to attend meetings and present grievances, Art. V(C). *Collective Bargaining Agreement*, https://www.afge.org/globalassets/documents/cbas/c45---fsis-contract.pdf.

105. USDA has many employees in Texas who are part of Defendants' bargaining units and covered by the CBAs, including 501 FSIS employees.

106. One of FSIS's primary functions is investigative work—specifically, inspections into meat, poultry, and egg product safety. FSIS also performs and has as a primary function national security work by protecting the nation's food supply. FSIS defends against intentional contamination of meat, poultry, and egg products—key components of the U.S. food supply. Under National Security Memorandum-16 (NSM-16, 2023), FSIS collaborates with intelligence and law enforcement to detect and respond to biological, chemical, or radiological attacks on food. This has obvious national security implications. A contaminated food supply could kill thousands, disrupt public trust, and destabilize government operations.

107. Specifically, the Significant Incident Preparedness and Response Staff (SIPRS) within FSIS works with government agencies at all levels, industry, and other organizations to develop and implement strategies to prevent, protect against, mitigate, respond to, and recover from intentional contamination of the food supply. FSIS promotes food defense by encouraging establishments to voluntarily adopt a functional food defense plan, implement food defense practices (including security measures), and conduct training and exercises to ensure preparedness.

108. Food security is also important for economic stability. FSIS oversees hundreds of billions of dollars in meat, poultry, and egg products each year. Its inspections—which are mandatory at slaughter and processing—prevent outbreaks that could crater consumer confidence and trade. This directly protects the economic and productive strength of the United States.

109. FSIS also regulates imports from other countries, ensuring equivalence to U.S. safety standards (*e.g.*, it audited Brazil's system after 2017 meat scandals and suspended imports for a time until Brazilian producers came up to standards). Food can be a vector for foreign threats, as the current avian flu outbreak demonstrates.

### C. Environmental Protection Agency

110. EPA is an agency covered by the Executive Order. EPA's mission is to protect human health and the environment. The Office of National Security within the Environmental Protection Agency administers programs that advance the nation's ability to prevent, protect, respond to, mitigate, and recover from intentional, unintentional, or natural events and disasters.

111. EPA and/or its agencies or components have entered into CBAs with Defendants, including the Environmental Protection Agency Master Collective Bargaining Agreement. https://www.afge.org/globalassets/documents/cbas/afge---epa-mcba---2024-final-07.19.2024.pdf.

112. That CBA includes numerous terms that materially restrict the power of EPA to govern and set policies for its own workforce. For example, Article 2 is a new "scientific integrity" article expressly designed to empower the agency's career staff vis-à-vis political appointees and to prevent the Trump Administration from rolling back Biden Administration energy and climate policies. Indeed, AFGE has advertised that the CBA was designed to affect substantive policy outcomes on energy and climate policy. Given the effect those policies have on our economy and dependence on China for critical minerals, the President determined that Chapter 71 cannot be applied to EPA in a manner consistent with national security requirements and considerations.

113. Like most other CBAs at issue, the EPA CBA also generally requires performance improvement periods of 90 days, and "[u]nder no circumstances" less than 60 days, before agencies can propose to remove an underperforming employees. *EPA Master Collective Bargaining Agreement*, Art. 17, § 5(H). This is between double and triple the 30 days the President has determined is generally appropriate for these evaluations.[1]

114. EPA Region 6, which is headquartered in Dallas, Texas, has 634 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

115. One of EPA's primary functions is investigative work, namely conducting criminal and civil investigations into environmental violations. As the FLRA has explained, EPA criminal investigators engage in work that affects national security, which the Authority has defined as "sensitive activities of the government that are directly related to the protection or preservation of the military, economic, and productive strength of the United States," *Dep't of Air Force,* 62 F.L.R.A. 332, 335 (2008), by "safeguarding the nation's land, water, and air." *United States EPA*, 70 F.L.R.A. 279, 283 (2017).

116. EPA also serves a primary national security function through its role in energy policy. The Clean Air Act empowers EPA to regulate greenhouse gas emissions, including by regulating American use of fossil fuels as opposed to renewable energy sources. As Congress explained in creating the Department of Energy, the nation's shortage of nonrenewable energy sources and "increasing dependence on foreign energy supplies present a serious threat to the national security of the United States." 42 U.S.C. § 7111. EPA policymaking regarding renewable energy sources may also have substantial effects on national security by promoting use of products,

---

[1] Office of Personnel Management, Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* (March 27, 2025).

such as electric vehicle batteries, that would increase the United States's dependence on foreign adversaries like China for critical natural resources.

117.     EPA's role in energy policy also impacts national security through its effects on the nation's economic capacity.  For example, several Biden Administration EPA rules operated to shift power generation from fossil fuels to more expensive renewable sources, undermining America's economy by passing higher energy costs through every stage of production.  *See* 2023 Power Plant Carbon Pollution Standards, 40 CFR Part 60.  The President has declared a national energy emergency in large part because high energy prices hurt America's economic and productive capacity.  Everything that EPA is doing to prevent fossil fuel use has a direct bearing on America's economic and productive capacity, and thus U.S. national security.

### D.     Department of Homeland Security

118.     The Federal Emergency Management Agency (FEMA) is a component of DHS that is covered by the Executive Order.  FEMA works to make sure America is equipped to prepare for and respond to disasters.  The Nonprofit Security Grant Program, one of FEMA's programs, provides funding support for target hardenings and other physical security enhancements and activities to nonprofit organizations that are at high risk of a terrorist attack.

119.     The United States Citizenship and Immigration Services (USCIS) is a component of DHS that is covered by the Executive Order.  USCIS administers the country's naturalization and immigration system.

120.     The United States Coast Guard (USCG) is a component of DHS that is covered by the Executive Order.  USCG conducts military operations to defend the nation.

121.     DHS and/or its agencies or components have entered into CBAs with Defendants, including the National Protection and Programs Directorate (now Cybersecurity and Infrastructure Security Agency) Collective Bargaining Agreement; the Federal Emergency Management Agency

Collective Bargaining Agreement; the United States Citizenship and Immigration Services Collective Bargaining Agreement; and the United States Coast Guard Collective Bargaining Agreement.

122. Those CBAs include numerous terms that materially restrict the power of DHS and its components to govern and set policies for its own workforce.

123. For example, FEMA's CBA requires the agency to permit employees to spend thousands of on-duty hours on union matters and bars FEMA from firing underperforming employees except based on a performance improvement plan lasting "not less than" 60 days. *Collective Bargaining Agreement* 21, 47, https://www.afge.org/globalassets/documents/cbas/l4060---fema-contract.pdf.

124. The U.S. Citizenship and Immigration Services CBA permits employees to spend up to 100% of their on-duty time in a given year on union matters. *Collective Bargaining Agreement*, Art. 7(d), https://www.afge.org/globalassets/documents/cbas/uscis-cba-2021.pdf. The "purpose" of the CBA's telework provisions is to "ensure" that employees can telework "to the maximum extent possible," requiring USCIS to approve telework applications "to the maximum extent possible" and limiting the reasons USCIS may revoke telework arrangements. Art. 29(a)(2), (f), (k). The CBA also bars USCIS from terminating remote work agreements "without a legitimate business reason," and it requires USCIS to arbitrate grievances at the union's request. Art. 13; Art. 30(q).

125. The U.S. Coast Guard CBA, which took effect in the final month of the Biden Administration, makes all Coast Guard bargaining unit positions presumptively eligible for telework and sharply limits the reasons for which USCG can deny telework requests or terminate approved telework arrangements. *Negotiated Master Labor Agreement* 63, 66-67, https://www.afge.org/globalassets/documents/cbas/mla-afge-uscg---effective-december-17-

2024.pdf. The CBA also obligates the USCG to provide dedicated union office space and workstations in 13 USCG facilities, *id.* at 196; bars the USCG from reducing force unless "all other means" of avoiding the reduction in force "have been exhausted," *id.* at 92; and requires the USCG to retain underperforming employees on a performance improvement plan lasting at least 60 days, *id.* at 107.

126. DHS and/or its agencies or components have many employees in Texas who are part of Defendants' bargaining units and covered by the CBAs, including 350 USCIS employees, 19 USCG employees, and 153 FEMA employees.

127. DHS and its covered agencies and components serve primary national security functions. The National Protection and Programs Directorate, now called the Cybersecurity and Infrastructure Security Agency, performs a straightforward national security mission of protecting the Nation against foreign and domestic cyber threats.

128. Likewise, USCG is, on its face, a national security agency dedicated to protecting the United States from security threats.

129. FEMA's operations also serve a national security function through its role in disaster preparedness, response, and recovery, which strengthens the nation's resilience to crises that could destabilize critical infrastructure, the economy, or public order—key components of national security.

130. For example, FEMA's Office of National Continuity Programs (ONCP) "guides the planning, implementation and assessment of continuity programs that enable federal, state, local, tribal and territorial governments to continue performing essential functions and delivering critical services when typical operations are disrupted by an emergency. ONCP also ensures that at all times, the President, federal agencies and governments at all levels are able to provide timely

and effective alerts and warnings regarding natural disaster, acts of terrorism and other manmade disasters or threats to public safety."

131.     FEMA's National Exercise Program conducts simulations of large-scale disasters, including cybersecurity, public health, and terrorism scenarios, to test interagency coordination and readiness.

132.     FEMA also operates the Integrated Public Alert and Warning System (IPAWS), a national system that allows authorized entities to send emergency alerts to the public through multiple communication channels, including Wireless Emergency Alerts (WEA), the Emergency Alert System (EAS), and National Oceanic and Atmospheric Administration (NOAA) Weather Radio, enhancing communication and response capabilities during national security threats and other emergencies.

133.     FEMA's efforts in disaster response and mitigation help safeguard critical infrastructure—such as power grids, transportation systems, and communication networks—from natural disasters, cyberattacks, or terrorist attacks.

134.     Finally, USCIS conducts investigative work as it screens and vets immigration applications. Its work to screen out potential national security threats and prevent them from becoming U.S. residents is also important national security work. USCIS collects fingerprints and photographs and collaborates with agencies like the FBI to conduct security checks and share national-security relevant information.  More broadly, USCIS maintains the integrity of the U.S. immigration system, which is important national security work—as the prior administration's failures in this regard demonstrated.

###     E.     Department of Housing and Urban Development

135.     The Office of the Chief Information Officer (CIO) is a component of HUD that is covered by the Executive Order.

136.    HUD and/or its agencies or components have entered into CBAs with Defendants, including the Department of Housing and Urban Development Collective Bargaining Agreement. Employees of HUD's Office of Chief Information Officer are covered by that agreement and subject to the Executive Order.

137.    That CBA includes numerous terms that materially restrict the power of HUD and its CIO to govern and set policies for its own workforce, including limiting arbitration of employee grievances, months of advanced notice before reductions in force, and a commitment to permit telework "to the maximum extent possible."    *See* HUD Contract 73, 163-64, 243, https://www.afge.org/globalassets/documents/cbas/c222---hud-contract.pdf243.    Moreover,  the CBA limits disciplinary actions to "just and sufficient cause"—a higher bar than the statutory "efficiency of the service" standard.

138.    The CBA also requires HUD to provide the union with "conveniently located" private offices—with "floor to ceiling walls and a lockable door"—in HUD buildings paid for by taxpayer dollars, along with taxpayer-funded computers, software, printers, office supplies, and cleaning services.  *Id.* at 226, 228-29.  The CBA additionally requires HUD to permit employees to spend thousands of hours of on-duty time working on union matters.  *Id.* at 220-22.

139.    HUD has 9 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

140.    The HUD CIO office performs essential national security work through its role in cybersecurity.  Given the role of computer systems in government functions, cybersecurity is national security.  Hostile nation states like China, Iran, and North Korea are constantly seeking to penetrate agency computer systems.

141.    More specifically, CIO offices implement cybersecurity frameworks under the Federal Information Security Modernization Act (FISMA) of 2014, protecting agency systems

from cyber threats that could compromise national security, such as state-sponsored attacks or ransomware. CIO offices also manage systems for storing agency data and personally identifying information—including data that, if shared with foreign governments or terrorist organizations, could pose substantial risks to national security.

### F. Department of Justice

142. The Federal Bureau of Prisons (BOP) is a component of DOJ that is covered by the Executive Order. BOP protects public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are appropriately secure, humane, and cost-efficient.

143. DOJ and/or its agencies or components have entered into CBAs with Defendants, including the Federal Bureau of Prisons Master Agreement.

144. That CBA includes numerous terms that materially restrict the power of DOJ and its components to govern and set policies for its own workforce.

145. For example, the BOP CBA requires at least nine months of notice to the union before any reduction in force. *Master Agreement* 59, https://www.afge.org/globalassets/documents/cbas/master-agreement-2021-amended-to-may-2026.pdf.

146. The CBA also provides for union activities as part of employees' "paid duty time," and it requires the heightened "just and sufficient cause" standard for disciplinary actions. *Id.* at 29, 37, 70.

147. DOJ and/or its agencies or components have many employees in Texas who are part of Defendants' bargaining units and covered by the CBAs, including 1550 BOP employees.

148. DOJ performs classic investigative work by investigating whether federal crimes have been committed and prosecution warranted. Many DOJ components, including ATF, DEA, and the litigating divisions, all have as a primary function investigating whether crimes have been

committed. BOP likewise conducts internal investigations into inmate activities, like monitoring communications to disrupt security threats.

149.    One of DOJ's primary functions is national security work. DOJ has described its mission to include defending the interests of the United States, ensuring public safety against threats foreign and domestic, and providing federal leadership in preventing and controlling crime. That mission to protect public safety, particularly against foreign threats, is a conventional national security role. Consistent with that mission, DOJ litigating divisions prosecute terrorist and other foreign threats against U.S. citizens, while other DOJ arms investigate and prevent hostile actions.

150.    As relevant here, BOP in particular has a direct and primary national security function of incarcerating individuals who threaten the public safety of Americans. Those individuals include, but are not limited to, foreign terrorists. It would seriously threaten public safety if the government did not reliably detain violent criminals and terrorists. BOP also monitors inmate communications to detect and disrupt threats, such as terrorist threats. Notably, a 2020 DOJ Inspector General report faulted BOP for failing to identify all terrorist inmates admitted into its institutions and failing to sufficiently monitor their communications.

## G.    Social Security Administration

151.    The Office of the Chief Information Officer (CIO) is a component of SSA that is covered by the Executive Order.

152.    SSA and/or its agencies or components have entered into CBAs with Defendants, including the Social Security Administration National Agreement. Employees of SSA's Office of the CIO are covered by that agreement and subject to the Executive Order.

153.    That CBA includes numerous terms that materially restrict the power of SSA and its CIO to govern and set policies for their own workforce.

154. For example, the CBA requires performance improvement plans to last at least 60 days and also imposes the heightened "just cause" standard for disciplinary actions. *National Agreement* 135, 141, https://www.afge.org/globalassets/documents/ cbas/ 2019-ssa-afge-national-agreement.pdf.

155. The CBA additionally provides for use of SSA office space and up to 250,000 on-duty hours by SSA employees for union activities. *Id.* at 93-94, 186. And the CBA limits SSA's authority to revoke telework agreements. *Id.* at 99, 232.

156. SSA and/or its agencies or components have 2,407 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

157. The SSA CIO office performs essential national security work through its role in cybersecurity. Given the role of computer systems in government functions, cybersecurity is national security. Hostile nation states like China, Iran, and North Korea are constantly seeking to penetrate agency computer systems.

158. More specifically, CIO offices implement cybersecurity frameworks under the Federal Information Security Modernization Act (FISMA) of 2014, protecting agency systems from cyber threats that could compromise national security, such as state-sponsored attacks or ransomware. CIOs also manage systems for storing agency data and personally identifying information—including data that, if shared with foreign governments or terrorist organizations, could pose substantial risks to national security.

## H. Department of Veterans Affairs

159. The VA is an executive agency that is covered by the Executive Order. The VA's mission is to care for those who have served in our nation's military and for their families, caregivers, and survivors. Its Office of Operations, Security, and Preparedness provides strategic

leadership for the VA's nationwide national security operations, preparedness, security, and law enforcement missions and ensures integration across the department.

160. The VA and/or its agencies or components have entered into CBAs with Defendants, including the Department of Veterans Affairs Master Agreement.

161. That CBA includes numerous terms that materially restrict the power of the VA and its components to govern and set policies for the agency's own workforce. For example, it requires underperforming employees' performance improvement periods to last at least 90 days. VA Master Agreement 134, https://afgenvac.org/wp-content/uploads/2023/08/VA-AFGE-2023-Master-Agreement.pdf. Even though Congress gave VA new statutory authority at 38 U.S.C. § 714 to dismiss poor performers without such periods, VA could not use this authority because this CBA contractually required three-month improvement periods. *U.S. Dep't of Veterans Affs.*, 71 F.L.R.A. 1113 (2020). VA was subsequently prohibited from seeking to remove lengthy improvement periods from its contract on the grounds that asking a union to make such a concession was bad faith bargaining. Opinion and Award, *AFGE Council 222 and Dep't of Hous. & Urb. Dev.*, F.M.C.S. Case No. 200310-04768, at 39–42 (Mar. 28, 2021), https://afgecouncil222.com/G/20gopoftdurtermnegarbd.pdf. This CBA therefore functions to prevent VA from using its statutory authority under 38 U.S.C. § 714. The CBA further requires VA to apply the heightened "just and sufficient cause" standard to all disciplinary actions. VA Master Agreement, 50.

162. This CBA also requires VA to give advance notice to employees and unions before opening investigations, tipping off subjects and enabling them to cover their tracks. *Id.* at 95. VA must further negotiate the local effect of changes agreed to in national negotiations, requiring extensive negotiations and delay before the agency can make most changes to working conditions. *Id.* at 243-244.

163. The CBA additionally permits VA employees to spend up to 100% of their on-duty hours on union matters and requires the VA to use taxpayer funds to provide the union with office space, computers, printers, and other supplies and equipment. *Id.* at 245.

164. The VA and/or its agencies or components have 29,582 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

165. Congress has given the VA a primary national security function, making the agency the backstop medical provider for American troops in times of war or any national emergency that involves armed conflict. Congress has also provided that this role may take precedence over almost everything else the VA does, excepting only the treatment of veterans with service-related disabilities. *See* 38 U.S.C. § 8111A.

166. Congress has also tasked the VA with providing medical services during national disasters and national emergencies. *See* 38 U.S.C. § 1785. The agency used that authority during the COVID-19 pandemic. Effective response to national emergencies is a national security function.

## COUNT I
### (FSLMRS AND 28 U.S.C. § 2201)

167. Plaintiffs reassert the allegations set forth above in paragraphs 1–166.

168. The Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The Act serves an important function by allowing parties to seek legal clarity and resolve concrete disputes without taking actions that would expose them to potential liability (for example, by breaching or repudiating a contract, infringing a patent, or violating a statute). *See generally MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

169. Here, the President has issued an Executive Order, entitled *Exclusions from Federal Labor-Management Relations Programs*, which excludes certain agencies and subdivisions

thereof from coverage under 5 U.S.C. Chapter 71. Plaintiff agencies believe that, pursuant to that Executive Order, they may rescind or repudiate the CBAs described above. And Plaintiff agencies wish to rescind or repudiate those CBAs, because they prevent Plaintiff agencies from adopting personnel policies that align with the President's priorities and interfere with the President's direction of agencies engaged in sensitive operations implicating the Nation's security, intelligence, counterintelligence, or investigative functions.

170. An actual controversy has arisen and now exists between the parties concerning the rights and obligations of Plaintiffs under the terms of the CBAs. Pursuant to those agreements, Plaintiff agencies must provide prolonged performance improvement periods for underperforming employees before proposing termination or removal in contravention of Administration priorities; must employ heightened burdens of proof for misconduct-based removals; must permit employees to perform union business during official duty hours payable by taxpayer-funded salaries and wages; suffer often lengthy midterm bargaining delays before they can substantively modify working conditions; and incur various other pecuniary, logistical, and procedural burdens on operations.

171. Plaintiff agencies dispute their obligation to continue abiding by the terms of the CBAs because they have been exempted from the FSLMRS by the President's Executive Order issued pursuant to 5 U.S.C. § 7103(b). That exemption has the legal effect of voiding the extant CBAs. *See Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487*, 338 F.3d 440, 441 (5th Cir. 2003) ("When the NLRB decertified the Union on September 18, 2000, the CBA automatically terminated by operation of law."). And that basis for the invalidity of the CBAs arises under federal law, 5 U.S.C. § 7101 *et seq.*; 22 U.S.C. § 4101 *et seq.*, together with the Executive Order.

172.    But Defendants assuredly will not agree that the CBAs can be lawfully rescinded or repudiated.  Indeed, the National Council of the AFGE has explained that it is "fighting back" against any presidential efforts to streamline the federal workforce and will take steps to litigate against President "Trump's Attacks on Civil Service." *What AFGE Is Doing:  A Recap of AFGE's Major Actions Against Trump's Attacks on Civil Service* (March 3, 2025), https://www.afge.org/article/what-afge-is-doing-a-recap-of-afges-major-actions-against-trumps-attacks-on-civil-service-2/.

173.    There is accordingly a concrete and immediate dispute over the rights of the parties, leaving Plaintiff agencies with uncertainty regarding their power to terminate the subject CBAs pursuant to the Executive Order.  A declaratory judgment is thus appropriate to ratify that Plaintiffs need not continue abiding by the personnel, salary, promotion, and other policies imposed by the subject CBAs.

174.    The Court should declare that Plaintiff agencies do have the power and authority under the Executive Order to rescind or repudiate the subject CBAs.  The Executive Order was lawful under 5 U.S.C. § 7103(b).  Through the Executive Order, the President has determined that Plaintiffs agencies have "as a primary function intelligence, counterintelligence, investigative, or national security work."  5 U.S.C. § 7103(b)(1)(A).  The President has further determined that the provisions of 5 U.S.C. Chapter 71 cannot be applied to each such "agency or subdivision in a manner consistent with national security requirements and considerations."  *Id.* § 7103(b)(1)(B). The Executive Order thus properly excludes those agencies and subdivisions thereof from coverage under 5 U.S.C. Chapter 71.

175.    Because Plaintiff agencies have been properly excluded from coverage under 5 U.S.C. Chapter 71, Plaintiff agencies are free to rescind or repudiate CBAs that were previously negotiated with Defendants' unions.  The statutory provisions that make CBAs binding on

agencies are no longer applicable to Plaintiffs. 5 U.S.C. § 7114(c)(3), 22 U.S.C. § 4113(f)(3). And once repudiation is accomplished, Plaintiff agencies will no longer be bound by the terms of the CBAs. Plaintiff agencies will no longer have a duty to engage in collective bargaining with certain of their employees, and Defendants can no longer represent the employees in collective bargaining.

176.     For the reasons described above, the Court should declare that Plaintiff agencies have the power to terminate the subject CBAs pursuant to the Executive Order.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Declare that Plaintiff agencies are authorized to terminate their CBAs pursuant to the Executive Order and OPM's implementing guidance; and

2. Award such other relief as the Court deems equitable and just.


Dated: March 27, 2025

                              Respectfully submitted,

                              YAAKOV M. ROTH
                              Acting Assistant Attorney General
                              Civil Division

                              ERIC HAMILTON
                              Deputy Assistant Attorney General
                              Civil Division, Federal Programs Branch

                              */s/ Emily Hall*
                              EMILY HALL (D.C. Bar No. 1780317)
                              Counsel to the Assistant Attorney General
                              Civil Division, United States Department of Justice
                              950 Pennsylvania Ave. NW
                              Washington, DC 20530
                              Tel: (202) 307-6482
                              Fax: (202) 514-8071
                              emily.hall@usdoj.gov

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch

LISA ZEIDNER MARCUS
Senior Counsel, Federal Programs Branch

*Counsel for Plaintiffs*

EXHIBIT 5



← Post

## Post



**Elon Musk** ✓ 𝕏
@elonmusk

Interesting

> **Insurrection Barbie** ✓ @DefiyantlyFree · Feb 12
>
> On December 19, 2024, Marc Elias launched Civil Service Strong. The press release calls the firm a  coalition of civil society institutions and organizations, including 2.2 million federal government civil servants.
>
> They literally formed this group to go after Donald Trump
>
> Show more

7:28 PM · Feb 12, 2025 · **7.6M** Views

💬 987        ⟲ 3.1K        ♡ 16K        🔖 389        ⬆️

💬 Read 987 replies

### New to X?

Sign up now to get your own personalized timeline!

[G] Sign up with Google

[🍎] Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

🔄 Retry

Terms of Service    Privacy Policy
Cookie Policy    Accessibility    Ads info
More ···    © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Insurrection Barbie on X: "On December 19, 2024, Marc Elias launched Civil Service Strong. The press release calls the firm a coal…

← **Post**

 **Insurrection Barbie** ✔ 
@DefiyantlyFree

On December 19, 2024, Marc Elias launched Civil Service Strong. The press release calls the firm a  coalition of civil society institutions and organizations, including 2.2 million federal government civil servants.

They literally formed this group to go after Donald Trump legally during the second Trump second term.

This is a coalition of the following organizations:

1. American Federation of Government Employees
2. American Federation of State, County and Municipal Employees
3. Citizens for Responsible Ethics in Washington
4. Democracy Forward
5. Government Accountability Project
6. National Federation of Federal Employees
7. Project on Government Oversight
8. State Democracy Defenders Fund

Almost every single lawsuit that has been filed against the second Trump administration has come from this group. This group combines democratic state Attorneys General, Norm Eisen, Marc Elias and every single one of the Trump haters from act one.

They also have a website where people can educate themselves about the threats to civil service from the Trump administration.

This is the organization that coordinates all of the lawsuits against the administration.

And it can all be traced back to Marc Elias and Norm Eisen.

Because if it seems like it's a coordinated hit job, it usually is.

7:10 PM · Feb 12, 2025 · **9.2M** Views

💬 1.7K          ⇄ 10K          ♡ 23K          🔖 2.1K          ↑

💬 Read 1.7K replies

**New to X?**

Sign up now to get your own personalized timeline!



G  Sign up with Google

  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.



Something went wrong. Try reloading.

↻ Retry

Terms of Service    Privacy Policy
Cookie Policy    Accessibility    Ads info
More ···    © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in        Sign up

EXHIBIT 6





← Post



**Elon Musk** ✓ 𝕏
@elonmusk

Which law firms are pushing these anti-democratic cases to impede the will of the people?


@amuse ✓  @amuse · Feb 11

LAWFARE: Democrat judges across the country are working with Democrat AGs and NGOs to either block/delay president Trump's EOs aimed at reducing fraud, abuse, and waste. This time it is Biden-appointed Judge Angel Kelley from MA ordering Trump to restore DEI funding to the NIH.



☰  **AMUSE·X**                    𝕏  🔍
                                  SUBSCRIBE ON 𝕏

**POLITICS**
**BIDEN JUDGE BLOCKS TRUMP**
**NIH FUNDING PAUSE & CUTS**
Judge Angel Kelley has blocked the President's NIH funding cuts for DEI programs and pauses for most other discretionary funding. The Massachusetts judge is the latest federal judge to block or delay Trump's attempts to reduce fraud, abuse, & waste.

NIH
National Institutes
of Health

AMUSE·X

**SUBSCRIBE TO AMUSE·X**
ACCURACY CONFIDENCE: NORMAL

ALT  amuse

10:24 AM · Feb 11, 2025 · **4.3M** Views

💬 7.8K        🔁 16K        ♡ 48K        🔖 975        ⬆️

💬 Read 7.8K replies

---

### New to X?

Sign up now to get your own personalized timeline!

[G] Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

↻ Retry

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More •••   © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up