Leon Dayan, SBN 153162
Abigail V. Carter*
Ramya Ravindran*
Lane M. Shadgett*
J. Alexander Rowell*
**BREDHOFF & KAISER P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com
*Application *pro hac vice* forthcoming

Daniel Feinberg, SBN 135983
Catha Worthman, SBN 230399
Anne Weis, SBN 336480
**FEINBERG, JACKSON, WORTHMAN & WASOW, LLP**
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Attorneys for Plaintiffs* (Additional Counsel on signature page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; NATIONAL NURSES ORGANIZING COMMITTEE/NATIONAL NURSES UNITED; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; NATIONAL ASSOCIATION OF GOVERNMENT EMPLOYEES, INC.; NATIONAL FEDERATION OF FEDERAL | Case No.: <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

EMPLOYEES, IAM, AFL-CIO;

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S. OFFICE OF
PERSONNEL MANAGEMENT; CHARLES
EZELL, in his official capacity as Acting Director
of the U.S. Office of Personnel Management; U.S.
DEPARTMENT OF STATE; U.S. AGENCY
FOR INTERNATIONAL DEVELOPMENT;
MARCO RUBIO, in his official capacities as U.S.
Secretary of State and Acting Administrator for
the U.S. Agency for International Development;
U.S. DEPARTMENT OF DEFENSE; PETER
HEGSETH, in his official capacity as U.S.
Secretary of Defense; U.S. DEPARTMENT OF
THE TREASURY; SCOTT BESSENT, in his
official capacity as U.S. Secretary of the
Treasury; U.S. DEPARTMENT OF VETERANS
AFFAIRS; DOUG COLLINS, in his official
capacity as U.S. Secretary of Veterans Affairs;
U.S. DEPARTMENT OF JUSTICE; PAMELA
BONDI, in her official capacity as U.S. Attorney
General; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ROBERT F.
KENNEDY JR., in his official capacity as
Secretary of Health and Human Services; U.S.
DEPARTMENT OF HOMELAND SECURITY;
KRISTI NOEM, in her official capacity as
Secretary of Homeland Security; U.S.
DEPARTMENT OF THE INTERIOR; DOUG
BURGUM, in his official capacity as Secretary of
the Interior; U.S. DEPARTMENT OF ENERGY;
CHRIS WRIGHT, in his official capacity as
Secretary of Energy; U.S. DEPARTMENT OF
AGRICULTURE; BROOKE ROLLINS, in her
official capacity as Secretary of Agriculture; U.S.
ENVIRONMENTAL PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as
Administrator of the U.S. Environmental
Protection Agency; U.S. NATIONAL SCIENCE
FOUNDATION; DR. SETHURAMAN
PANCHANATHAN, in his official capacity as
Director of the U.S. National Science Foundation;
U.S. INTERNATIONAL TRADE
COMMISSION; AMY A. KARPEL, in her
official capacity as Chair of the U.S. International
Trade Commission; U.S. GENERAL SERVICES

COMPLAINT                                             2

1  ADMINISTRATION; STEPHEN EHIKIAN, in
   his official capacity as Acting Administrator of
2  the General Services Administration; U.S.
   SOCIAL SECURITY ADMINISTRATION;
3  LELAND DUDEK, in his official capacity as
   Acting Commissioner of the Social Security
4  Administration; U.S. DEPARTMENT OF
   LABOR; LORI CHAVEZ-DEREMER, in her
5  official capacity as Secretary of Labor; U.S.
   DEPARTMENT OF HOUSING AND URBAN
6  DEVELOPMENT; SCOTT TURNER, in his
   official capacity as Secretary of the U.S.
7  Department of Housing and Urban Development;
   U.S. DEPARTMENT OF TRANSPORTATION;
8  SEAN DUFFY, in his official capacity as
   Secretary of Transportation; U.S.
9  DEPARTMENT OF EDUCATION; LINDA
   MCMAHON, in her official capacity as Secretary
10 of Education;

11

12                    Defendants.

13      1.      Congress has long recognized that "labor organizations and collective bargaining

14 in the civil service are in the public interest." 5 U.S.C. § 7101(a). Accordingly, in the Civil Service

15 Reform Act of 1978, it codified an extensive labor-management relations framework for federal

16 civil servants in Chapter 71 of Title 5 of the U.S. Code ("Chapter 71"). For decades, federal civilian

17 employees at agencies across the government have served their country honorably while joining

18 together with their fellow civil servants to collectively bargain.

19      2.      On March 27, 2025, President Trump issued an executive order entitled

20 "Exclusions from Federal Labor-Management Programs," which stripped the vast majority of

21 federal workers of their right to organize and bargain collectively through a labor organization of

22 their choosing ("Exclusion Order"). Although the Exclusion Order purported to be based on

23 national security grounds, it broadly eliminated federal labor law protections for workers across a

24 wide swath of agencies ranging from the Department of Veterans Affairs to the Environmental

25 Protection Agency that have been provided by statute for nearly fifty years.

26      3.      The vast overbreadth of the list of excluded agencies and the incongruity between

27 the stated rationale of national security and those agencies' primary functions would itself raise

28 questions that the invocation of national security was pretextual. But here there is no need to

COMPLAINT                                                                                          3

speculate as to the true rationale behind the Exclusion Order. The White House made clear that it was eliminating federal labor law protections for the vast majority of federal workers in response to constitutionally-protected speech and petitioning activity by Plaintiffs and other federal employee unions in opposition to executive actions by the Trump Administration.

4. The White House Fact Sheet accompanying the Exclusion Order decried actions by "hostile Federal unions" who had "declared war on President Trump's agenda," including by "filing grievances to block Trump policies." The Fact Sheet specifically referenced a statement by the "largest Federal union"—*i.e.*, Plaintiff AFGE—that it was "fighting back" against President Trump's policies. To further drive home the retaliatory intent of the Exclusion Order, the White House Fact Sheet concluded with the message "President Trump supports constructive partnerships with unions who *work with him*." (emphasis added).

5. The avowedly retaliatory nature of the Exclusion Order and its attempt to punish federal unions who engage in politically disfavored speech and petitioning activities and decline to "work with" the President renders it unconstitutional under the First Amendment. Each of the Plaintiff Unions in this case has engaged in extensive speech and petitioning activity that has been broadly critical of "Trump's agenda"—both his agenda to decimate the federal workforce and his broader agenda to fundamentally restructure the federal government through expansive and unprecedented exercises of executive authority.

6. Plaintiffs' efforts have not gone unnoticed. Elon Musk, who runs the President's "Department of Government Efficiency," reposted on X (formerly Twitter) a post attacking a coalition of institutions as conducting a "coordinated hit job" against President Trump's agenda. The post called out Plaintiffs AFGE, AFSCME, and NFFE directly by name and claimed "[a]lmost every single lawsuit that has been filed against the second Trump administration has come from this group" and "[t]his is the organization that coordinates all of the lawsuits against the administration." When reposting the attack, Musk added the comment "Interesting".

7. The Exclusion Order unconstitutionally retaliates against Plaintiffs for their protected First Amendment activity in opposition to President Trump.

8. In addition, the President's actions are *ultra vires* and violate the separation of

powers. In the CSRA, Congress granted federal employees, including those at the agencies listed in the Exclusion Order, the right to join together in unions and collectively bargain with their employers. The statute permits the President in specific narrow circumstances to exclude agencies or subdivisions only upon a determination that those agencies have a *primary function* of intelligence, counterintelligence, investigative, or national security work, and a further determination that Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

9.     Previous presidents respected Congress's wishes and only excluded certain subcomponents of departments. President Trump, however, has treated this limited grant of authority as an invitation from Congress to tear up Chapter 71 altogether. There is no limiting principle that would save Chapter 71 from wholesale Presidential invalidation while permitting the exclusions President Trump has decreed here. President Trump's attack on unions across the government therefore exceeds his authority granted by Congress under the CSRA. His attempt to unilaterally rewrite the statute so as to render its requirements unrecognizable cannot stand.

10.     Furthermore, the Exclusion Order and its implementation by the Office of Personnel Management ("OPM") and the Agency Defendants have also unlawfully stripped away contractual rights and protections from hundreds of thousands of civil servants represented by the Plaintiffs without being provided due process required by the Fifth Amendment: They were never given notice of the President's determination, any underlying evidence supporting it, or an opportunity to rebut that evidence. And indeed, the unilateral abrogation of property rights guaranteed by a contract with the federal government independently violates the Fifth Amendment.

11.     The Exclusion Order also violates the Equal Protection Clause of the Fifth Amendment. The Exclusion Order purports to eliminate federal labor law rights due to alleged "obstruction" caused by provisions in union collective bargaining agreements but retains such rights for other employees at the very same agencies who have similar provisions in their collective bargaining agreements. Singling out groups for disfavored treatment based on whether they are deemed to be "work[ing] with" President Trump is not rationally related to a legitimate government interest.

12.     Because Defendants' actions are *ultra vires* and violate Plaintiffs' and their members' constitutional rights, the Exclusion Order should be enjoined.

### Jurisdiction

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

14.     Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201.

### Venue

15.     The District of Northern California is a proper venue for this action under 28 U.S.C. § 1391(e) because Plaintiff NNOC/NNU resides here and Plaintiffs AFGE, NNOC/NNU, NAGE, and NFFE represent federal employees here who have lost rights at work due to the Exclusion Order.

### Divisional Assignment

16.     This matter should be assigned to the Oakland Division because Plaintiff NNOC/NNU is headquartered in Alameda County and Plaintiff Unions represent federal employees throughout Northern California, including in Alameda County, who have lost rights at work due to the Exclusion Order.

### Parties

17.     Plaintiff American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001. AFGE, the largest union of federal workers, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States and the District of Columbia. It represents more than 50,000 federal employees in California, at agencies including, but not limited to: the Department of Veterans Affairs, the Small Business Administration, the Environmental Protection Agency, and the Department of Defense. AFGE represents employees of the VA who are employed in San Francisco, Oakland, San Bruno, Eureka, Ukiah, Clearlake, and Martinez, California. AFGE represents employees working throughout the San Francisco Bay Area, including employees at the San Francisco Veterans Health Care System, the Palo Alto VA Medical Center, and various Social Security field offices and military installations.

COMPLAINT                                                                                      6

18. AFGE members include nurses caring for our nation's veterans in the Department of Veterans Affairs, civilian employees in the Department of Defense supporting our military personnel and their families, border patrol agents securing our borders, correctional officers maintaining safety in federal facilities, scientists conducting critical research, health care workers serving on military bases, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

19. AFGE is dedicated to fighting for dignity, safety, and fairness on the job for its members, and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

20. Plaintiff American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street, N.W., Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils, and affiliates in 46 states, the District of Columbia and Puerto Rico. AFSCME, through its subordinate bodies including AFSCME District Council 20 and the United Nurses Association of California / Union of Health Care Professionals ("UNAC"), represents federal civilian employees in agencies and departments across the federal government. AFSCME, through UNAC, represents employees of the VA who are employed at Pettis Memorial Hospital in Loma Linda, California and employees of the DOD who are employed at the Naval Medical Center San Diego.

21. AFSCME members include nurses, corrections officers, childcare providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer. Its members working for the federal government make our communities stronger, healthier, and safer by working to ensure aviation safety at the Federal Aviation Administration, criminal justice through the Department of Justice, health care for military servicemembers, veterans, and their families through the Departments of Defense and Veterans Affairs, a high-quality U.S. food system through the Department of Agriculture, the

distribution of free press in repressive regimes worldwide through the Agency for Global Media, and community service through the Peace Corps and AmeriCorps.

22.     Plaintiff National Nurses Organizing Committee/National Nurses United ("NNOC/NNU") is a labor organization and nonprofit corporation headquartered at 155 Grand Ave., Oakland, California 94612. NNOC/NNU members include Registered Nurses working in the Department of Veterans Affairs across 13 states who provide care to our nation's veterans through a broad range of services. Approximately 1000 RNs employed at the San Diego VA are represented by NNOC/NNU. RNs with remote work arrangements are also in NNOC/NNU's bargaining unit. This includes nurses who live and work in Alameda, Marin, and Santa Clara counties in California.

23.     Plaintiff Service Employees International Union, AFL-CIO ("SEIU") is a labor organization of approximately two million working people united by the belief in the dignity and worth of workers and the services they provide. SEIU's members work in healthcare, the public sector, and property services. SEIU has over 150 affiliates across the United States, Canada, and Puerto Rico, and is headquartered at 1800 Massachusetts Ave., N.W., Washington, D.C. 20036.

24.     SEIU members include physicians, technicians, long-term care workers, janitors, security officers, airport workers, librarians, childcare workers, educators, fast food workers, employees who work for city, county, and federal governments, and many more. SEIU, together with its local affiliates, represent approximately 80,000 federal sector employees in the United States, including nurses, doctors, other healthcare workers, police officers, first responders, office workers, scientists, engineers, analysts, maintenance workers, and more. SEIU federal sector members provide a broad swath of services and bring a substantial amount of expertise to numerous agencies across the federal government.

25.     The National Association of Government Employees, Inc. ("NAGE"), also known as the National Association of Government Employees, SEIU Local 5000, is a national labor organization incorporated in Delaware and headquartered at 159 Thomas Burgin Parkway, Quincy, Massachusetts 02169. NAGE is also an affiliate of SEIU. In addition to many thousands of state, municipal, and private sector employees, NAGE represents approximately 75,000 federal civilian

bargaining unit employees. NAGE represents approximately 8,000 federal bargaining unit employees working for VA and DOD in California, including Army and Navy civilian employees working at locations including Naval Support Activity Monterey, Moffett Field, Camp Parks, Fort Hunter Liggett, and Parks Reserve Forces Training Area.

26.     Founded in 1961, NAGE is an organization of members united by the belief in the dignity and worth of all workers and the services they provide. NAGE is dedicated to improving the lives of workers and their families and creating a more just and humane society.

27.     NAGE members include groundskeepers, janitorial staff, cashiers, warehouse workers, childcare providers, drivers, administrative staff, healthcare providers, contract specialists, information technology specialists, technicians, engineers, support personnel, first responders, and many more. NAGE members work at various federal agencies including the Department of Defense, the Department of Veterans Affairs, the National Institutes of Health, the Department of Transportation, the Department of the Interior, and the Environmental Protection Agency.

28.     Plaintiff National Federation of Federal Employees, IAM, AFL-CIO ("NFFE") is an unincorporated association with its principal place of business in Washington, D.C. NFFE, the nation's first federal union, is a national labor union representing approximately 110,000 professional and non-professional federal government workers across the United States. NFFE, through its Local 1, represents professional employees of the San Francisco VA Medical Center and System in San Francisco, Oakland, Palo Alto, and Santa Clara who provide medical care to veterans throughout the Bay Area. NFFE is an affiliate of the International Association of Machinists and Aerospace Workers (IAM).

29.     NFFE members include nurses, psychologists, doctors, and physical therapists caring for our nation's veterans in the Department of Veterans Affairs, civilian employees in the Department of Defense supporting our military personnel and their families, health care workers serving on military bases, wildland firefighters, rangers, and land management specialists in five federal land management agencies, passport specialists verifying and processing millions of U.S. passport applications each year, veterinarians ensuring the humane treatment of animals across the

country, scientists conducting critical research and managing public data, employees improving our nation's aerospace system at the Federal Aviation Administration, and employees of the General Services Administration making sure the federal government has facilities and space to operate.

30. AFGE, AFSCME, NNOC/NNU, SEIU, NAGE, and NFFE ("Plaintiff Unions") bring this action on behalf of themselves as organizations and on behalf of their members, who have lost statutory and contractual protections at work due to the Exclusion Order.

31. Defendant Donald J. Trump is the President of the United States. He is sued solely in his official capacity. In that capacity, he issued the Exclusion Order.

32. Defendant United States Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.

33. Defendant Charles Ezell is Acting Director of OPM and is sued in his official capacity. In that capacity, he issued the memorandum to heads and acting heads of departments and agencies titled "Guidance of Executive Order Exclusions from Federal Labor-Management Programs."

34. Defendant United States State Department ("State") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order.

35. Defendant United States Agency for International Development ("USAID") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order.

36. Defendant Marco Rubio is the Secretary of State and Acting Administrator for USAID and is sued in his official capacities.

37. Defendant United States Department of Defense ("DOD") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order, except for subdivisions under which labor rights may be reinstated by the Secretary of Defense.

38. Defendant Peter Hegseth is the Secretary of Defense and is sued in his official capacity. The Exclusion Order delegates authority to him to reinstate Chapter 71 rights to selected subdivisions of DOD.

COMPLAINT                                                                                    10

39. Defendant United States Department of the Treasury ("Treasury") is a federal agency headquartered in Washington, D.C. Except for the Bureau of Engraving and Printing, it is excluded from Chapter 71 by the Exclusion Order,

40. Scott Bessent is the Secretary of the Treasury and is sued in his official capacity.

41. Defendant United States Department of Veterans Affairs ("VA") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order, except for subdivisions under which labor rights may be reinstated by the Secretary of Veterans Affairs.

42. Doug Collins is the Secretary of Veterans Affairs and is sued in his official capacity. The Exclusion Order delegates authority to him to reinstate Chapter 71 rights to selected subdivisions of VA.

43. Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order, except for certain subdivisions of the United States Marshals Service.

44. Defendant Pamela Bondi is the U.S. Attorney General and is sued in her official capacity.

45. Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C. HHS's component sub-agencies excluded from Chapter 71 by the Exclusion Order include the Office of the Secretary; the Food and Drug Administration ("FDA"); the Centers for Disease Control and Prevention ("CDC"); the Administration for Strategic Preparedness and Response; the Office of General Counsel; the Office of Refugee Resettlement, the Administration for Families and Children; and the National Institute of Allergy and Infectious Diseases, National Institutes of Health ("NIH").

46. Defendant Robert F. Kennedy Jr. is the Secretary of Health and Human Services and is sued in his official capacity.

47. Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C. DHS's component sub-agencies excluded from Chapter 71 by the Exclusion Order include the Office of the Secretary; Office of the General Counsel; Office of Strategy, Policy, and Plans; Management Directorate; Science and Technology

Directorate; Office of Health Security; Office of Homeland Security Situational Awareness; U.S. Citizenship and Immigration Services; United States Immigration and Customs Enforcement ("ICE"); United States Coast Guard ("USCG"); Cybersecurity and Infrastructure Security Agency; and the Federal Emergency Management Agency.

48.  Defendant Kristi Noem is the Secretary of Homeland Security and is sued in her official capacity.

49.  Defendant United States Department of the Interior ("Interior") is a federal agency headquartered in Washington, D.C. Interior's component sub-agencies excluded from Chapter 71 by the Exclusion Order include the Office of the Secretary, the Bureau of Land Management ("BLM"), the Bureau of Safety and Environmental Enforcement, and the Bureau of Ocean Energy Management.

50.  Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

51.  Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order, except for the Federal Energy Regulatory Commission.

52.  Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity.

53.  Defendant United States Department of Agriculture ("USDA") is a federal agency headquartered in Washington, D.C. USDA's component sub-agencies excluded from Chapter 71 by the Exclusion Order include the Food Safety and Inspection Service and the Animal and Plant Health Inspection Service.

54.  Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.

55.  Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order.

56.  Defendant Lee Zeldin is Administrator of the EPA and is sued in his official capacity.

57.   Defendant United States National Science Foundation ("NSF") is a federal agency headquartered in Arlington, VA. It is excluded from Chapter 71 by the Exclusion Order.

58.   Dr. Sethuraman Panchanathan is the Director of the NSF and is sued in his official capacity.

59.   Defendant United States International Trade Commission ("USITC") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order.

60.   Defendant Amy Karpel is Chair of the USITC and is sued in her official capacity.

61.   Defendant United States General Services Administration ("GSA") is a federal agency headquartered in Washington, D.C. It is excluded from Chapter 71 by the Exclusion Order.

62.   Defendant Stephen Ehikian is Acting Administrator of the GSA and is sued in his official capacity.

63.   Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C. DOT's component sub-agencies include the Federal Aviation Administration ("FAA").

64.   Defendant Sean Duffy is Secretary of Transportation and is sued in his official capacity. Secretary Duffy was delegated authority by the Exclusion Order to issue orders excluding any DOT subdivision from Chapter 71.

65.   Defendant United States Social Security Administration ("SSA") is a federal agency headquartered in Washington, D.C. SSA's Office of the Chief Information Officer was excluded from Chapter 71 by the Exclusion Order.

66.   Leland Dudek is Acting Commissioner of the SSA and is sued in his official capacity.

67.   Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C. DOL's Office of the Chief Information Officer was excluded from Chapter 71 by the Exclusion Order.

68.   Defendant Lori Chavez-DeRemer is Secretary of Labor and is sued in her official capacity.

69.   Defendant United States Department of Housing and Urban Development ("HUD")

COMPLAINT                                                                                          13

is a federal agency headquartered in Washington, D.C. HUD's Office of the Chief Information Officer was excluded from Chapter 71 by the Exclusion Order.

70. Scott Turner is the Secretary of HUD and is sued in his official capacity.

71. Defendant United States Department of Education ("Education") is a federal agency headquartered in Washington, D.C. Education's Office of the Chief Information Officer was excluded from Chapter 71 by the Exclusion Order.

72. Linda McMahon is Secretary of Education and is sued in her official capacity.

## Factual Background

### I. Federal Employees at Departments Across the Government Have Served Their Country and Collectively Bargained for Decades

73. For more than 60 years, our federal government has recognized that permitting collective bargaining between agencies and their employees strengthens the public interest.

74. In 1961, President John F. Kennedy formed a "Task Force on Employee-Management Relations in the Federal Service." Secretary of Defense Robert F. McNamara served as one of the Task Force's six members.

75. The Task Force explained that it "most emphatically" endorsed the "view that the public interest calls for a strengthening of employee-management relations within the Federal Government" and called federal employees' involvement "in the formulation and implementation of personnel policies . . . an opportunity to be embraced." Task Force Report at 1190.

76. In 1962, following these recommendations, President John F. Kennedy issued Executive Order No. 10988, "Employee-Management Cooperation in the Federal Sector." This Order recognized that "the efficient administration of the Government . . . require[s] that orderly and constructive relationships be maintained between employee organizations and management officials." Executive Order 10988 established a system where employee organizations could be recognized as exclusive representatives of bargaining units to negotiate binding collective bargaining agreements.

77. Presidents issued new executive orders building on that framework. *See, e.g.,* Exec. Order No. 11491, 34 Fed. Reg. 17605 (Oct. 28, 1969); Exec. Order No. 11838, 40 Fed. Reg. 5743

COMPLAINT 14

(Feb. 6, 1975). While the bargaining frameworks permitted agencies to exclude agencies or subcomponents with "a primary function [of] intelligence, investigative, or security work" when it was determined "that the Order cannot be applied in a manner consistent with national security requirements and considerations," Exec. Order 11,491, § 3(b)(3), at no point was any Cabinet Department excluded writ large from coverage on the basis that collective bargaining was inconsistent with national security requirements and considerations. Rather, for decades federal employees at agencies listed in the Exclusion Order have had the right to join unions and engage in collective bargaining. *See* 1 A/SLMR 1, 1-12 (1971).

## II. Congress Enacts the Civil Service Reform Act of 1978

78.     Nearly five decades ago, Congress enacted the Civil Service Reform Act of 1978, which statutorily established collective bargaining for federal employees in Title VII, codified at Chapter 71 of Title 5 of the U.S. Code ("Chapter 71"). [1]

79.     This Act "significantly strengthened the position of public employee unions while carefully preserving the ability of federal managers to maintain 'an effective and efficient Government.'" *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 92 (1983) (quoting 5 U.S.C. § 7101(b)).

80.     In enacting the CSRA, Congress found that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a).

81.     Chapter 71 guarantees employees "the right to form, join, or assist any labor organization, or to refrain from any such activity." 5 U.S.C. § 7102.

82.     Chapter 71 also guarantees employees the right to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." 5 U.S.C. § 7102(2).

83.     Chapter 71 requires agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election." 5

---

[1] Chapter 71 of Title 5 is also known as the Federal Service Labor-Management Relations Statute.

U.S.C. § 7111(a).

84.     Once labor organizations are certified as exclusive representatives, they must act for "all employees in the unit" and are required to represent the interests of all such employees "without discrimination and without regard to labor organization membership." 5 U.S.C. § 7114(a)(1).

85.     Federal employees voluntarily choose to join labor organizations and to pay membership dues to those organizations. 5 U.S.C. § 7115. If an employee within a bargaining unit so chooses and provides a written authorization to do so, agencies are required to deduct membership dues from an employee's pay and transmit those dues to the labor organization. *Id.* No employee is mandated to pay any membership dues, or any agency or other fees, to a labor organization under the statutory framework.

86.     Chapter 71 requires agencies and exclusive representatives to negotiate in good faith to reach a collective bargaining agreement. "[I]f agreement is reached," agencies and exclusive representatives are required "to execute on the request of any party to the negotiation a written document embodying the agreed terms, and to take such steps as are necessary to implement such agreement." 5 U.S.C. § 7114(b)(5). Upon approval of the agency head, or failure to approve or disapprove the agreement within 30 days, the agreement "shall take effect and shall be binding on the agency and the exclusive representative." *Id.* § 7114(c)(3).

87.     Collective bargaining agreements entered into by Plaintiffs have provided bargaining unit employees with protections such as safety and health requirements to ensure their welfare, protections for workers regarding reduction-in-force ("RIF") actions and procedures, procedures for and limits on discipline and adverse actions against members, and provisions covering working hours, overtime, sick leave, and time off.

88.     As part of Congress's efforts to design a system "to meet the special requirements and needs of the Government," *id.* § 7101(b), Chapter 71 expressly protects enumerated management rights, excluding these topics from the collective bargaining process, *id.* § 7106. For example, these rights protect agency officials' authority "to determine the mission, budget, organization, number of employees, and internal security practices of the agency," and "in

COMPLAINT                                                                                    16

accordance with applicable laws . . . to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees." 5 U.S.C. § 7106.

89. Chapter 71 also protects the management right to "take whatever actions may be necessary to carry out the agency mission during emergencies." *Id.*

90. The bargaining framework is further tailored to ensure government flexibility by removing certain employees from its coverage. For example, Chapter 71 excludes "management official[s]"—individuals in positions "the duties and responsibilities of which require or authorize the individual to formulate, determine, or influence the policies of the agency"—from its definition of "employee." *Id.* § 7103 (a)(2), (a)(11). Furthermore, bargaining units may not include "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." *Id.* § 7112(b)(6).

91. Likewise, Chapter 71 expressly excludes certain agencies from its scope, including the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service. 5 U.S.C. § 7103(a)(3).

92. In certain limited circumstances, the President is permitted to issue orders excluding other agencies or subdivisions thereof from Chapter 71. This is only permissible after a determination is made that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) "the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

93. Presidents' past use of this § 7103(b)(1) authority demonstrates its limited scope: It has never been used to exclude an entire Cabinet Department from Chapter 71. Instead, presidents have only used this authority to exclude specific sub-department agencies or subdivisions thereof. *See, e.g.,* Exec. Order 12171, 44 Fed. Reg. 66565 (Nov. 19, 1979) (excluding, *inter alia*, six intelligence-focused "[a]gencies or subdivisions of the Department of

COMPLAINT                                                                                    17

the Army, Department of Defense"); Exec. Order 12410, 48 Fed. Reg. 13143 (Mar. 28, 1983) (excluding the Joint Special Operations Command, a subdivision under the jurisdiction of the Joint Chiefs of Staff); Exec. Order 13039, 62 Fed. Reg. 12529 (Mar. 11, 1997) (excluding the Naval Special Warfare Development Group, a subdivision of the Department of the Navy, Department of Defense).

94.     In January 2020, President Trump issued a memorandum that purported to delegate his authority under 5 U.S.C. § 7103(b)(1) to "issue orders excluding Department of Defense agencies or subdivisions thereof" from coverage under Chapter 71 to the Secretary of Defense. 85 Fed. Reg. 10033 (Jan. 29, 2020).

95.     Then-Secretary of Defense Mark Esper testified before Congress that he did not request the authority from the President and could not recall a time in the past where using this authority would have been warranted. Secretary Esper explained he would wait to see what his staff recommended "and make an assessment from there." Mark Esper Testimony, House Armed Services Committee (Feb. 27, 2020).

96.     A bipartisan coalition of U.S. senators pushed back against using this authority to strip bargaining rights from DOD employees en masse, explaining that "collective bargaining is not only compatible with this needed flexibility, but also is a key component in preserving flexibility by giving employees a voice in the system and providing avenues for management to receive feedback." Erich Wagner, "Senators from Both Political Parties Urge Trump to 'Reconsider' Defense Union Memo," *Government Executive* (Feb. 28, 2020). They went on to note that "exemptions permitted by the process are not meant to be given widely to an entire department as a sweeping declaration, but to be carefully considered." *Id.*

97.     Secretary Esper never exercised the authority delegated by President Trump.

98.     On February 24, 2021, President Joe Biden rescinded the delegation to the Secretary of Defense that purported to allow the secretary to exercise the president's 5 U.S.C. § 7103(b)(1) authority. Exec. Order 14018 § 1, 86 Fed. Reg. 11855 (Feb. 24, 2021).

**III.   Plaintiff Unions Speak Out Against Executive Actions by the Trump Administration**

99.   From the beginning of his second term, President Trump has sought to reduce the size of, and the protections afforded to, the federal workforce. *See, e.g.*, Exec. Order 14171, 90 Fed. Reg. 8625 (Jan. 20, 2025) (purporting to eliminate civil service protections for "policy-influencing" positions); Exec. Order 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) (establishing "Department of Government Efficiency").

100.   Guided by Elon Musk and the Department of Government Efficiency ("DOGE"), the Trump administration has fired tens of thousands of civil servants who were serving their probationary period, sought to eradicate entire government agencies, and is seeking to fire tens or hundreds of thousands more through mass reductions-in-force. *See* Exec. Order 14210, 90 Fed. Reg. 11095 (Feb. 11, 2025) (calling for "large-scale reductions in force").

101.   Plaintiff Unions have been on the front lines in the press, social media, airwaves, and in the courts opposing the Trump administration's agenda. This includes lawsuits against the Trump administration and DOGE's efforts to strip federal workers of their rights and to fire them en masse and other examples of executive overreach. *See, e.g.*, *AFGE v. Trump*, No. 1:25-cv-00264 (D.D.C.) (AFGE, AFSCME); *AFGE v. Ezell*, No. 1:25-cv-10276 (D. Mass.) (AFGE, AFSCME, NAGE); *AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal.) (AFGE, AFSCME); *Widakuswara v. Lake*, No. 25-cv-002390 (S.D.N.Y.) (AFGE, AFSCME); *AFSCME v. SSA*, No. 1:25-cv-00596 (D. Md.) (AFSCME); *AFL-CIO v. DOL*, No. 1:25-cv-00339 (D.D.C.) (AFSCME, AFGE, SEIU); *All. for Retired Ams. v. Bessent*, No. 1:25-cv-00313 (D.D.C.) (AFGE, SEIU); *Somerville Public Schools v. Trump*, No. 1:25-cv-10677 (D. Mass.) (SEIU, AFSCME Council 93); *NTEU v. Trump*, No. 1:25-cv-00420 (D.D.C.) (NFFE); *AFT v. Bessent*, No. 8:25-cv-00430 (D. Md.) (NFFE); *Ctr. for Taxpayer Rts. v. IRS*, 1:25-cv-00457, (D.D.C.) (NFFE).

102.   It could not be clearer that the Trump administration is monitoring which entities are filing suits against the administration. Musk reposted on X an attack on a coalition of organizations supporting the civil service, which includes members who have filed suits challenging Trump administration policies, that characterized the group as conducting a

"coordinated hit job" on President Trump's agenda and directly named Plaintiffs AFGE, AFSCME, and NFFE. @elonmusk, X (Feb. 12, 2025, 10:28 PM), https://x.com/elonmusk/status/1889879302965191056. Musk also reposted a story on X about a lawsuit successfully blocking cuts to National Institutes of Health funding stating "Which law firms are pushing these anti-democratic cases to impede the will of the people?" @elonmusk, X (Feb. 11, 2025, 1:24 PM), https://x.com/elonmusk/status/1889380095015465272.

103.    And President Trump himself has announced his intention to use his administration to target groups based on their speech, stating "We have a lot of law firms that we're going to be going after . . . [b]ecause they were very dishonest people." Joe DePaolo, *'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'*, Mediaite (Mar. 9, 2025), https://www.mediaite.com/news/we-have-a-lot-of-law-firms-were-going-after-trump-declares-plan-to-target-law-firms-he-considers-very-very-dishonest/. And during a March 24, 2025 cabinet meeting, President Trump reiterated his intention to retaliate against law firms, stating "law firms have to behave themselves," and "they behave very badly, very wrongly." Michael Birnbaum, *Law firms refuse to represent Trump opponents in the wake of his attacks*, Washington Post (Mar. 25, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/.

104.    President Trump has issued multiple executive orders seeking to punish law firms because they represented clients or causes disfavored by the President. *See, e.g.,* Exec. Order 14230, *Addressing Risks from Perkins Coie LLP* (Mar. 6, 2025) (ordering agencies to terminate contracts with law firm that Trump claimed "worked . . . to judicially overturn . . . election laws"); Exec. Order 14237, *Addressing Risks from Paul Weiss* (Mar. 14, 2025) (same, regarding law firm that "brought a pro bono suit against individuals" involved in the January 6 Capitol riot); Exec. Order 14246, *Addressing Risks from Jenner & Block* (Mar. 25, 2025) (same, regarding law firm that Trump claimed "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States"); Exec. Order, *Addressing Risks from WilmerHale* (Mar. 27, 2025) (same).

105.    The focus on lawsuits against the administration is further demonstrated by a

March 6, 2025 memorandum for agency heads from President Trump stating that "[i]n recent weeks, activist organizations . . . have obtained sweeping injunctions . . . functionally inserting themselves into the executive policy making process and therefore undermining the democratic process" and demanding that agencies request that courts require securities to be posted by parties seeking preliminary relief.

106.  Plaintiff Unions, along with their allies, have achieved major success in court cases challenging the legality of various executive actions taken by the Trump administration. For example, on March 13, 2025, in a case brought by AFGE, AFSCME, local unions, and non-profit organizations, a federal judge granted a preliminary injunction from the bench that required reinstatement of thousands of fired probationary workers at the Departments of Veterans Affairs, Agriculture, Interior, Energy, Defense, and Treasury. *AFGE v. Ezell*, No. C-25-01780-WHA, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025).

107.  Each Department ordered to reinstate their unlawfully fired probationary workers due to *AFGE v. Trump*, or subcomponents thereof, are included in the Exclusion Order.

108.  On March 21, AFSCME and AFGE joined journalists, other unions, and non-profit press freedom organizations to challenge the Trump Administration's dismantlement of the U.S. Agency for Global Media and its Voice of America media programming, which promotes free press and democracy abroad. *Widakuswara v. Lake*, No. 25-cv-02390 (S.D.N.Y.). They filed for a temporary restraining order on March 24, which was granted on March 28.

109.  Plaintiff Unions have also sought to protect Americans' data by challenging actions by DOGE. Unions including AFGE, AFSCME, and SEIU sued the Department of Labor on February 5, 2025 to protect sensitive data at the DOL. *AFL-CIO v. DOL*, No. 1:25-cv-00339 (D.D.C.). AFGE and SEIU brought a suit against the Treasury Department on February 3, 2025 to protect sensitive personal and financial data. *All. for Retired Ams. v. Bessent*, No. 1:25-cv-00313 (D.D.C.). NFFE and others sued the Education Department, Treasury Department, and OPM on February 10, 2025 and obtained a preliminary injunction protecting their members' data on March 24, 2025. *AFT v. Bessent*, No. DLB-25-0430, 2025 WL 895326 (D. Md. Mar. 24, 2025). And AFSCME and others sued the Social Security Administration and DOGE and obtained a TRO

protecting personal data on March 20, 2025. *AFSCME v. SSA*, No. 1:25-cv-00596, 2025 WL 868953 (D. Md. Mar. 20, 2025.)

110.    Plaintiff Unions have also worked to enforce the rights of their members and bargaining unit employees by filing grievances against agencies when Trump administration policies violate the rights of covered employees. For example, at the VA, AFGE affiliates and NNOC/NNU have filed grievances on policies including the "5 points" email and cancellation of alternative workplace arrangements at the VA.

### IV.    In Response to "Hostile Unions," Trump Issues the Exclusion Order

111.    The night of March 27, 2025, President Trump issued the Exclusion Order. In it, he declared that pursuant to his authority under 5 U.S.C. § 7103(b), the following agencies and subdivisions (the "Excluded Agencies"), and accordingly, their employees, were excluded from Chapter 71 of Title 5:

    a.  The Department of State.

    b.  The Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'

    c.  The Department of the Treasury, except the Bureau of Engraving and Printing.

    d.  The Department of Veterans Affairs.

    e.  The Department of Justice.

    f.  Agencies or subdivisions of the Department of Health and Human Services:

        i.  Office of the Secretary.

        ii.  Food and Drug Administration.

        iii.  Centers for Disease Control and Prevention.

        iv.  Administration for Strategic Preparedness and Response.

        v.  Office of the General Counsel.

        vi.  Office of Refugee Resettlement, Administration for Children and Families.

        vii.  National Institute of Allergy and Infectious Diseases, National Institutes of Health.

COMPLAINT                                                                                          22

g. Agencies or subdivisions of the Department of Homeland Security:

    i. Office of the Secretary.

    ii. Office of the General Counsel.

    iii. Office of Strategy, Policy, and Plans.

    iv. Management Directorate.

    v. Science and Technology Directorate.

    vi. Office of Health Security.

    vii. Office of Homeland Security Situational Awareness.

    viii. U.S. Citizenship and Immigration Services.

    ix. United States Immigration and Customs Enforcement.

    x. United States Coast Guard.

    xi. Cybersecurity and Infrastructure Security Agency.

    xii. Federal Emergency Management Agency.

h. Agencies or subdivisions of the Department of the Interior:

    i. Office of the Secretary.

    ii. Bureau of Land Management.

    iii. Bureau of Safety and Environmental Enforcement.

    iv. Bureau of Ocean Energy Management.

i. The Department of Energy, except for the Federal Energy Regulatory Commission.

j. The following agencies or subdivisions of the Department of Agriculture:

    i. Food Safety and Inspection Service.

    ii. Animal and Plant Health Inspection Service.

k. The International Trade Administration, Department of Commerce.

l. The Environmental Protection Agency.

m. The United States Agency for International Development.

n. The Nuclear Regulatory Commission.

o. The National Science Foundation.

p. The United States International Trade Commission.

q. The Federal Communications Commission.

r. The General Services Administration.

s. The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

    i. Office of the Chief Information Officer.

    ii. any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.

112. Although the Exclusion Order purported to be tailored to those agencies and subdivisions that have as their primary function "intelligence, counterintelligence, investigative, or national security work," the Order *carved out* from the exclusion subdivisions of the United States Marshals Service, as well as "any agency police officers, security guards, or firefighters" *except* those working at the Bureau of Prisons. Exclusion Order § 2 (1-499(a)).

113. Plaintiff AFGE and its affiliated subordinate bodies represent all bargaining unit employees at the Bureau of Prisons.

114. The Exclusion Order permitted the Departments of Defense and Veterans Affairs—but only these Departments—to suspend the application of the Order and restore Chapter 71 coverage to selected subdivisions. *Id.* § 4. But they must make that determination within 15 days and publish it in the Federal Register.

115. All of the Plaintiff Unions represent employees at the VA whose bargaining rights are in limbo: their rights were eliminated by the order, and are now at the mercy of a decision by the VA Secretary. And AFGE, AFSCME, NAGE, and NFFE represent DOD employees in a similar situation.

116. The Exclusion Order delegated authority to the Secretary of Transportation to issue orders excluding its subdivisions, including the Federal Aviation Administration, from Chapter 71 coverage. *Id.* § 5.

117. Plaintiff Unions AFGE, AFSCME, and NAGE represent DOT employees whose rights are now placed in jeopardy and could be eliminated by the Transportation Secretary.

COMPLAINT    24

118.     The Exclusion Order signals that additional exclusions are forthcoming: it asks each agency head to report within 30 days to the President which additional agency subdivisions they determine should be excluded from Chapter 71. *Id.* § 7.

119.     Each of the Plaintiff Unions represents employees at some of these currently non-excluded agencies and/or subdivisions, such that their members' collective bargaining rights are hanging in the balance.

120.     The Exclusion Order directs agency heads to, "upon termination of the applicable collective bargaining agreement," reassign employees who were conducting official time business, terminate pending grievance proceedings, and terminate proceedings before the Federal Labor Relations Authority involving exceptions or arbitral awards or unfair labor practices. *Id.* § 6.

121.     At no point did President Trump give notice or the underlying unclassified evidence supporting his determination to the affected employees and exclusive representatives whose statutory bargaining rights he eliminated and whose contracts he abrogated.

122.     The affected employees and exclusive representatives also had no opportunity to rebut the evidence underlying the determination that purportedly formed the basis of the exclusion.

123.     A White House spokesperson explained the President's motivation for the Exclusion Order: "The goal is to stop employees in certain security-related agencies from unionizing in ways that disrupt the president's agenda." Rebecca Davis O'Brien, "Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts," *New York Times* (Mar. 29, 2025) https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html.

**OPM Exclusion Memorandum**

124.     Before the Executive Order was publicly issued, Charles Ezell, the Acting Director of the Office of Personnel Management, issued a memorandum to heads and acting heads of departments and agencies titled "Guidance of Executive Order Exclusions from Federal Labor-Management Programs" ("Exclusion Memorandum").

125.     OPM's Exclusion Memorandum explained that Chapter 71 and the Foreign Service Labor-Management Relations Statute "will no longer apply" to the agencies listed in the Exclusion Order. Exclusion Memorandum p.1.

COMPLAINT                                                                                                  25

126. As such, the Exclusion Memorandum stated that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions." *Id.* at 3.

127. The Exclusion Memorandum emphasized that the Exclusion Order caused unions to "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" the Order. *Id.*

128. The Exclusion Memorandum then instructed agencies to "consider and implement the changes described below," outlining "some common provisions of agency CBAs that may be inconsistent with the President's policies and management priorities." *Id.*

129. OPM instructed agencies "[t]o implement [the Exclusion Order], agencies should cease participating in grievance procedures after terminating their CBAs." *Id.* at 5.

130. Highlighting that the Exclusion Order is intended to make it easier to fire workers en masse, OPM also instructed agencies to "[d]isregard [c]ontractual RIF [a]rticles," such that "[a]fter termininating their CBAs," they "should conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond" statutory and regulatory requirements. *Id.*

131. OPM instructed agencies that after they "terminate CBAs that require [Performance Improvement Plans ("PIPs")] of more than 30 days, they should take prompt action to reduce PIPs for former bargaining unit employees to no more than 30 days." *Id.* at 4.

132. OPM instructed agencies "that have terminated their CBAs" to "thereafter use chapter 75 procedures to separate underperforming employees without PIPs in appropriate cases." *Id.*

133. OPM explained that "employees no longer have representational activities to conduct once their agency or subdivision has been excluded from the [Chapter 71] coverage," such that the Exclusion Order "requires agencies to promptly return" employees on official time to conduct representational work "to performing solely agency business." *Id.* at 6.

134. OPM also instructed agencies that "[w]hen a covered agency terminates its CBAs," they should terminate allotments to dues payments through agency payroll systems. *Id.*

**White House Fact Sheet**

135. That same night, the White House issued a Fact Sheet describing its Exclusion

COMPLAINT                                                                26

Order. The White House, Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025) https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

136. The Fact Sheet laid bare the true reason for the President's Exclusion Order: retaliating against Plaintiff Unions for daring to stand up and oppose "President Trump's agenda."

137. In the Fact Sheet, the White House referred to "hostile Federal unions" and asserted that "Certain Federal unions have declared war on President Trump's agenda."

138. The Fact Sheet stated that "[t]he largest Federal union"—Plaintiff AFGE—"describes itself as 'fighting back' against Trump. It is widely filing grievances to block Trump policies."

139. The Fact Sheet further highlighted that "VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration – an average of over one a day."

140. Each Plaintiff Union represents employees at the VA, and most Plaintiff Unions or their affiliates have filed grievances to advocate for their members' rights at the VA since President Trump's inauguration.

141. The Fact Sheet also made clear that President Trump was targeting unions based on their viewpoint, stating "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions."

**Waco Lawsuit**

142. The same night, and on information and belief before the Exclusion Order was published on the White House website, the Departments of Defense, Agriculture, Homeland Security, Housing and Urban Development, Justice, and Veterans Affairs, along with the Environmental Protection Agency and Social Security Administration, filed suit in the Western District of Texas at Waco against a collection of local unions and councils (the "Waco Lawsuit").

143. All of the local unions and councils sued in the Waco Lawsuit are affiliated with

COMPLAINT                                                                27

1    Plaintiff AFGE.

2        144.    In the Waco Lawsuit, the Trump administration attacks core tenets of the collective

3    bargaining framework set forth by Congress in Chapter 71 of Title 5.

4        145.    For example, it decries that CBAs include provisions related to "unaccountable

5    private arbitrators in the form of grievance adjudication," Waco Compl. ¶ 3, despite the fact that

6    Congress provided that all CBAs "shall provide procedures for the settlement of grievances,

7    including questions of arbitrability" and that grievance procedures in federal CBAs "shall be

8    subject to binding arbitration," 5 U.S.C. § 7121(b)(1)(C)(iii); *see also* Waco Compl. ¶ 104 (noting

9    that a CBA requires an agency "to arbitrate grievances at the union's request").

10       146.    In the Waco Lawsuit, the plaintiff departments contend that the Exclusion Order,

11   in conjunction with Chapter 71 and the Foreign Service Labor Relations Act, "vitiate[s] their CBAs

12   with Defendants." Waco Compl. ¶ 13.

13       147.    The Waco Lawsuit highlights that Plaintiff AFGE has published an article on its

14   website stating it is "fighting back" against the Trump administration's "Attacks on Civil Service."

15   Waco Compl. ¶ 172.

16       148.    That article, published March 3, 2025, catalogued an extensive list of First

17   Amendment-protected activities in which AFGE was engaged in response to executive actions

18   taken by the Trump administration. It highlighted AFGE's involvement in seven lawsuits against

19   the administration in federal court. These included not only lawsuits to protect the rights of federal

20   employees, but also multiple lawsuits "against the administration for sharing confidential data with

21   the so-called Department of Government Efficiency (DOGE) run by Elon Musk." It stated that

22   AFGE "continues to educate the public about the impact of these anti-worker policies on federal

23   employees and the American people who rely on them to provide the services they have paid for

24   and deserve" and its "leaders have been giving interviews to the media and have been quoted

25   extensively on the danger of these policies." And it explained that it was "working with councils

26   and locals in drafting local and national grievances against actions that violated our contracts."

27   AFGE, *What AFGE Is Doing: A Recap of AFGE's Major Actions Against Trump's Attacks on*

28   *Civil Service* (Mar. 3, 2025), https://www.afge.org/article/what-afge-is-doing-a-recap-of-afges-

major-actions-against-trumps-attacks-on-civil-service-2/.

149. The various departments bringing the Waco Lawsuit requested declaratory relief that they "have the power to terminate the subject CBAs pursuant to the Executive Order." Waco Compl. ¶ 176.

**V.    Plaintiff Unions' Representation of Employees at Excluded Agencies and the DOT**

150. AFGE represents approximately 6,490 employees working at the Department of State, including at the Bureau of the Comptroller. Its members provide office support and assistance to the department.

151. NFFE represents approximately 1,540 employees working at Passport Services at the Department of State. Its members process millions of passport applications for American citizens.

152. AFGE represents nearly 250,000 civilian employees working throughout the Department of Defense, at a wide variety of agencies including but not limited to the Defense Health Agency, Army and Air Force Exchange Services, Defense Commissary Agency, Defense Contract Management Agency, Defense Finance and Accounting Service, and service branches including the Army, Air Force, Marine Corps, Navy, and National Guard.

153. AFSCME represents around 400 federal employees who, as registered nurses, provide health care at the Naval Medical Center San Diego, a component of the DOD.

154. NAGE represents approximately 40,000 employees working at Defense agencies including but not limited to Army and Air Force Exchange Services, Defense Commissary Agency, the Navy Exchange, Defense Intelligence Agency, and service branches including the Army, Air Force, Marine Corps, Navy, and National Guard.

155. NFFE represents approximately 21,900 employees working at Defense agencies including Defense Health Agency and service branches including the Army, Air Force, Space Force, Marine Corps, Navy and Coast Guard.

156. AFGE represents approximately 1,100 employees working at the U.S. Mint in the Department of Treasury. Its members include coin press operators, machinists, police officers, and other professional and non-professional staff.

COMPLAINT                                                                                          29

157. AFGE represents approximately 320,000 employees working throughout the VA. AFGE members, many who are veterans themselves, serve veterans working in a variety of roles, including pharmacists, nurses, social workers, chaplains, housekeeping aids, veterans claim examiners, veterans service representatives, canteen staff, custodians, and physicians.

158. NNOC/NNU represents approximately 16,400 Registered Nurses working at the VA. RNs represented by NNOC/NNU provide care to our nation's Veterans, through a broad range of services, including but not limited to inpatient and outpatient services, care at and away from the bedside, working in units ranging from critical care units to in-home services, and also providing patient education.

159. SEIU and/or its affiliates represent approximately 27,000 employees providing services to veterans at the VA.

160. NAGE represents approximately 22,000 employees working at the VA. NAGE members serve veterans in a variety of ways including as physicians, nursing staff, pharmacists, technicians, medical support assistants, counselors, therapists, administrative staff, food service workers, groundskeepers, janitorial staff, and cemetery workers.

161. AFSCME represents approximately 850 employees who, as registered nurses, provide health care at the VA.

162. NFFE represents approximately 9,700 employees working at the VA.

163. AFGE represents approximately 28,000 employees, primarily corrections officers, at the Department of Justice working at the Bureau of Prisons and Executive Office for Immigration Review.

164. AFSCME represents approximately 600 employees at the DOJ working for the Office of Justice Programs, the DOJ's largest grant making component. It also represents DOJ employees at the U.S. Parole Commission, Justice Management Division, Office of Community Oriented Policing Services, and some of the DOJ's Litigation Divisions. In total AFSCME represents around 1,500 DOJ employees.

165. AFGE represents approximately 2,500 employees at the Department of Health and Human Services working at the Center for Disease Control and Prevention, who serve in various

positions such as health communication specialists. In addition, AFGE represents approximately 100 employees at the Department of Health and Human Services working at the Food and Drug Administration, who serve in various positions.

166.    AFGE represents approximately 25,000 employees at the Department of Homeland Security in subcomponents included in the Exclusion Order. The employees represented by AFGE are employees working at Citizenship and Immigration Services in positions such as economists, program analysts at the Federal Emergency Management Agency, mechanics and financial clerks for the U.S. Coast Guard, and professional employees at Immigration and Customs Enforcement.

167.    AFGE represents approximately 800 employees at the Department of Interior. The employees represented by AFGE are employees of the National Information Resources Management Center, Bureau of Land Management, and Office of Secretary in various positions.

168.    NFFE represents approximately 1,500 employees at the Department of Interior's Bureau of Land Management.

169.    AFGE represents approximately 3,800 employees at the Department of Energy in excluded components. The employees represented by AFGE are professional and non-professional employees.

170.    AFGE represents approximately 6,000 employees in the Food Safety and Inspection Service and the Animal and Plant Health Inspection Service at the Department of Agriculture.

171.    NFFE represents approximately 120 employees at the Animal and Plant Health Inspection Service at the Department of Agriculture. NFFE also represents approximately 130 employees at the Office of the Chief Information Officer at the Department of Agriculture.

172.    AFGE represents approximately 8,500 employees working at the Environmental Protection Agency in a variety of positions, including budget analysts, program analysts, biologists, chemists, and lawyers.

173.    NAGE represents approximately 400 employees working at the Environmental Protection Agency in a variety of positions.

174.    AFGE represents approximately 1,000 USAID employees working in a variety of

COMPLAINT                                                                    31

1    positions, including program analysts.

2         175.    AFGE represents approximately 700 employees working at the National Science

3    Foundation in a variety of positions, including IT specialists and mathematicians.

4         176.    AFGE represents approximately 250 employees working at the International Trade

5    Commission in a variety of positions.

6         177.    AFGE represents approximately 4,000 employees working at the General Services

7    Administration in a variety of positions, including architects, accountants, engineers, contract

8    specialists, project managers, program analysts, and realty specialists.

9         178.    NFFE represents approximately 3,100 employees working at the General Services

10   Administration.

11        179.    NAGE represents approximately 800 employees working at the Federal Aviation

12   Administration and the U.S. Volpe National Transportation Center, contained within the

13   Department of Transportation, in a variety of positions, including flight data specialists, engineers,

14   scientists, community planners, and others.

15        180.    AFSCME represents approximately 2,000 non-supervisory employees working at

16   the Federal Aviation Administration, contained within the Department of Transportation.

17        181.    NFFE represents approximately 800 employees working at the Federal Aviation

18   Administration, contained within the Department of Transportation.

19        182.    AFGE represents approximately 4,600 employees at the Department of

20   Transportation, including employees at the FAA, FRA, FTA, NHTSA, PHMSA, FMCSA and

21   Great Lakes Saint Laurence Seaway Development Corporation. AFGE members at the Department

22   of Transportation work in a variety of positions including program analysts and economists.

23        183.    AFGE represents employees in the Office of Chief Information Officer at the Social

24   Security Administration, the Department of Housing and Urban Development, the Department of

25   Education, and the Office of Personnel Management.

26   **VI.    Plaintiff Unions and Their Members Have Been Harmed by the Exclusion Order**

27        184.    Plaintiff Unions AFGE, AFSCME, NNOC/NNU, SEIU, NAGE, and NFFE on their

28   own or in conjunction with their affiliated councils and locals, represent members and bargaining

COMPLAINT                                                                              32

unit employees in agencies and departments across the federal government for which they or their affiliates have been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

185. As described above, Plaintiff Unions represent members and bargaining unit employees at agencies included in the Exclusion Order.

186. Membership in Plaintiff Unions is voluntary.

187. The leadership of Plaintiff Unions are democratically elected by and from their respective members.

188. The activities of Plaintiff Unions are funded by their members through voluntary membership dues.

189. AFGE represents approximately 660,000 civilian employees working in Excluded Agencies, including DOD, Treasury, VA, DOJ, HHS, DHS, Interior, Energy, USDA, EPA, USAID, and GSA.

190. AFSCME represents approximately 2,700 civilian employees working in Excluded Agencies, including DOD, VA, and DOJ.

191. NNOC/NNU represents approximately 16,400 civilian employees working at the VA, an Excluded Agency.

192. SEIU and/or its affiliates represents approximately 27,000 civilian employees working at the VA, an Excluded Agency.

193. NAGE represents approximately 62,400 civilian employees working in Excluded Agencies, including DOD, VA, and EPA.

194. NFFE represents approximately 37,900 civilian employees working in Excluded Agencies, including DOD, VA, Interior (BLM), USDA (APHIS), State, and GSA.

195. Plaintiff Unions' representation of federal civilian employees includes engaging in collective bargaining with federal agencies, providing representation in binding arbitrations and other matters, including formal discussions and investigative examinations, arising under the Federal Service Labor-Management Relations Statute, 5 U.S.C. Ch. 71, political advocacy, the submission of public comments to agency rulemakings, and litigation in court.

196. By removing a wide swath of agencies at which Plaintiffs represent employees from

the coverage of Chapter 71, the Exclusion Order dramatically impairs the ability of Plaintiff Unions and their affiliates to perform core services for their members: representing them in negotiations with agencies to secure binding collective bargaining agreements covering federal employees' working conditions, and enforcing those obligations through contractual grievance procedures and before the Federal Labor Relations Authority.

197.    Because of the Exclusion Order, Plaintiff Unions and/or their affiliated subordinate bodies have lost "their status as the 'exclusive[ly] recogni[zed]' labor organizations for the employees of the" Excluded Agencies. Exclusion Memorandum at 3.

198.    As a result of the Exclusion Order, Excluded Agencies are refusing to participate in proceedings before the Federal Labor Relations Authority

199.    For example, one Excluded Agency has informed AFGE and Federal Labor Relations Authority that it is no longer engaging in the process to hold an election to determine if employees wish to be represented by AFGE pursuant to a petition for representation filed in February. And the FLRA has informed NNOC/NNU that a representation case hearing was "indefinitely postponed" due to the Exclusion Order.

200.    As a result of the Exclusion Order, Excluded Agencies are refusing to honor contractual obligations made to their employees and their exclusive representatives, including Plaintiff AFGE's members and affiliates.

201.    For example, one Excluded Agency has informed an AFGE member that it will not take further action on a grievance due to the Exclusion Order and Exclusion Memorandum.

202.    Each Plaintiff Union has also been harmed by its loss of bargaining power resulting from the Exclusion Order.

203.    Plaintiff Unions' members have now lost contractual rights and protections governing their working conditions that they had obtained through collective bargaining. For example, members have lost rights covering safety and health requirements to ensure their welfare, protections for workers regarding reduction-in-force ("RIF") actions and procedures, procedures for and limits on discipline and adverse actions against members, and provisions covering working hours, overtime, sick leave, and time off.

204.    Plaintiff Unions' members working at Excluded Agencies have lost additional benefits of union representation, including the ability to use the grievance and arbitration process to enforce their rights at work.

205.    Because the government has excluded Plaintiff Unions' members working at the Excluded Agencies from coverage under Chapter 71, these members' statutory protections guaranteeing voluntary payroll deduction of dues, see 5 U.S.C. § 7115, are no longer in effect.

206.    For each Plaintiff Union, a majority of federal employees' dues are paid through voluntary payroll deduction. Accordingly, the exclusion of their members at the Excluded Agencies, and associated loss of payroll deduction rights, will cause Plaintiff Unions to lose revenue that is used to further their mission.

207.    For example, one Excluded Agency has informed a NFFE local union that it has terminated the CBA, will no longer recognize NFFE as an exclusive representative, that payroll deduction of dues will stop immediately, that official time for union officials and stewards will no longer be provided, and that NFFE must vacate office space.

208.    The majority of AFGE and NFFE's members work for the Excluded Agencies. Accordingly, the Exclusion Order will have a devastating impact on AFGE and NFFE's finances by eliminating the majority of their revenue, threatening their existence in their current form.

209.    The majority of AFSCME, NNOC/NNU, SEIU, and NAGE's executive branch employee members work for the Excluded Agencies. Accordingly, the Exclusion Order will eliminate most of the revenue that AFSCME, NNOC/NNU, SEIU, and NAGE receive from executive branch employees.

210.    Efforts to counteract the harm from the Exclusion Order is diverting Plaintiff Unions' employees and resources from being otherwise used to further their mission by organizing and representing employees, negotiating with employers, and advocating for improved employment conditions.

### Count I

*Retaliation and Viewpoint Discrimination in Violation of the First Amendment*

211.    Plaintiffs reallege Paragraphs 1 through 210.

COMPLAINT                                                                                      35

212. AFGE, AFSCME, SEIU, NAGE, and NFFE have exercised their First Amendment right to petition the government by filing lawsuits against the Trump administration challenging a variety of anti-worker actions and other aspects of "Trump's agenda" that Plaintiffs believe exceed the authority of the executive branch. Plaintiffs have also made public statements critical of policies advanced by the Trump administration.

213. Plaintiff Unions and their affiliates have also petitioned the government by filing grievances challenging Trump administration policies that have harmed their federal employee bargaining unit members.

214. The Exclusion Order and OPM's Exclusion Memorandum were initiated, and were issued, in retaliation for Plaintiff Unions' protected exercise of their First Amendment rights.

215. In direct response and in close temporal proximity to this First Amendment-protected activity, Defendants have retaliated against the Plaintiff Unions by eliminating their status as exclusive representative for a substantial number of their federal employee members and excluding those members from federal labor law protection.

216. Defendants have further stated their intent to rescind numerous binding CBAs and terminate outstanding grievances pursuant to the retaliatory Exclusion Order.

217. The elimination of the right to serve as exclusive representative, abrogation of contracts, and associated economic injury to Plaintiff Unions serves to chill First Amendment protected conduct by a person of ordinary firmness.

218. Public statements confirm that the Exclusion Order was retaliatory and based on Plaintiff Unions' views: the White House's own Fact Sheet justified the Order by claiming that "Certain Federal unions have declared war on President Trump's agenda" and "[t]he largest Federal union describes itself as 'fighting back' against Trump."

219. The same night the Exclusion Order was released, the Trump administration filed suit seeking declaratory relief that it may rescind its binding CBAs pursuant to the Exclusion Order. The lawsuit was filed exclusively against affiliates of AFGE, the "largest Federal union" targeted in the Fact Sheet.

220. The Fact Sheet confirms the intended chilling effect of the Exclusion Order on other

unions with a viewpoint-based threat. The Fact Sheet concludes by stating, "President Trump *supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction* that jeopardizes his ability to manage agencies with vital national security missions." (emphasis added).

221.    The chill resulting from the Exclusion Order is heightened even further because it delegates authority to some agency heads to determine whether certain subdivisions should be excluded or included in Chapter 71 protections and asks all agency heads to suggest additional exclusions.

222.    All Plaintiff Unions represent employees in agencies where the threat remains that additional bargaining rights will be stripped away. Paired with the Fact Sheet's admonition that Trump supports "unions who work with him," this encourages unions to refrain from voicing political views critical of the Trump administration or publicly support Trump, or else face the elimination of their representation rights and membership.

### **Count II**

*Ultra vires (Violation of Chapter 71 of Title 5/Separation of Powers)*

223.    Plaintiffs reallege Paragraphs 1 through 222.

224.    Pursuant to 5 U.S.C. § 7103(b)(1), agencies or subdivisions thereof may only be excluded from Chapter 71 if (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

225.    Decades of consistent practice demonstrates that this exclusion is meant to be applied narrowly.

226.    The very Federal Labor Relations Authority case cited by the Executive Order cautions that "national security" must be read narrowly in light of the fact that "[l]abor organizations and collective bargaining in the civil service have been determined by the congress to be 'in the public interest.'" *Dep't of Energy and NAGE, Local R5-181*, 4 F.L.R.A. 644 (1980) (quoting 5 U.S.C. § 7101(a)).

227.     Instead, the Exclusion Order purports to use the exemption to destroy Congress's carefully crafted collective bargaining system and eliminate federal labor law protections for the vast majority of federal workers.

228.     The vast overbreadth of the Exclusion Order demonstrates that it was not based on an actual determination that each agency or subcomponent removed from Chapter 71 by the Order has as its primary function "intelligence, counterintelligence, investigative, or national security work." The Exclusion Order removes wholesale departments and subdivisions from Chapter 71 that do not satisfy the statutory criteria for exclusion.

229.     Moreover, the fact that for decades, civilians working at the agencies in the Exclusion Order, including the Department of Defense, have served their country while retaining collective bargaining protections under Chapter 71 belies the claim that these protections cannot be applied to those departments "in a manner consistent with national security requirements and considerations."

230.     The White House's own Fact Sheet accompanying the Exclusion Order further rebuts any claim that the Exclusion Order was based on the required factual determinations necessary to eliminate statutory rights under 5 U.S.C. § 7103(b) about each included agencies: this Order was driven not by the function of the agency but by who federal employees have chosen as their elected representatives. The White House acknowledged that President Trump eliminated union rights to strike a blow at "hostile Federal unions" that it claims are "enable[d]" by the CSRA.

231.     Instead of considering whether labor practices could be applied consistent with national security requirements, President Trump used the pretext of national security to attack unions he concluded had "declared war on [his] agenda" and were not "work[ing] with him."

232.     Because the Exclusion Order is contrary to Chapter 71 of Title 5, including 5 U.S.C. § 7103(b)(1), it is ultra vires and void.

## **Count III**

*Violation of the Fifth Amendment (Procedural Due Process)*

233.     Plaintiffs reallege Paragraphs 1 through 232.

234.     The Due Process Clause of the Fifth Amendment to the United States Constitution

provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V.

235.    "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 579 (1934).

236.    Chapter 71 makes clear that federal collective bargaining agreements are binding on all parties. *See* 5 U.S.C. §§ 7114, 7116.

237.    Agency terminations of federal CBAs and outstanding grievances pursuant to the Exclusion Order and Exclusion Memorandum will deprive Plaintiff Unions, their affiliates, and their members of constitutionally protected property interests contained in collective bargaining agreements with the Excluded Agencies.

238.    The Supreme Court and the Ninth Circuit have recognized that due process generally "requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied[,] and be afforded an opportunity to rebut that evidence." *Kashem v. Barr*, 941 F.3d 358, 384 (9th Cir. 2019) (quoting *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 319 (D.C. Cir. 2014)).

239.    Even if national security concerns are implicated, due process of law requires "notice of, and access to, the unclassified information" underlying the decision. *Id.* (quoting *Ralls Corp.*, 758 F.3d at 320).

240.    Because the Exclusion Order was issued without giving Plaintiff Unions and other affected parties notice, the underlying unclassified evidence supporting the president's determination, and an opportunity to rebut that evidence, it should be enjoined.

### Count IV

*Violation of the Fifth Amendment (Abrogation of Property Rights in Federal Contract)*

241.    Plaintiffs reallege Paragraphs 1 through 240.

242.    "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." *Lynch v.*

COMPLAINT                                                                                          39

*United States*, 292 U.S. 571, 580 (1934) (quoting *The Sinking Fund Cases*, 99 U.S. 700, 719 (1878)).

243.    Because Congress authorized the Excluded Agencies to form binding contracts that created protected property interests, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Id.* at 579.

244.    Because the Exclusion Order abrogates Plaintiff Unions' contracts with the federal government and associated property interests, it violates the Fifth Amendment and should be enjoined.

### Count V

*Violation of the Fifth Amendment (Equal Protection)*

245.    Plaintiffs reallege Paragraphs 1 through 244.

246.    The Due Process Clause contains "an equal protection component" that binds the federal government in the same way that the Equal Protection Clause binds the states. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023) (internal quotations omitted).

247.    The Equal Protection clause is violated when the government singles out similarly situated entities for adverse treatment without a constitutionally legitimate justification. A "bare ... desire to harm a politically unpopular group" is not a legitimate government interest. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985). Moreover, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.*

248.    The Exclusion Order's division between which agencies and subdivisions are excluded from Chapter 71 demonstrates that the purported national security rationale is "so attenuated as to render the distinction arbitrary or irrational." The Exclusion Order permits police officers, security guards, and firefighters working at otherwise excluded agencies to remain protected by Chapter 71—except for those working at the AFGE-represented Bureau of Prisons, whose labor rights were eliminated. Similarly, AFSCME-represented employees at DOJ working on policing issues have lost bargaining rights on supposed national security grounds, while the

COMPLAINT                                                                                    40

1    police whose work they support retain their bargaining rights.

2        249.    In addition, the same features of Congress's collective bargaining framework that

3    the government contends impede its national security goals—such as binding CBAs that take

4    precedence over new agency regulations and grievance and arbitration procedures, *see* Waco

5    Compl. ¶¶ 78, 104—apply to CBAs covering police and firefighters.

6        250.    The government's own statements demonstrate that the distinctions contained in

7    the Exclusion Order are based on which unions the Trump administration deems "hostile" because

8    they have engaged in speech and petitioning activity critical of President Trump's agenda.

9    Punishing Plaintiffs for their constitutionally protected activity is not a legitimate government

10   interest.

11       251.    Because the Exclusion Order violates equal protection principles, it should be

12   enjoined.

### Relief Requested

14   **WHEREFORE**, Plaintiff pray that this Honorable Court enter an ORDER:

15       A.  Declaring that the Exclusion Order, the Exclusion Memorandum, and the

16           associated termination of federal CBAs and grievances violates the First

17           Amendment, Fifth Amendment, and is *ultra vires*;

18       B.  Enjoining the Defendants and their agents and successors from implementing or

19           otherwise giving effect to the Exclusion Order and Exclusion Memorandum;

20       C.  Directing Defendants to honor the assignment of union dues by continuing to allot

21           union membership dues and to remit any dues that have been collected;

22       D.  Granting Plaintiffs' attorney's fees and costs; and

23       E.  Granting such other relief as this Court may deem just and proper.

24                                   Respectfully submitted,

25   DATED: April 3, 2025              */s/ Leon Dayan*
                                       Leon Dayan, SBN 153162
26                                     Abigail V. Carter*
                                       Ramya Ravindran*
27                                     Lane M. Shadgett*
                                       J. Alexander Rowell*
28                                     BREDHOFF & KAISER P.L.L.C.

COMPLAINT                                                                    41

805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com
*Application *pro hac vice* forthcoming

Daniel Feinberg, SBN 135983
Catha Worthman, SBN 230399
Anne Weis, SBN 336480
FEINBERG, JACKSON, WORTHMAN
& WASOW, LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Attorneys for Plaintiffs American Federation of
Government Employees, AFL-CIO; American
Federation of State, County and Municipal
Employees, AFL-CIO; National Nurses Organizing
Committee/National Nurses United; Service
Employees International Union, AFL-CIO;
National Association of Government Employees,
Inc.; National Federation of Federal Employees,
IAM, AFL-CIO*

Rushab B. Sanghvi, SBN 302809
Andres M. Grajales*
American Federation of Government Employees,
AFL-CIO
80 F Street NW
Washington, D.C. 20001
Tel: (202) 639-6426
SanghR@afge.org
Grajaa@afge.org
*Application *pro hac vice* forthcoming

*Counsel for Plaintiff American Federation
of Government Employees (AFGE)*

Teague P. Paterson, SBN 226659
Matthew S. Blumin*

COMPLAINT

42

American Federation of State, County, and
Municipal Employees, AFL-CIO
1625 L Street NW
Washington, D.C. 20036
Tel: (202) 775-5900
Fax: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Application *pro hac vice* forthcoming

*Counsel for Plaintiff American Federation of State
County and Municipal Employees, AFL-CIO
(AFSCME)*


Nicole Daro, SBN 276948
National Nurses United
155 Grand Ave.
Oakland, CA 94612
Tel: (510) 207-8291
ndaro@calnurses.org

*Counsel for Plaintiff NNOC/NNU*

Steven K. Ury, SBN 199499
Service Employees International Union, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

*Counsel for Plaintiff Service Employees
International Union, AFL-CIO (SEIU)*
*Application *pro hac vice* forthcoming

Sarah E. Suszczyk*
National Association of
Government Employees, Inc.
159 Thomas Burgin Parkway
Quincy, MA 02169
Tel: (617) 376-7239
ssuszczyk@nage.org

*Counsel For Plaintiff National Association
of Government Employees (NAGE)*
*Pro hac vice application forthcoming*

Yvette M. Piacsek*

General Counsel
National Federation of Federal Employees, IAM, AFL-CIO
1225 New York Avenue NW, Suite 450
Washington, D.C. 20005
Tel: (202) 216-4428
ypiacsek@nffe.org
*Application *pro hac vice* forthcoming

*Counsel for Plaintiff NFFE*