YAAKOV M. ROTH
    Acting Assistant Attorney General
EMILY M. HALL
SARAH E. WELCH
    Counsel to the Assistant Attorney General, Civil Division
ERIC HAMILTON
    Deputy Assistant Attorney General
ALEXANDER K. HAAS
    Director
JACQUELINE COLEMAN SNEAD
    Assistant Branch Director
LISA ZEIDNER MARCUS
    Senior Counsel
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
    Trial Attorneys
    U.S. Department of Justice, Civil Division
    Federal Programs Branch
    1100 L St., NW, Twelfth Floor
    Washington, DC 20530
    Tel: (202) 353-5652
    Fax: (202) 616-8470
    Email: Lydia.Jines@usdoj.gov

Counsel for Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Case No. 3:25-cv-03070-JD<br><br>**Defendants' Opposition to Plaintiffs' *Ex Parte* Motion for a Preliminary Injunction and Order to Show Cause**<br><br>Judge: Hon. James Donato |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ....................................................................2

STATUTORY AND REGULATORY BACKGROUND......................................................2

I.    The President's Authority to Control the Conduct of Federal Employees.....................2

II.   The FSLMRS Framework and Related Executive Orders ............................................3

III.  The Statutory Channeling Requirement ......................................................................4

STATEMENT OF RELEVANT FACTS ..............................................................................4

LEGAL STANDARDS .........................................................................................................5

ARGUMENT ........................................................................................................................6

I.    Plaintiffs Do Not Establish Irreparable Harm Absent a Preliminary Injunction .................6

II.   Plaintiffs Cannot Show a Likelihood of Success on the Merits ......................................9

      A.   The FSLMRS precludes district court jurisdiction over plaintiffs' claims.................9

      B.   Plaintiffs are unlikely to succeed on their *ultra vires* claims..........................12

      C.   The Executive Order is Valid ..............................................................................13

           1.   Presidential § 7103(b)(1) determinations are not subject to judicial review. .......13

           2.   The identified agencies meet the FSLMRS statutory criteria ....................15

      D.   Plaintiffs are unlikely to succeed on their constitutional claims..........................22

           1.   Plaintiffs' First Amendment claims are unlikely to succeed. ....................22

           2.   Plaintiffs are unlikely to succeed on their Fifth Amendment claims..........27

III.  The Balance of the Equities and the Public Interest Weigh Against Plaintiffs .................28

IV.   Plaintiffs Should Be Ordered to Post Security in Connection with Any Injunctive Relief.........29

CONCLUSION......................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AFGE v. Reagan*,
870 F.2d 723 (D.C. Cir. 1989) ................................................................. 14

*Air Line Emps. Ass'n, Int'l. v. Nat'l Mediation Bd.*,
1981 WL 2391 (D.D.C. May 18, 1981) .................................................... 14

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
281 F. Supp. 2d 59 (2003) ....................................................................... 23

*Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ........................................................ 4, 9, 10

*Am. Fed'n of Gov't Emps. v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ...................................................... 9, 10, 11

*Amerco v. NLRB*,
458 F.3d 883 (9th Cir. 2006) ................................................................... 12

*Arcamuzi v. Cont'l Air Lines, Inc.*,
819 F.2d 935 (9th Cir. 1987) ..................................................................... 8

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2004) ................................................................... 6

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) .......................................................................... 10, 11

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ........................................................................... 6, 23

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ................................................................... 26

*Bd. of Governors of Fed. Reserve Sys. v. MCorp*,
502 U.S. 32 (1991) .................................................................................. 12

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011) ................................................................................ 26

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ..................................................................... 2

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
464 U.S. 89 (1983) ............................................................................. 3, 11

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .................................................................. 6, 7

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ................................................................................ 21

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................................. 7

*Connick v. Myers*,
   461 U.S. 138 (1983) ................................................................................................ 26

*CTIA - The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) .................................................................................... 6

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................................ 13

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) .............................................................................. 28

*DCH Reg. Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ................................................................................ 12

*Def. Logistics Agency*,
   5 FLRA 126 (1981) ................................................................................................... 8

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ................................................................................................ 24

*Dep't of Def. v. FLRA*,
   685 F.2d 641 (D.C. Cir. 1982) ................................................................................ 14

*Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181*,
   4 FLRA 644 (1980) ............................................................................................ 16, 17

*Dep't of Homeland Sec. v. NTEU*,
   68 FLRA 13 (2014) ................................................................................................. 16

*Dep't of the Air Force, Warner Robins Air Logistics Ctr., Robins AFB, Ga.*,
   52 FLRA 225 (1996) ............................................................................................... 11

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988) ........................................................................................... 15, 22

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) .................................................................................... 9

*Eisinger v. Fed. Lab. Rels. Auth.*,
   218 F.3d 1097 (9th Cir. 2000) ................................................................................ 28

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) .................................................................................................... 10

*Elrod v. Burns*,
   427 U.S. 347 (1976) .................................................................................................. 6

*FDA v. Wages & White Lion Invs., L.L.C.*,
   145 S. Ct. 898 (2025) .............................................................................................. 24

*Fed. Express Corp. v. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ............................................................................ 12

*Fed. Law Enf't Officers Ass'n v. Ahuja*,
62 F.4th 551 (D.C. Cir. 2023) ............................................................................ 11

*Fouladi v. City of Tucson*,
94 F. App'x 485 (9th Cir. 2004) ......................................................................... 24

*Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*,
391 F. Supp. 2d 1 (D.D.C. 2005) ................................................................... 6, 23

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................................... 24

*Gilligan v. Morgan*,
413 U.S. 1 (1973) ............................................................................................... 22

*Gizzo v. Ben-Habib*,
44 F. Supp. 3d 374 (S.D.N.Y. 2014) .................................................................. 27

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) ............................................................................ 29

*Heckler v. Ringer*,
466 U.S. 602 (1984) ........................................................................................... 11

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ............................................................................... 7

*Hill v. City of Scottsdale*,
2012 WL 2952377 (D. Ariz. Jul. 19, 2012) ...................................................... 28

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ............................................................................................... 15

*Hughes Commc'ns Galaxy, Inc. v. United States*,
271 F.3d 1060 (Fed. Cir. 2001) ......................................................................... 28

*Karahalios v. Def. Language Inst./Foreign Language Ctr.*,
821 F.2d 1389 (9th Cir. 1987),
*aff'd*, 489 U.S. 527 (1989) ................................................................................... 9

*Kensington Vol. Fire Dep't., Inc. v. Montgomery Cnty.*,
684 F.3d 462 (4th Cir. 2012) ............................................................................. 26

*Khenaisser v. Zinke*,
693 F. App'x 608 (9th Cir. 2017) ........................................................................ 9

*Local 1498, AFGE v. AFGE, AFL/CIO*,
522 F.2d 486 (3d Cir. 1975) ................................................................................. 3

*Manhattan-Bronx Postal Union v. Gronouski*,
350 F.2d 451 (D.C. Cir. 1965) ........................................................................ 2, 3

*Maryland v. King*,
    567 U.S. 1301 (2012)...........................................................................................29

*Miranda v. City of Casa Grande*,
    15 F.4th 1219 (9th Cir. 2021)............................................................................28

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).............................................................................................5

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)...........................................................................................24

*Myers v. United States*,
    272 U.S. 52 (1926)...............................................................................................2

*N. Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020).........................................................................13

*Nat'l Treasury Emps. Union v. Reagan*,
    1981 WL 150530 (D.D.C. Sept. 3, 1981)...........................................................14

*Nat'l Treasury Emps. Union v. Reagan*,
    1981 U.S. Dist. LEXIS 16482 (D.D.C. Sept. 3, 1983).......................................23

*New Vision Photo. v. D.C.*,
    54 F. Supp. 3d 12 (D.D.C. 2014)......................................................................27

*Nieves v. Barlett*,
    587 U.S. 391 (2019)...........................................................................................24

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................6, 28

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009)...........................................................................13

*Olympic Fed. Sav. & Loan Ass'n v. Dir., Off. of Thrift Supervision.*,
    1990 WL 134841 (D.D.C. Sept. 6, 1990)...........................................................28

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*,
    391 U.S. 563 (1968)...........................................................................................26

*Recycle for Change v. Cty of Oakland*,
    856 F.3d 666 (9th Cir. 2017)...............................................................................6

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005)..................................................................................27

*Rosenberger v. Rector and Visitors of the University of Virginia*,
    515 U.S. 819 (1995)...........................................................................................23

*S. Dep't of Def., Ohio Nat'l Guard*,
    71 FLRA 829 (2020).............................................................................................8

*San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty.*,
   825 F.2d 1404 (9th Cir. 1987) ............................................................................ 27

*Smith v. Ark. State Highway Emps., Local,
1315*, 441 U.S. 463 (1979) ........................................................................... 6, 23

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ............................................................................... 9, 10

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .......................................................................... 15, 17, 22

*U.S. Dep't of Lab., Wash., D.C.*,
   37 FLRA 25 (1990) ..................................................................................... 8

*U.S. Dep't of the Treasury, U.S. Mint*,
   35 FLRA 1095 (1990) ................................................................................. 8

*U.S. Immigr. & Customs, Enf't*,
   67 FLRA 501 (2014) .................................................................................. 21

*United States EPA*,
   70 FLRA 279 (2017) .................................................................................. 17

*United States v. Chemical Found.*,
   272 U.S. 1 (1926) ..................................................................................... 24

*Webster v. Doe*,
   486 U.S. 592 (1988) .................................................................................. 15

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943) .................................................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................. 5, 6, 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .................................................................................. 14

**Statutes**

5 U.S.C. § 7101 ............................................................................................ 3

5 U.S.C. § 7103 ..................................................................................... *passim*

5 U.S.C. § 7116 .......................................................................................... 11

5 U.S.C. § 7118 ....................................................................................... 4, 12

5 U.S.C. § 7123 ....................................................................................... 4, 10

5 U.S.C. § 7131 .......................................................................................... 26

5 U.S.C. § 7301 ............................................................................................ 3

6 U.S.C. § 111 ................................................................................................................... 19

10 U.S.C. § 9081 ............................................................................................................... 18

19 U.S.C. § 1337 ............................................................................................................... 20

19 U.S.C. § 1671 ............................................................................................................... 20

22 U.S.C. § 4103 ............................................................................................................... 18

28 U.S.C. § 509A .............................................................................................................. 16

28 U.S.C. § 1491 ............................................................................................................... 28

32 U.S.C. § 102 ................................................................................................................. 18

38 U.S.C. § 1785 ............................................................................................................... 19

42 U.S.C. § 247d ............................................................................................................... 17

42 U.S.C. § 247d-4 ........................................................................................................... 17

42 U.S.C. § 1862 ............................................................................................................... 20

42 U.S.C. § 7111 ........................................................................................................... 2, 17

42 U.S.C. § 19031 ............................................................................................................. 20

42 U.S.C § 300hh-10 ........................................................................................................ 17

44 U.S.C. 3506 .................................................................................................................. 16

Pub. L. No. 81-507, 64 Stat. 149 (1950) .......................................................................... 20

Pub. L. No. 95-454, 92 Stat. 111 (1978) ............................................................................ 3

Pub. L. No. 111-353, 124 Stat. 3885 (2011) .................................................................... 17

**The Constitution**

U.S. Const., art. II, § 1, cl. 1 .............................................................................................. 2

U.S. Const., art. II, § 2, cl. 1 ............................................................................................ 26

**Rules**

Fed. R. Civ. P. 65(c) ......................................................................................................... 29

**Executive Orders**

Exec. Order No. 10,988, 27 Fed. Reg. 551 (Jan. 19, 1962) ............................................... 3

Exec. Order No. 11,491, 34 Fed. Reg. 17,605 (Oct. 31, 1969) ......................................... 3

Exec. Order No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28. 1971) ................................................. 3

Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971) ............................................... 3

Exec. Order No. 11,838, 40 Fed. Reg. 5,743, 7,391 (corrected) (Feb. 7, 1975) ...................... 3

Exec. Order No. 44 Fed. Reg. 66,565 (Nov. 20, 1979) ........................................................... 4

Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997) ............................................... 4

Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002) ................................................... 4

Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008) ................................................. 4

Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017) ................................................ 4

Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025) .......................................... 18, 19

Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025) ............................... 4, 16, 17, 19

**Regulations**

*Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024) ........................................................... 17

*New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units*, 89 Fed. Reg. 39,798 (May 9, 2024) .................................................................................. 17

## **INTRODUCTION**

Plaintiffs—six national public-sector labor unions—ask this Court to second guess a lawful exercise of the President's authority. The Federal Service Labor-Management Relations Statute (FSLMRS), which governs bargaining with public-sector labor unions, authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determination that "the agency or subdivision has as *a* primary function intelligence, counterintelligence, investigative, or national security work," and that the provisions of the statute "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). Since 1979, when President Carter exempted more than forty-five agencies or subdivisions pursuant to that authority, Presidents have issued executive orders exempting additional agencies and subdivisions from the statute's coverage as they have assessed the Nation's changing needs.

On March 27, 2025, President Trump issued such an order. In Executive Order 14,251, *Exclusions from Federal Labor Management Relations Program*, the President made the determinations specified in the FSLMRS, thereby excluding the identified agencies and agency subdivisions from its coverage. Plaintiffs seek to enjoin Defendants—the President, the Director of the Office of Personnel Management (OPM), and twenty federal agencies or subdivisions and their respective Secretaries or Directors—from implementing Executive Order 14,251. Plaintiffs assert that the Executive Order "threatens [their] very existence" and reduces their bargaining power. Mem. in Supp. of Pls.' Mot. for [Prelim. Inj.] 19, ECF No. 15-1 ("Mot."). In addition, Plaintiffs argue that the Executive Order violated their rights under the First and Fifth Amendments.

Plaintiffs' request for a preliminary injunction should be denied for several reasons. At the outset, Plaintiffs fail to establish that they will suffer irreparable harm absent preliminary relief. Their asserted harms are either insufficiently certain and imminent to justify the extraordinary relief of a preliminary injunction, or are remediable on a favorable ruling later in this case.

Nor are Plaintiffs likely to succeed on the merits of their claims, which broadly allege that the President exceeded his statutory authority, retaliated against Plaintiffs based on the specific content of their speech, and denied Plaintiffs and their members due process before the alleged termination of the CBAs. *First*, this Court lacks jurisdiction to hear Plaintiffs' claims. Congress directed that the sort of

unfair labor practice (ULP) claims that Plaintiffs attempt to pursue here must be channeled through the comprehensive remedial scheme set forth in the FSLMRS. *Second*, the FSLMRS precludes *ultra vires* review and, in any event, the Executive Order is valid. *Third*, Plaintiffs are unlikely to succeed because the Court lacks authority to review the President's national security determinations, and in any event, the facts and the law readily support the President's exercise of his discretion here. *Fourth*, Plaintiffs are unlikely to succeed on their constitutional claims because the President's decision is entitled to a presumption of regularity as a facially valid executive action that Plaintiffs have not (and cannot) overcome through unsupportable retaliation or viewpoint-discrimination claims. *Fifth* and finally, Plaintiffs fail to identify an interest held by their organizations or their members that entitles either to due process or other relief asserted pursuant to the Fifth Amendment.

Likewise, the balance of the equities and the public interest favor Defendants. Plaintiffs' requested preliminary injunction would interfere with the President's lawful authority to ensure the relevant segments of the federal workforce are able to meet one of their primary purposes: protecting the national security of the United States. Accordingly, because Plaintiffs cannot establish any element required for the extraordinary emergency relief they seek, the Court should deny their motion.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiffs are likely to succeed on the merits.

2. Whether Plaintiffs have proved that irreparable harm will result absent emergency relief.

3. Whether the balance of the equities and the public interest favor Defendants.

4. Whether Plaintiffs must post security in conjunction with any preliminary relief.

## STATUTORY AND REGULATORY BACKGROUND

### I.    The President's Authority to Control the Conduct of Federal Employees

Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const., art. II, § 1, cl. 1. This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*,

350 F.2d 451, 456 (D.C. Cir. 1965). Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Before Congress enacted the FSLMRS, in 1978, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g.*, *Local 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union*, 350 F.2d at 452. Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988, in 1962. Exec. Order No. 10,988, 27 Fed. Reg. 551 (Jan. 19, 1962); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91-92 (1983) ("*BATF*"). Multiple Presidents subsequently have amended that Order. *See* Exec. Order No. 11,491, 34 Fed. Reg. 17,605 (Oct. 31, 1969), as amended by Exec. Order No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28. 1971), Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971), and Exec. Order No. 11,838, and 40 Fed. Reg. 5,743, 7,391 (corrected) (Feb. 7, 1975).

## II. The FSLMRS Framework and Related Executive Orders

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq*. The statute, enacted as Title VII of the Civil Service Reform Act of 1978 (CSRA), Pub. L. No. 95-454, 92 Stat. 111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *BATF*, 464 U.S. at 91. The FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the FSLMRS exempts certain agencies and matters from its coverage. 5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency, among others). The FSLMRS also empowers the President to exempt additional agencies from its requirements: It provides that "[t]he President may issue an order excluding *any* agency or subdivision thereof from coverage under [the FSLMRS] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the FSLMRS] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1) (emphasis added).

1   Pursuant to this authority, President Carter issued an executive order in 1979 excluding from

2   FSLMRS coverage more than forty-five agencies or agency subdivisions, precluding those agencies' and

3   subdivisions' employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov.

4   20, 1979). Every President since then, with the sole exception of President Biden, has issued similar

5   executive orders adding to that list in response to changing circumstances and the evolving investigative

6   and national security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg.

7   12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002); Exec. Order No.

8   13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017).

9   **III.    The Statutory Channeling Requirement**

10  In the FSLMRS, Congress established a dedicated mechanism for resolving federal labor-

11  management disputes. The FSLMRS "provides several alternative mechanisms to challenge management

12  actions." *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) ("*Air*

13  *Force*"). For example, "any person" may file a charge of an "unfair labor practice" with the Federal Labor

14  Relations Authority (FLRA). *See* 5 U.S.C. § 7118(a)(1). The statute also provides exclusive mechanisms

15  for an employee or union to file a grievance in accordance with a negotiated grievance procedure outlined

16  in a collective bargaining agreement. *Id.* § 7121. The FLRA's final orders, including orders resolving

17  negotiability disputes and ULP charges, are, with few exceptions not relevant here, subject to specified

18  judicial review only in the appropriate court of appeals. 5 U.S.C. § 7123(a).

19  **STATEMENT OF RELEVANT FACTS**

20  On March 27, 2025, President Trump issued an Executive Order, like many Presidents before him,

21  excluding certain agencies from FSLMRS coverage. *See* Exec. Order No. 14,251, 90 Fed. Reg. 14,553

22  (Mar. 27, 2025). In Section 2 of the Executive Order, the President determined that certain agencies and

23  subdivisions—including the Defendant agencies and subdivisions in this case—have as a primary function

24  intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be

25  applied to those agencies and subdivisions in a manner consistent with national security requirements and

26  considerations. Thereby, he satisfied both prongs of 5 U.S.C. § 7103(b).

27  In a "Fact Sheet" released that same day, *see* Compl. ¶ 135, ECF No. 1, the White House Press

28  Office explained that "President Trump is taking action to ensure that agencies vital to national security

can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security." Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://perma.cc/W93G-Z889.

Shortly after the Executive Order was issued, the Office of Personnel Management ("OPM") issued guidance to federal agencies regarding Executive Order 14,251. *See* Mem. from Charles Ezell, Acting Director, OPM to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025) ("Ezell Mem."), https://perma.cc/9UYM-F8E7; Compl. ¶ 124. In that guidance, OPM expressed the legal position of the Administration that under a lawful implementation of the President's Executive Order, the covered agencies would be "no longer required to collectively bargain with Federal unions" and that "the statutory authority underlying the original recognition of the relevant unions no longer applies." Ezell Mem. at 3. Consequently, those unions are no longer exclusive representatives of the agency employees, and the relevant agency would not have to select or recognize an exclusive bargaining representative. OPM directed covered agencies to "consult with their General Counsels as to how to implement the President's directive" in the Executive Order, and to consider and implement changes that are "consistent with the President's national security determination." *Id*. OPM has since advised agencies not to terminate any collective bargaining agreements ("CBAs") until the conclusion of litigation or further guidance from OPM directing such termination. *See* Opp. to Pls.' Mot. for PI at 6, *Nat'l Treasury Emps. Union v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 11, 2025), ECF No. 26 ("*NTEU v. Trump*").[1]

Plaintiffs filed this lawsuit on April 3, 2025. ECF No. 1. On April 7, Plaintiffs moved for temporary restraining order. ECF No. 15. On April 8, the Court denied a TRO and converted Plaintiffs' motion to a motion for a preliminary injunction. ECF No. 28.

## LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

---

[1] On April 25, 2025, the United States District Court for the District of Columbia issued a preliminary injunction order in *National Treasury Employees Union v. Trump*, advising that an opinion will follow. That preliminary injunction applies to the defendants in that case. *See* Order, *NTEU v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 25, 2025), ECF No. 32.

139, 165 (2010) (A preliminary injunction is an "extraordinary remedy"). Accordingly, "[a] plaintiff seeking a preliminary injunction must establish that [it] is [1] likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Recycle for Change v. Cty of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    Plaintiffs Do Not Establish Irreparable Harm Absent a Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish . . . that [it would] likely . . . suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm."). To meet this requirement, Plaintiffs must show a "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2004) (citation omitted).

To begin, Plaintiffs' constitutional arguments fail to identify any harm, let alone irreparable harm. "[T]he mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). To demonstrate irreparable harm, a plaintiff must show that "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see CTIA*, 928 F.3d at 851 (finding no irreparable harm where plaintiff failed to show "actual or threatened" harm). Plaintiffs have shown neither. There is no ongoing First Amendment violation, as issuance of the Executive Order was a discrete action and, even if Plaintiffs' CBAs are terminated, the absence of a CBA is not unconstitutional, as there is no First Amendment right to collective bargaining. *See Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979) ("[T]he First Amendment does not impose any affirmative obligation on the government . . . to recognize [a public employee union] and bargain with it."); *Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8-9 (D.D.C. 2005) ("There is . . . no constitutionally protected right to bargain collectively."); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313 (1979). Accordingly, Plaintiffs have not

demonstrated irreparable injury to their First Amendment rights for which the extraordinary remedy of a preliminary injunction is either necessary or appropriate. And, contrary to their assertion, Plaintiffs do not assert a Fifth Amendment claim of the type courts have found to constitute irreparable harm. *See e.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (finding irreparable harm where individual was unlawfully detained without due process).

Plaintiffs next argue that they will suffer an irremediable loss of bargaining power absent immediate relief, both because they will lose members and because they will no longer be the exclusive representative of particular employees, supposedly resulting in less power at the bargaining table and loss of the "primary method" used to bargain for employees and available to exclusive representatives. Mot. at 38. This speculative chain of possibilities fails to establish irreparable harm. *See, e.g.*, *Caribbean Marine Servs. Co.*, 844 F.2d at 674 ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") (italics in original). Even if agencies did remove Plaintiffs' members from bargaining units, those employees could remain members of Plaintiff unions—the unions would simply no longer be the *exclusive* bargaining representative. Further, even if Plaintiffs somehow could establish certain, imminent loss of members, Plaintiffs offer no reason why losing some number of their current members while this litigation is pending could not be remedied by a favorable ruling in this case restoring their scope of representation.

Second, any related loss of bargaining power is too speculative a basis for granting relief at this stage. Plaintiffs provide no support for the proposition that potential members who otherwise would have joined the union will decide not to join because of Executive Order 14,251. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-11 (2013) (explaining that a "theory of standing[] which relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that a threatened injury must be certainly impending"). Moreover, Plaintiffs' asserted loss of bargaining power—when it is engaged in bargaining for members who are not subject to the Executive Order, and thus still covered by the FSLMRS—is pure conjecture. Nothing in the FSLMRS ties an exclusive representative's ability to negotiate a contract with the number of employees it represents outside the bargaining unit. Mere speculation about a loss of bargaining power falls far short of the required "clear" showing of irreparable

harm. *Winter*, 555 U.S. at 22.

Finally, Plaintiffs claim they will suffer reduced dues from Defendants' refusal to withhold union dues from employees' paychecks. Mot. at 38. As an initial matter, the Ninth Circuit has made clear that "temporary economic loss alone generally is not a basis for injunctive relief." *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987). And even if economic loss were irreparable, Plaintiffs can only speculate as to any economic loss attributable to Defendants' failure to withhold dues from employees' paychecks. Indeed, the termination of automatic withholding is merely procedural. Union members remain free to pay their dues directly to the union, rather than through payroll deductions. Plaintiffs are currently soliciting such direct dues payments from their members. *AFGE E-Dues*, https://www.afge.org/common-pages/e-dues/. Plaintiffs cannot demonstrate that their members—whose union membership is entirely voluntary—will cease paying union dues in the wake of Executive Order 14,251 or agency decisions not to withhold dues payments. And, even if Plaintiffs could, that would be a *voluntary* action not sufficient to demonstrate irreparable harm caused by the challenged action.

Moreover, contrary to Plaintiffs' assertion, arbitrators and ALJs have broad latitude to fashion appropriate remedies to make a union whole, including by requiring the relevant agency to compensate for revenues lost due to improperly failing to withhold dues. Indeed, when an ULP causes employees or unions to suffer monetary losses, the FLRA requires the offending party to pay backpay, restore leave, or otherwise reimburse them. *U.S. Dep't of Lab., Wash., D.C.*, 37 FLRA 25, 39-41 (1990). And when agencies have violated the dues deduction requirements of § 7115, the FLRA routinely orders agencies to reinstate the dues allotments of individuals in the unit whose allotments were unlawfully terminated, and to reimburse the union in an amount equal to the dues it would have received but for the agency's unlawful conduct. *See, e.g., U.S. Dep't of the Treasury, U.S. Mint*, 35 FLRA 1095, 1100 (1990); *Def. Logistics Agency*, 5 FLRA 126, 131-33 (1981); *see U.S. Dep't of Def., Ohio Nat'l Guard,* 71 FLRA 829, 873, 875 (2020) (upholding ALJ decision finding it "routine[]" to require agencies to reimburse unions when the agency's unlawful conduct prevented dues withholding and ordering such reimbursement). For these reasons, Plaintiffs' asserted economic loss fails to establish the substantial, certain, and unrecoverable injury necessary to justify a preliminary injunction.

At base, Plaintiffs cannot establish that their claimed pecuniary harms are irreparable, or that any

1     feared loss of bargaining rights or dues revenue is nonspeculative and "cannot be remedied." Mot. at 38.

2 **II.    Plaintiffs Cannot Show a Likelihood of Success on the Merits**

3        "Likelihood of success on the merits 'is the most important' *Winter* factor; if a movant fails to

4 meet this 'threshold inquiry,' the court need not consider the other factors," *Disney Enterprises, Inc. v.*

5 *VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted). Plaintiffs cannot establish a likelihood

6 of success on the merits for at least two reasons: their claims are statutorily channeled away from district

7 court review, and in any event, they would not prevail on the merits.

8        **A.    The FSLMRS precludes district court jurisdiction over plaintiffs' claims**

9        Plaintiffs cannot show that their claims may be heard in district court. By Plaintiffs' account,

10 Executive Order 14,251 is invalid, meaning the agencies and subdivisions identified in the Executive

11 Order remain subject to the FSLMRS, and the CBAs with Defendant agencies are therefore valid and

12 binding. Under that theory, Plaintiffs' claims belong in the exclusive administrative process provided in

13 the FSLMRS: They must first go to the FLRA, then to a court of appeals. *See Am. Fed'n of Gov't Emps.*

14 *v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*"); *Air Force*, 716 F.3d at 638; *Thunder*

15 *Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).

16        In *AFGE v. Trump*, numerous federal unions, including Plaintiff AFGE, asserted broad

17 constitutional and statutory challenges to a set of three Executive Orders issued by President Trump during

18 his first term. The orders would have enacted substantial changes to the way federal unions operated. The

19 D.C. Circuit reversed a district court decision in favor of the unions on jurisdictional grounds, holding that

20 the comprehensive administrative-judicial review scheme set forth by the FSLMRS channeled jurisdiction

21 from federal district courts. 929 F. 3d at 753, 762. The court of appeals emphasized that most federal labor

22 disputes must be heard through the FLRA review scheme, with any judicial review occurring in the

23 relevant federal court of appeals. *Id.* at 754-61; *see also Khenaisser v. Zinke*, 693 F. App'x 608, 609 (9th

24 Cir. 2017) (district court lacks jurisdiction over ULP claims, which must be channeled to the FLRA);

25 *Karahalios v. Def. Language Inst./Foreign Language Ctr.*, 821 F.2d 1389, 1393 (9th Cir. 1987)

26 (recognizing that the FSLMRS requires covered disputes to be presented to the FLRA, and the district

27 court lacks jurisdiction to consider them), *aff'd*, 489 U.S. 527 (1989).

28        This case requires the same jurisdictional outcome. Similar to those plaintiffs' broad challenge to

three labor EOs at issue in *AFGE v. Trump*, Plaintiffs here allege that Executive Order 14,251 and OPM guidance will result in financial harm and loss of bargaining power. Specifically, Plaintiffs claim that Defendants repudiated the relevant CBAs, refused to recognize and bargain with the relevant unions, and ceased withholding dues. These claims turn on Plaintiffs' argument that their members are covered by the FSLMRS's statutory requirements. They therefore fall within the statute's exclusive review scheme and may not be heard in federal district court. *AFGE v. Trump*, 929 F.3d at 756. This is so despite Plaintiffs' assertion that the Government has "destroyed any administrative channel." Mot. at 37. The FLRA is taking steps to assure itself of its jurisdiction over disputes involving agencies covered by the Executive Order, *See* Decl. of Erica Balkum ¶ 2, *NTEU v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 11, 2025), ECF No. 26-2, but this does not excuse Plaintiffs from seeking relief there, even if the FLRA cannot decide their broader constitutional arguments. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 17 (2012); *Air Force*, 716 F.3d at 638-39 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts."). Any arguments that the FLRA cannot resolve can be addressed by the relevant federal court of appeals. *See* 5 U.S.C. § 7123(a); *AFGE v. Trump*, 929 F.3d at 759.

The *Thunder Basin* factors—the existence of meaningful relief without district court review, whether a claim is "wholly collateral," and the relevance of agency expertise—establish that the FSLMRS precludes district court jurisdiction over Plaintiffs' claims. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)). First, a finding of preclusion in this case does not foreclose meaningful judicial review of Plaintiffs' claims. Plaintiffs can bring their claims before the FLRA, and any arguments that the FLRA cannot resolve will be addressed by the relevant federal court of appeals through the administrative-judicial review process Congress crafted in the FSLMRS. *See* 5 U.S.C. § 7123(a); *AFGE v. Trump*, 929 F.3d at 759. For that reason, Plaintiffs' invocation of constitutional claims does not excuse them from the requirement that they first seek relief before the FLRA. *AFGE v. Trump*, 929 F.3d at 759. The Supreme Court has previously held that whether a claim is precluded under the CSRA does not "turn on [its] constitutional nature . . . but rather on the type of the employee and the challenged employment action." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012). So too here, Plaintiffs cannot escape the FSLMRS's preclusive review scheme by framing their breach of contract arguments in constitutional terms. In short, Plaintiffs can still receive

meaningful judicial review of their claims by bringing them before the FLRA in the first instance followed by the relevant federal court of appeals.

Second, Plaintiffs' claims are within the statutory scheme and not collateral to it. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Plaintiffs challenge Defendant agencies' prospective repudiation of their CBAs, failure to collect dues, and similar failures to comply with FSLMRS requirements. These are ULP allegations, complaints of which the FLRA General Counsel investigates and prosecutes. 5 U.S.C. §§ 7116(a)(8), 7118; *see, e.g., Dep't of the Air Force, Warner Robins Air Logistics Ctr., Robins AFB, Ga.*, 52 FLRA 225 (1996) (finding agency violated the FSLMRS by repudiating a negotiated agreement and ordering agency to reverse changes that violated the agreement). These are the kinds of issues central to the FLRA's work and are in no way collateral to the statutory review provisions.

For similar reasons, Plaintiffs' claims are clearly within the expertise of the FLRA. The FLRA is the federal authority on matters of federal employment and labor relations. *E.g.*, *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983). In concluding that the unions had to first bring their constitutional claims before the FLRA and MSPB in *AFGE v. Trump*, the D.C. Circuit noted that those agencies, despite having less expertise on constitutional issues, may be able to "offer an interpretation of the [statutes] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *AFGE*, 929 F.3d at 761. So too here, the FLRA may well offer an interpretation of the statute or Executive Order 14,251 that obviates the need for addressing some of Plaintiffs' broader constitutional arguments. For the foregoing reasons, Plaintiffs' claims must be channeled to the FLRA.

Plaintiffs neither attempt to make an argument under *Thunder Basin* nor try to distinguish this case

from *AFGE v. Trump* or other decisions where courts have found that they lack jurisdiction over federal labor disputes. Instead, Plaintiffs argue that because certain federal agencies have brought a separate, affirmative lawsuit regarding the Executive Order, Defendants "concede" this Court's jurisdiction over Plaintiffs' claims. However, this Court has an independent duty to determine whether it has subject matter jurisdiction notwithstanding lawsuits brought in other courts, and the claims brought in *Department of Defense v. AFGE*, No. 6:25-cv-00119 (W.D. Tex. filed Mar. 27, 2025), are different.

Here, Plaintiffs' theory is based on the unlawfulness of the Executive Order and the continued applicability of the FSLMRS to the relevant agencies. From Plaintiffs' perspective, federal agencies are violating the FSLMRS by refusing to recognize the Plaintiffs as exclusive representatives, which is an ULP. The FLRA administrative review scheme provides the exclusive channel for such claims. 5 U.S.C. §§ 7118, 7123. By contrast, in the affirmative suits, the federal agencies contend that the FSLMRS is inapplicable and so recourse to its process would not make sense. Accordingly, and consistent with that position, the Government's claims do not have to be channeled through the FLRA's administrative scheme. For these reasons, Plaintiffs must bring their claims in this case through the FLRA administrative review process in the first instance.

### B.    Plaintiffs are unlikely to succeed on their *ultra vires* claims

Plaintiffs may not escape FSLMRS's channeled jurisdiction by characterizing their claims as *ultra vires*. The mere characterization of Plaintiffs' claims as an attack on the President and Defendant agencies' authority is insufficient to overcome the statutory bar. When, as here, "the statute provides us with clear and convincing evidence that Congress intended to deny" judicial review, the characterization of a claim as *ultra vires* is insufficient to confer subject matter jurisdiction. *Bd. of Governors of Fed. Reserve Sys. v. MCorp*, 502 U.S. 32, 44 (1991); *accord Amerco v. NLRB*, 458 F.3d 883, 889 (9th Cir. 2006) ("As was the case with the statutory question in *MCorp*, any constitutional infirmities raised by AMERCO can be remedied on petition for review from a final order of the NLRB.").

In any event, "[u]ltra vires review is . . . only available in extraordinary circumstances." *See DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503,509 (D.C. Cir. 2019) (noting "extremely limited scope" and "extraordinarily narrow" nature of *ultra vires* claims). Indeed, the bar for asserting an *ultra vires* claim is high: a plaintiff must meet a heightened standard "confined to 'extreme'" errors. *See Fed. Express Corp.*

*v. Dep't of Com.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022). Accordingly, an *ultra vires* claim requires a violation of a "specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). As a result, *ultra vires* claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). And, as the Supreme Court explained in *Dalton v. Specter*, permitting a party to assert a separation-of-powers claim like Plaintiffs' would "eviscerat[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." 511 U.S. 462, 474 (1994). The Court in *Dalton* thus squarely rejected the proposition "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. As explained below, Executive Order 14,251 was a lawful exercise of the President's statutory authority. Because the President's decision does not contravene any clear and specific statutory mandate, Plaintiffs fail to demonstrate a likelihood of success on the merits of an *ultra vires* claim.

## C.    The Executive Order is Valid

Plaintiffs also are unlikely to succeed on the merits in their *ultra vires* challenge to the validity of Executive Order 14,251. At base, the Court lacks authority to review the President's national security-related determinations under § 7103(b). Even so, the President's determinations are supported.

### 1.    Presidential § 7103(b)(1) determinations are not subject to judicial review.

Executive Order 14,251 represents the President's exercise of his authority under 5 U.S.C. § 7103(b)(1) to exclude certain agencies or subdivisions from the provisions of Chapter 71 of Title 5. The statute provides:

> The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1). As Executive Order 14,251 makes plain, the President determined that each

covered agency or subdivision has a relevant primary function, and he determined that Chapter 71's provisions could not be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. And as the statute makes plain, Congress vested the President—and the President alone—with the authority to exclude agencies or subdivisions from Chapter 71's coverage. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum[.]"). This Court lacks authority to second guess the President's determinations.

Courts have repeatedly recognized that § 7103(b)(1) entrusts the relevant determinations to the President alone, without interference from courts or other actors. A district court decades ago held that a § 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making § 7103(b)(1) determinations. *Nat'l Treasury Emps. Union v. Reagan*, 1981 WL 150530, at *2 (D.D.C. Sept. 3, 1981) (quoting 124 Cong. Rec. H.9633 (daily ed. Sept. 13, 1978)). There, the court concluded that "Congress granted the President complete discretion in determining the agencies to be excluded from the labor relations provisions," *id.*, leaving judicial review of the President's determinations available only in "instances of constitutional dimension or gross violation of the statute." *Id.* at *2–3 (quotation omitted).[2]

The D.C. Circuit has echoed that conclusion, observing that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist." *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). Likewise, others must not "arrogate" the President's "power in this regard;" instead, § 7103(b)(1) "is for the President alone to invoke." *Dep't of Def. v. FLRA*, 685 F.2d 641, 650 (D.C. Cir. 1982).

Indeed, the President need not even "insert written findings in an exempting order[]" under § 7103(b)(1). *AFGE*, 870 F.2d at 727. If the President's order can be sustained without *any* findings, the statute surely does not permit second guessing or flyspecking of findings actually made. Any other conclusion would be flatly inconsistent with the deference regularly due to the President's national

---

[2] *Reagan* suggested that this exception *may* exist, but did not apply it. But in other contexts, courts have suggested that when judicial review is available only for "gross violations," that "narrow" exception applies only where the action is "plainly beyond the bounds" of the governing statute. *Air Line Emps. Ass'n, Int'l. v. Nat'l Mediation Bd.*, 1981 WL 2391, at *1-3 (D.D.C. May 18, 1981). That case is not presented here.

security-related determinations. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (dismissing as "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e national security] sphere" an argument "for a searching inquiry into . . . the President's justifications" for a finding about national interests); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (concluding that a statute authorizing the CIA Director to terminate an employee when the Director "shall deem such termination necessary or advisable in the interests of the United States" forecloses "any meaningful judicial standard of review"). In sum, "[w]hen it comes to collecting evidence and drawing factual inferences" on questions of national security, "the lack of competence on the part of the courts is marked," and judicial review of those determinations is thus sharply constrained. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (citation omitted).

The President's determination under the statute's second prong—whether the provisions of Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B)—is especially ill-suited to judicial second guessing. When the President adopts "a preventive measure . . . in the context of . . . national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder*, 561 U.S. at 35. Determining the "national security requirements and considerations" of the Nation is not a task for which this Court or any other is well-equipped. *See id.* at 34 ("the lack of competence on the part of the courts is marked" (citation omitted)); *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (refusing to review denial of security clearance because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such a body determine what constitutes an acceptable margin of error in assessing the potential risk"). Rather, the President is entitled to reach a national security-based finding before the national security is jeopardized. As with the exemption's first prong, this Court is ill suited to second guess that determination.

### 2.    The identified agencies meet the FSLMRS statutory criteria

In any event, the President's determinations withstand scrutiny. Each Defendant agency or subdivision "has as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 5 U.S.C. § 7103(b)(1)(A).

The FLRA has "appl[ied] a standard dictionary definition of 'investigate' as meaning 'to search

into so as to learn the facts' inquire into systematically'" to determine whether work is "investigative."

*Dep't of Homeland Sec. v. NTEU*, 68 FLRA 13, 23 (2014) (quoting Webster's New World Dictionary of American English 710 (Victoria Neufeldt et al. eds., 3d college ed. 1988)). As for "national security work," that phrase has long and consistently been interpreted in the federal labor relations context to refer to work "directly related to protection and preservation of the military, economic, and productive strength of the United States[.]" *Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181*, 4 FLRA 644, 655–56 (1980). The Defendant agencies and/or their relevant subdivisions perform such work:

- Executive Order 14,251 § 2 identifies as exempt the "**Office of the Chief Information Officer**" (OCIO) or other agency or subdivision "that has information resources management duties as the agency or subdivision's primary duty" in certain agencies. For several Defendant agencies, the sole exempted component under the Executive Order is that agency's OCIO. Those agencies include the **Department of Education**, the **Department of Housing and Urban Development**, the **Department of Labor**, **OPM**, the **Department of Transportation** (DOT),[3] and **SSA**. *See* Exec. Order 14,251 § 2. The role of the OCIO is largely consistent across agencies and subdivisions, and that office engages as a primary function in national security work. Particularly for agencies with detailed, highly confidential information on large portions of the American public, cybersecurity is national security: Breaches threaten to divulge tremendous amounts of tactically valuable data to foreign adversaries who routinely seek to exploit security vulnerabilities. *See* 44 U.S.C. § 3506(a)(2)–(3), (b)(1)(c); *see, e.g.*, Chris Jaikaran, Cong. Rsrch. Serv., IF 12798, Salt Typhoon *Hacks of Telecommunications Companies and Federal Response Implications* (Jan. 23, 2025) (detailing ongoing cyberattacks by People's Republic of China state-sponsored hackers), https://www.congress.gov/crs-product/IF12798.

- The **Department of Justice** (DOJ) performs investigative, intelligence, and national security work as primary functions. DOJ's investigative work is carried out, for example, by prosecutors in U.S. Attorney's Offices, the Drug Enforcement Administration, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, and Firearm as well as its other litigating components. *See* U.S. Dep't of Just., *Organization, Mission and Functions Manual*, https://perma.cc/NT9G-HFCN. The Bureau of Prisons conducts internal investigations into inmate activities, including identifying and monitoring terrorist inmates' communications. *See* U.S. Dep't of Just. Off. of the Inspector General, *DOJ OIG Report*, https://perma.cc/QF5F-RAUK. DOJ's national security and intelligence missions are carried out by its National Security Division, which "consist[s] of the elements of the Department of Justice . . . engaged primarily in support of the intelligence and intelligence-related activities of the United States Government." 28 U.S.C. § 509A(b). Similarly, DOJ litigating divisions prosecute terrorist and other foreign threats against U.S. citizens, while other DOJ arms investigate and prevent hostile actions. This is why DOJ components like the National Security Division, U.S. Attorney's Offices, and the Criminal Division have long been exempted under 5 U.S.C. § 7103(b)(1).

- The relevant **Department of Health and Human Services** (HHS) subdivisions play major roles in, and have as primary functions, the "protection and preservation of the military,

---

[3] Executive Order 14,251 does not exclude from FSLMRS coverage DOT or any subdivisions of DOT other than DOT's OCIO, but rather emphasizes the national security work DOT does—"ensuring the safety and integrity of the national transportation system"—and delegates to the Secretary of Transportation authority under section 7103(b) of title 5 to "issue orders excluding any subdivision" and publish the determination in the *Federal Register*. As of this filing, the Secretary has not exercised that authority.

economic, and productive strength of the United States," *Oak Ridge*, 4 FLRA at 655-56, given their critical roles in pandemic and bioterrorism preparedness and response. *See* Exec. Order 14,251 § 2 (listing specific HHS components). For example, the Office of the Secretary holds the power to declare an emergency in the event of a pandemic or bioterrorist attack, and broad powers stemming from such a declaration, 42 U.S.C. § 247d(a). HHS's Centers for Disease Control and Prevention (CDC) likewise "has an essential role in defending against and combatting public health threats domestically and abroad," including the threat of "bioterrorism." 42 U.S.C. § 247d-4(a)(1). HHS's Administration for Strategic Preparedness and Response similarly "leads the nation's medical and public health preparedness for, response to, and recovery from disasters and public health emergencies." ASPR: Administration for Strategic Preparedness and Response, https://aspr.hhs.gov/Pages/Home.aspx; *see* 42 U.S.C § 300hh-10(f)(1) ("[T]he Assistant Secretary for Preparedness and Response shall implement strategic initiatives or activities to address threats, including pandemic influenza and which may include a chemical, biological, radiological, or nuclear agent . . . that pose a significant level of risk to public health and national security."). HHS's Food and Drug Administration (FDA) investigates the efficacy of drugs and medical treatments like vaccines. These investigative functions also directly affect America's economic and productive strength— for example, the FDA's rapid approval of the COVID-19 vaccine facilitated the reopening of the American economy. Likewise, a secure food supply is critical to national security, as Congress recognized in 2011 by passing the Food Safety Modernization Act to enhance the FDA's authority to prevent and respond to foodborne threats, including terrorist threats. *See* Pub. L. No. 111-353, 124 Stat. 3885. And preparedness for chemical, biological, radiological, and nuclear threats is a key part of FDA's mission, as it collaborates with other agencies to approve and stockpile treatments for national security threats such as anthrax, smallpox, and the like. *See, e.g.*, Emergency Preparedness and Response, https://www.fda.gov/emergency-preparedness-and-response. Finally, HHS's Office of Refugee Resettlement has as its mission aid to refugees and other immigrants. Immigration and the Government's policy toward foreign nationals within the country are core national security issues and emphatically within the President's national security prerogatives. *See, e.g.*, *Hawaii*, 585 U.S. at 704.

- As the FLRA has recognized, the **Environmental Protection Agency**'s (EPA) mission of environmental regulation, investigation, and enforcement is a national security mission. "Any sabotage or interference with the availability of safe drinking water or breathing air may impact the economic and productive strength of the country as well as the general health and safety of U.S. citizens." *United States EPA*, 70 FLRA 279, 283 (2017). EPA also has taken on a role in energy policy through its regulation of greenhouse gas emissions under the Clean Air Act. *See, e.g., New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units*, 89 Fed. Reg. 39,798 (May 9, 2024). EPA policies like its mandate to produce electric vehicles have serious national security implications, including by making America dependent on its adversaries for critical minerals necessary to produce electric vehicle batteries. *See Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024). Congress has long recognized that policies that reduce our reliance on foreign nations for critical resources implicate national security. *See* 42 U.S.C. § 7111.

- The **Department of Energy**'s primary role is setting national energy policy, with obvious national security objectives and implications. The same Congress that enacted the FSLMRS acknowledged Energy's national security objectives, closely tied to its role in regulating domestic energy production, when it created the Department. *See* 42 U.S.C. § 7111(2) ("[O]ur increasing dependence on foreign energy supplies present a serious threat to the national security of the United States and to the health, safety and welfare of its citizens."). The Department "ensure[s] the security of the U.S. nuclear weapons stockpile," "manages the Strategic Petroleum Reserve, invests in protection against cyber and physical attacks on U.S. energy infrastructure," and "provides training tools and procedures for emergency response and preparedness." U.S. Dep't of Energy, *Energy Security*, https://perma.cc/N5G9-GSDJ. On his

first day in office, President Trump recognized that "[e]nergy security is an increasingly crucial theater of global competition"; "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets"; and "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025).

- The **Department of Treasury**'s (Treasury) national security role is clear, primary, and longstanding. Treasury exists to promote the economic and productive strength of the United States—a core national security mission. Treasury's "mission is to maintain a strong economy and create economic and job opportunities by promoting the conditions that enable economic growth and stability at home and abroad, strengthen national security by combating threats and protecting the integrity of the financial system, and manage the U.S. Government's finances and resources effectively." U.S. Dep't of the Treasury, *Role of the Treasury*, https://perma.cc/7JQZ-QMQU. Put simply, Treasury exists to promote the economic and productive strength of the United States—a core national security mission.

- The **Department of State**'s[4] national security role involves executing the President's foreign policies to protect U.S. security, prosperity, and democratic values, and fostering an international environment where Americans can thrive. *See* U.S. Dep't of State, *About the U.S. Department of State*, https://www.state.gov/about/. The Department combats terrorism, safeguards U.S. interests abroad, and implements foreign policy initiatives to build a freer, more prosperous and secure world by, for example, adjudicating visa and passport applications; mitigating threats from the development of nuclear weapons programs in Iran and North Korea; liaising with American overseas private sector security interests; combatting transnational crime; and dealing with disarmament and global finance matters. *See e.g.,* U.S. Dep't of State, *Programs and Initiatives, https://www.state.gov/bureau-of-counterterrorism-programs-and-initiatives/.*

- The **Agency for International Development** (USAID) is "the principal U.S. agency responsible for extending development assistance to countries around the world." Its "programs aim to support economic growth, combat the spread of disease, promote democratic reform, and address food insecurity." *See* OIG Oversight: USAID Overview, https://perma.cc/G3TE-LL5K.

- The national security role of the **Department of Defense** (DOD) is self-evident. The primary mission of DOD is to provide the military forces needed to deter war and ensure our nation's security. U.S. Dep't of Defense, *About*, https://www.defense.gov/About/. The National Security Act of 1947, as amended, was enacted to promote the national security of the United States by providing for, *inter alia*, a Secretary of Defense and establishing DOD, including the Military Departments of the Army (including the Army National Guard pursuant to 32 U.S.C. § 102), the Navy (including naval aviation and the United States Marine Corps), and the Air Force (including the United States Space Force pursuant to 10 U.S.C. § 9081 and the Air National Guard pursuant to 32 U.S.C. § 102), under the direction, authority, and control of the Secretary of Defense. Pursuant to Title 10, Section 113, the Secretary of Defense is responsible for providing a "national defense strategy" that includes, among other things, "[t]he assumed strategic environment, including the most critical and enduring threats to the national security of the United States and its allies." Dep't of Defense, *About*, https://www.defense.gov/About/.

---

[4] Plaintiffs challenge exclusions made under the civil service statute, FSLMRS, in Section 2 of the Executive Order, which is applicable to civil service positions in these defendant agencies, including the Department of State and the United States Agency for International Development (USAID). The separate exclusions made under the Foreign Service Labor-Management Relations Statute, 22 U.S.C. § 4103(b), in Section 3 of the Executive Order, are currently being challenged in a lawsuit filed on April 7, 2025, in the District of Columbia, *American Foreign Service Association v. Trump*, No. 25-cv-1030 (D.D.C.). Plaintiffs are not parties to that action.

- The **Department of Veterans Affairs** (VA) has a primary national security function, which necessitates that the VA be free to exercise policy and management control of vital national medical resources without the hindrance and interference of arbitrary union action that impacts the ability of the agency to execute its vital mission. Congress has charged VA with providing medical services during national emergencies, a role it recently performed in the COVID-19 pandemic. *See* 38 U.S.C. § 1785; *see also* VA, *VA's Fourth Mission* at 1, https://perma.cc/R55T-NPP7. VA further takes actions to improve America's preparedness for national emergencies, including war, terrorism, and natural disasters. This mission involves developing plans and taking actions to ensure continued service to Veterans, as well as supporting national, state, and local emergency management efforts. In fact, AFGE has recognized the VA's national security role when criticizing the Administration's policy objectives. *See* AFGE.org, *Americans Should Brace for Massive Cuts to Benefits, Services Under Trump's Policies* (Nov. 18, 2024), https://www.afge.org/article/americans-should-brace-for-massive-cuts-to-benefits-services-under-trumps-policies/ ("It's hard to imagine what will happen to national security . . . as the majority of federal employees work at the Department of Defense, *Veterans Affairs*, and Homeland Security.") (emphasis added). Most of VA's medical service functions are also straightforwardly "investigative." They involve systematically searching into patient's symptoms to diagnose medical conditions.

- Unsurprisingly, the **Department of Homeland Security** (DHS), and the excepted DHS agencies and subdivisions, *see* Exec. Order 14,251 § 2 (listing specific DHS components), have national security as a primary purpose. DHS describes its "mission" as "secur[ing] the nation from the many threats we face" through the work of "employees in jobs that range from aviation and border security to emergency response, from cybersecurity analyst to chemical facility inspector," all with the goal of "keeping America safe." *About DHS*, https://www.dhs.gov/about-dhs. When Congress established DHS, it gave the agency as "primary mission[s]" the "prevent[ion of] terrorist attacks within the United States" and "reduc[tion of] the vulnerability of the United States to terrorism." 6 U.S.C. § 111(b).

- The relevant components of the **Department of Interior**, *see* Exec. Order 14,251 § 2, protect and manage the Nation's natural resources, which are essential to addressing the nation's energy production needs, and/or investigate environmental compliance and offshore incidents. *See* Dep't of Interior, About,https://perma.cc/MKV5-28GY; U.S. Dep't of Interior, *Bureau of Safety and Environmental Enforcement*, https://perma.cc/C35L-4TZR; *see also Declaring a National Energy Emergency*, Exec. Order No. 14,156 (Jan. 20, 2025). For example, the Outer Continental Shelf (OCS) is a significant source of oil and gas for the Nation's energy supply. The Bureau of Ocean Energy Management (BOEM) manages about 2,227 active oil and gas leases on approximately 12.1 million OCS acres. Offshore Federal production in FY 2024 reached approximately 668 million barrels of oil and 700 billion cubic feet of gas, almost all of which was produced in the Gulf of America. This accounts for about 14 percent of all domestic oil production and 2 percent of domestic natural gas production. U.S. Dep't of Interior, *Oil and Gas Energy*, https://perma.cc/S6AR-KZQ3

- The two exempted subdivisions of the **Department of Agriculture** (USDA)—the Food Safety and Inspection Service (FSIS) and Animal and Plant Health Inspection Service (APHIS)—both plainly have a primary investigative function that also affects national security. *See* Exec. Order No. 14,251, § 2. FSIS investigates food safety and integrity. For example, FSIS assures that meat, poultry, and egg products are wholesome, not adulterated, and properly marked, labeled, and packaged. USDA, *Food Defense*, https://www.fsis.usda.gov/food-safety/food-defense-and-emergency-response/food-defense. Food defense is a critical component of FSIS' mission to protect food products from contamination and adulteration intended to cause public health harm or economic disruption. Likewise, APHIS was established to safeguard the health, welfare, and value of American agriculture and natural resources. USDA, *Our Mission*, https://www.aphis.usda.gov/. As part of this mission, APHIS investigates biotechnology-derived agricultural products to ensure that they do not inadvertently introduce plant pests or

diseases and are available to American farmers to enhance production of food and fiber for the world. At the same time, APHIS monitors and responds to potential acts of agricultural bioterrorism, invasive species, diseases of wildlife and livestock, and conflicts between humans and wildlife.

- Since its inception in 1950, the **National Science Foundation**'s (NSF) mission "[t]o promote the progress of science; to advance the national health, prosperity, and welfare; [and] to secure the national defense" has prioritized national security work. Pub. Law No. 81-507, 64 Stat. 149 (emphasis added). Because safeguarding U.S. research security is essential to national security and the national defense,  NSF works closely on these priorities with law enforcement and intelligence communities while dedicating considerable effort and resources, including through the Office of the Chief of Research Security Strategy and Policy, to provide information and the tools necessary to ensure that U.S. researchers' work is protected and to clarify security issues and mitigate risks. *See, e.g.*, 42 U.S.C. § 19031. NSF is also a major federal funder of artificial intelligence (AI) research, having invested in foundational research since the early 1960s. NSF funding has supported AI breakthroughs that have advanced a deeper understanding of the potential misuse by malicious entities, which may include nation-state threat actors and other adversaries. NSF is also "authorized and directed . . . to take a leading role in fostering and supporting research and education activities to improve the security of networked information systems." 42 U.S.C. § 1862(a)(8). As with AI, NSF has invested for decades in research underpinning the quantum revolution and the development of inherently secure communications, global positioning systems (GPS), and sophisticated sensors and imaging tools. These technologies – conferring broad benefits to the Nation's welfare - are essential tools for the U.S. military and our collective national security. In sum, NSF's investments unleash groundbreaking discoveries and translational solutions to fuel economic prosperity, national security, and global science and engineering competitiveness.

- The **International Trade Commission** (USITC) has broad investigative responsibilities on matters of trade trade. USITC investigates the effects of allegedly dumped and subsidized imports on domestic industries. 19 U.S.C. §§ 1671 *et seq.*, 1673 *et seq.*; *See* U.S. Int'l Trade Comm'n, *About the USITC,* https://www.usitc.gov/press_room/about_usitc.htm. The agency conducts global safeguard investigations when domestic industries allege serious injury by increased imports. *Id.* § 2252. USITC also investigates cases involving imports that allegedly infringe intellectual property rights or otherwise unfairly injure a domestic industry. 19 U.S.C. § 1337. USITC also, by law, provides the House Committee on Ways and Means, the Senate Committee on Finance, and the President or, by delegation, the U.S. Trade Representative with objective and thorough analysis and information on trade policy and U.S. competitiveness matters. *Id.* § 1332. USITC also has the responsibility of maintaining the Harmonized Tariff Schedule of the United States, the official legal document that sets out the tariff rates and statistical categories for all merchandise imported into the United States. *Id.* § 3007. These trade responsibilities have a direct bearing on America's economic and productive strength.

- The **General Services Administration**'s (GSA) primary functions include securing both federal buildings and federal information technology systems, with obvious national security implications. For example, GSA's Office of Mission Assurance (OMA) coordinates physical security of owned and leased federal buildings. *See* GSA, *OMA*, https://perma.cc/TCQ5-LN2Q. OMA also coordinates response activities to ensure continuity of operations planning for emergencies, and is the primary agency—along with the Federal Emergency Management Agency—for emergency support function logistics. In this latter role GSA provides emergency relief supplies, telecommunications support, and emergency transportation services during disasters or national security incidents like terrorist attacks. GSA's Federal Acquisition Service (FAS) oversees contracts for cybersecurity tools and services, such as those under the Highly Adaptive Cybersecurity Services program. *See* GSA, *Highly Adaptive Cybersecurity Services*, https://perma.cc/NRZ2-PPKQ. The FAS also oversees the Federal Risk and Authorization Management Program (FedRAMP), a governmentwide program that provides a standardized

approach to security assessment, authorization, and continuous monitoring for cloud products and services. *See* GSA, *FedRAMP*, https://perma.cc/UB6L-7HJD.

In sum, each Defendant agency "has as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 5 U.S.C. § 7103(b)(1)(A).

The President also properly determined that the provisions of Chapter 71 cannot be applied to any of the exempted agencies or subdivisions "consistent with national security requirements and considerations." *Id*. § 7103(b)(1)(B). When it comes to national security, the needs of the mission dictate working conditions. By nature, national security work may and does, at any time, require changes in working conditions or employee status to be accomplished without hesitation, advanced notice, or opportunity to bargain with labor organizations. The President's "executive decisions" in the national-security realm require "delicate, complex" assessments and rapid responses from agencies and employees. *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

But CBAs negotiated under the FSLMRS, including those of Defendant agencies, are designed to reduce the control of the agency or subdivision over its personnel and operations. For example, under the FSLMRS, agencies must postpone operational changes that substantively affect working conditions until they have offered the relevant union or unions an opportunity to bargain and finished any subsequent negotiations, including impasse proceedings when needed. This process often imposes delays of months or years before operational changes can take effect; for example, the FLRA ruled that Immigrations and Customs Enforcement violated the FSLMRS by immediately changing cybersecurity practices in response to malware attacks instead of completing midterm negotiations with its union over the change. *See U.S. Immigr. & Customs Enf't*, 67 FLRA 501 (2014).

Employee performance is also critical in agencies with important national security roles. Many provisions in Defendant agencies' CBAs make it more difficult to remove employees who perform poorly. For example, CBAs often require "performance improvement periods" (PIPs) of at least 60 days before agencies can propose removing an employee for poor performance. *See, e.g.*, AFGE National Veterans Affairs Council and U.S. Department of Veterans Affairs, Master Agreement (2011) at 134, https://perma.cc/7PLV-ENRM ("at least 90 calendar days"). Even after that process, CBAs allow unions to grieve dismissals of poor performers to binding arbitration, with arbitrators overturning approximately three-fifths of removals they hear. *See* James Sherk, America First Policy Inst., *Union Arbitrators*

*Overturn Most Federal Employee Dismissals* 5 (2022). The result: OPM recently found that a plurality of federal employees reported that poor performers in their work units typically "remain in the work unit and continue to underperform," including at most of Defendant agencies. *See* OPM, *2023 Office of Personnel Management Federal Employees Viewpoint Survey: Report by Agency* 49-60, https://www.opm.gov/fevs/reports/data-reports/data-reports/report-by-agency/2023/2023-agency-report.pdf. The President permissibly concluded that requiring lengthy delays before adjusting operations and CBAs provisions that impede or prevent Defendant agencies from separating underperforming employees are inconsistent with national security considerations.

At base, national security determinations inevitably involve the exercise of "[p]redictive judgment" about risks to national security. *Egan*, 484 U.S. at 529; *see Hawaii*, 585 U.S. at 708 (national security judgments "involve large elements of prophecy"). They also involve policy determinations about what level of risk is tolerable in any given set of circumstances. The Court should not second guess the President's determinations about the relevant "national security requirements and considerations" at all, 5 U.S.C. § 7103(b)(1)(B), because—to reiterate—"it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see* Section II(C)(1), *supra*. But the Court certainly must not second guess those determinations in a retrospective manner, based on the agencies, threats, and union behavior of yesteryear.

### D.    Plaintiffs are unlikely to succeed on their constitutional claims

Plaintiffs alternatively try to manufacture constitutional violations under the First and Fifth Amendments. They are unlikely to succeed on those meritless claims, either.

#### 1.    Plaintiffs' First Amendment claims are unlikely to succeed.

Plaintiffs' First Amendment claims are unlikely to succeed. Plaintiffs' viewpoint-discrimination claim fails because there is no constitutional right to collective bargaining and the Executive Order draws no distinctions based on viewpoint. And their retaliation claim fails because the Court cannot look behind a facially legitimate presidential action to search for allegedly retaliatory motives—and none were present here in any event.

**Viewpoint Discrimination.** At the outset, Plaintiffs' viewpoint-discrimination theory is meritless. Plaintiffs say the Executive Order "strips collective bargaining rights from . . . federal unions" based on

the unions' viewpoints. Mot. at 25. But Plaintiffs lack a First Amendment right to collective bargaining. "[T]he First Amendment does not impose any affirmative obligation on the government . . . to recognize [a public employee union] and bargain with it." *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313 (1979) (Arizona's recalcitrance to negotiate with union "no First Amendment problems"). Likewise, courts recognize that "[t]here is . . . no constitutionally protected right to bargain collectively." *Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8-9 (D.D.C. 2005); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 281 F. Supp. 2d 59, 65 (2003). Courts have thus uniformly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1). *See, e.g.*, *Nat'l Treasury Emps. Union v. Reagan*, 1981 U.S. Dist. LEXIS 16482, at *7 (D.D.C. Sept. 3, 1983) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). Nor does Executive Order 14,251 otherwise impinge on any protected activity: It does not bar Plaintiffs from recruiting employees to join their unions, petitioning the government, or engaging in any other activity protected under the First Amendment.

Moreover, in any event, the Executive Order does not distinguish between unions, let alone draw lines based on unions' viewpoints. Instead, it distinguishes *agencies or subdivisions*. Plaintiffs tellingly identify no part of the Executive Order that supposedly draws such lines; instead, they refer to nonoperative language in a separate publication. Mot. at 25. That sets this supposed viewpoint discrimination far apart from the cases Plaintiffs cite as supporting their theory—like *West Virginia State Board of Education v. Barnette*, where students were required to *express* a viewpoint by participating in the Pledge of Allegiance, 319 U.S. 624, 627-30 (1943), or *Rosenberger v. Rector and Visitors of the University of Virginia*, where a university refused to provide otherwise-available funds for expression of a particular viewpoint, 515 U.S. 819, 831-32 (1995). Unlike in those cases, Plaintiffs can identify nothing about the *agency* exemptions in Executive Order 14,251 that discriminates based on a *union's* viewpoint.

**Retaliation.** Plaintiffs' retaliation theory, in turn, falls far short of the high bar for First Amendment retaliation claims. It is well settled that facially valid executive actions—that is, those within the lawful authority of the executive—are entitled to a presumption of regularity. "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary,

courts presume that they have properly discharged their official duties." *United States v. Chemical Found.*, 272 U.S. 1, 14 (1926). Indeed, "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quotation omitted). That presumption imposes a bar to review that is difficult to surmount. Overcoming it requires a "strong showing of bad faith or improper behavior." *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 923 (2025) (quotation omitted). Plaintiffs cannot clear that bar because, as explained above, the President has acted within the bounds of his clear authority over Executive Branch employees. *See, e.g.*, *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 496-97 (2010) ("Article II makes a single President responsible for the actions of the Executive Branch." (cleaned up)). The Court's inquiry should stop here.

Even if the Court could properly look behind the President's stated justification, Plaintiffs' theory fails on the facts. To state a claim of First Amendment retaliation, "a plaintiff must establish a causal connection between the [alleged] retaliatory animus and the plaintiff's subsequent injury." *Nieves v. Barlett*, 587 U.S. 391, 398-99 (2019) (cleaned up). If the Federal Government would have taken the challenged action absent the asserted First Amendment activity, a retaliation claim fails. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Plaintiffs mischaracterize the President's decision as impermissible retaliation. Not so. The President can (and did) permissibly determine that intentionally impeding agency administration and responsiveness, when an agency or agency subdivision has a primary national security function, renders FSLMRS coverage incompatible with national security considerations. The President's determinations with respect to § 7103(b)(1)(B) are thus a facially legitimate pursuit of legitimate policy objectives, not retaliatory.

Moreover, mere temporal proximity is not sufficient alone to establish a causal connection, particularly where, on the face of the Executive Order, no connection is suggested. *See Fouladi v. City of Tucson*, 94 F. App'x 485, 486 (9th Cir. 2004). In asking the Court to infer causation from temporal proximity, Plaintiffs overlook the proximity of the Executive Order to an event of much greater significance than Plaintiffs' Federal litigation activity or public statements: the change in presidential administrations that occurred just two months prior and concomitant change in agency policies that are in tension—or outright conflict—with agency CBAs. Plaintiffs have even acknowledged that some of their

contracts were designed to stymie President Trump's policies. *See, e.g.*, AFGE Council 238, *Press Release: AFGE Council 238 Reaches New Contract with the EPA* (May 30, 2024), https://perma.cc/UYH9-RR2S ("With former President Trump—who attacked science and gutted the EPA during his presidency—campaigning for a second term, [AFGE] Council 238 worked closely with members to ensure this contract best positioned the Agency to carry out its work to protect the planet regardless of who is in power."). It is self-evident that the Executive Order was precipitated by the new administration's differing perspectives and policy judgments pertaining to national security work in the federal workforce rather than retaliation for protected union speech. Compl. ¶ 80, *Dep't of Defense v. AFGE*, No. 6:25-cv-119 (W.D. Tex. Mar. 27, 2025), ECF No. 1 ("The Biden Administration renegotiated many CBAs to last through most or all of President Trump's second term.").

Plaintiffs' primary contention is that the White House "Fact Sheet" regarding the Executive Order and a separate lawsuit filed in the Western District of Texas—both of which note that certain federal-sector unions have taken actions under the FSLMRS to impede the President's policy objectives—offer evidence of retaliatory motive. But neither passes muster. The Fact Sheet shows how the FSLMRS gives the federal unions power to impede presidential policies, and discusses how federal unions have and are using their power to do so. For example, many unions renegotiated contracts under the Biden Administration and are filing grievances to enforce those provisions against conflicting Trump Administration policies. This demonstrates not retaliation for speech, but part of why the President concluded the FSLMRS could not be applied to these agencies in a manner consistent with national security considerations.

Section 7103(b), by its nature, is a recognition by Congress that union activity—in any manner encompassed by the collective bargaining rights afforded under the statute—can impede agency operations and that, when such activity impacts national security considerations, the President can act to restrict it by exempting agencies or subdivisions that have national security work as a primary function from the Act's coverage. Plaintiffs' focus on the Fact Sheet's reference to union efforts to impede the President's agenda fails to acknowledge that the statute expressly permits just that sort of functional analysis with reference to union conduct. Further, as both the fact sheet and the Texas Complaint make clear, the President signed Executive Order 14,251 in service of two of his top longstanding policy

priorities: protecting Americans from threats to national security and improving the efficiency and efficacy of the federal workforce.

Nor, in any event, do Plaintiffs convincingly explain why filing grievances under the FSLMRS would be protected by the First Amendment. Grievances are brought by federal employees authorized to perform union work while on official time. *See* 5 U.S.C. § 7131. Government employees have limited First Amendment rights to speak and petition. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968) (speech); *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390-91 (2011) (petition). Plaintiffs do not engage with this body of law, so they have not explained how the relevant grievances are speech made as a private citizen or, even if so, how the employees' interest in speaking outweighs the public employer's interest in promoting workplace efficiency and discipline—especially when the grievances are part of a campaign to resist management priorities. *See, e.g.*, *Connick v. Myers*, 461 U.S. 138, 154 (1983) ("an employee grievance concerning internal office policy" does not touch on "matters of public concern").

Moreover, Plaintiffs have failed to establish any chilling effect. "Not every government restriction . . . is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory," *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) (citation omitted). Plaintiffs suggest that because Section 4 of the Executive Order delegates authority to the DOD and VA, and Section 7 directs agency heads to determine whether other agency subdivisions should be exempt under the FSLMRS, the Executive Order "would certainly chill a person of ordinary firmness from engaging in" exercising his or her constitutional rights to avoid prompting further exemptions. Mot. at 19 (citation omitted). But the President's instruction that agencies provide input as to whether he should exercise his statutory authority is not an action directed at Plaintiffs at all, let alone an action that could plausibly operate to deter expressive activity. *See, e.g.*, *Kensington Vol. Fire Dep't., Inc. v. Montgomery Cnty.*, 684 F.3d 462, 468 (4th Cir. 2012) (rejecting plaintiffs' First Amendment retaliation claim where "the budget eliminated some of Plaintiffs' funding, [but] its effect was not felt by Plaintiffs alone"). An attempt to restrict this communication would imperil communication within the Executive Branch. *But see* U.S. Const. art. II, § 2, cl. 1 (Opinions Clause).

Plaintiffs have not established that they are likely to succeed on the merits of their retaliation claim.

So that claim likewise cannot support a preliminary injunction here.

**2.  Plaintiffs are unlikely to succeed on their Fifth Amendment claims.**

Plaintiffs' Fifth Amendment claims—one for "abrogation of property rights in federal contract" and another for violation of procedural due process—are likewise unlikely to succeed. Compl. ¶¶ 241-44; Mot. at 31-36.[5] They argue that they have a property right in their CBAs. *E.g.*, Mot. at 31-32. But whether their claim is couched as a substantive or procedural due process claim, Plaintiffs fail to make the threshold showing that they have a constitutionally protected property interest.

Not all public contracts give rise to a constitutionally protected property interest. *See, e.g.*, *San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty.*, 825 F.2d 1404, 1408 (9th Cir. 1987) ("not *every* interference with contractual expectations" gives rise to "federal due process protection"); *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014) (observing that "'ordinary' or 'routine' government contracts do not, by themselves," give rise to Fifth Amendment property rights); *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photo. v. D.C.*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)). The CBAs at issue here generally provide procedural protections to Plaintiffs, but are not themselves employment contracts—or anything akin to that "prime protected category" of contracts. *San Bernardino*, 825 F.2d at 1409-10 (holding that, for due process purposes, plaintiff lacked a "property interest" in a four-year contract to provide professional services). Just the opposite: All of Plaintiffs' CBAs are entered pursuant to the FSLMRS, which makes clear that the President has authority to exempt agencies and subdivisions from existing union representation. *See* 5 U.S.C. § 7103(b). Plaintiff's CBAs similarly make clear that they are subject to the provisions of applicable law, which includes § 7103(b)'s authorization for national security exemptions. *See, e.g.*, VA & AFGE, 2011 Master Agreement at 6, https://perma.cc/7PLV-ENRM. ("shall be governed by

---

[5] The Complaint asserts a third Fifth Amendment claim, based on the Equal Protection component of the Fifth Amendment. *See* Compl. ¶¶ 245–51 (Count V). Because that claim is not presented in the PI motion currently before the Court, Defendants do not address it here and reserve all arguments on Plaintiffs' Equal Protection claim for forthcoming briefing.

applicable federal statutes"). Having entirely failed to engage with this body of law and the FSLMRS backdrop to their CBAs, Plaintiffs cannot demonstrate that they are likely to succeed on this claim.

In any event, due process does not require *pre-deprivation* process before recission of Plaintiffs' CBAs, as they claim. Mot. at 44-45. Post-deprivation process available through a challenge to the recission in the FLRA (and the courts of appeals on a petition for review of an FLRA decision) is adequate. *See, e.g., Miranda v. City of Casa Grande*, 15 F.4th 1219, 1226 (9th Cir. 2021) (concluding that existing post-deprivation remedies were constitutionally adequate); *Hill v. City of Scottsdale*, 2012 WL 2952377, at *6 (D. Ariz. Jul. 19, 2012) (same); *see also Eisinger v. Fed. Lab. Rels. Auth.*, 218 F.3d 1097, 1101 (9th Cir. 2000) (Court of Appeals has jurisdiction to review final orders of the FLRA). Plaintiffs have offered no explanation of why this process is constitutionally inadequate. That oversight leaves them—again— unable to show that they are likely to succeed on the merits.

Last, Plaintiffs' theory that Defendants have breached or will breach their CBAs would at most give rise to a contract-based claim in the exclusive jurisdiction of the Court of Federal Claims. *See Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (Fifth Amendment claims "rarely arise under government contracts," which the government typically does not enter "in its sovereign capacity," so any "remedies arise from the contracts themselves," not "from the constitutional protection of private property rights"); 28 U.S.C. § 1491(a)(1) (exclusive jurisdiction in Court of Federal Claims for "any claim against the United States founded . . . upon any express or implied contract with the United States"). Plaintiffs may not use a due process claim as "an alternative legal vehicle" through which to enforce their contracts. *See Olympic Fed. Sav. & Loan Ass'n v. Dir., Off. of Thrift Supervision.*, 1990 WL 134841, at *8 (D.D.C. Sept. 6, 1990).

## III.    The Balance of the Equities and the Public Interest Weigh Against Plaintiffs

A preliminary injunction also is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). At the outset, given that Plaintiffs cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear [it] cannot make the corresponding strong showings [on the second two factors] required to tip the balance in its favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

It is vital that agencies with a primary purpose of national security are responsive and accountable to the American people. The clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining. Moreover, the public has a strong interest in ensuring that agencies with a primary intelligence, counterintelligence, investigative, or national security function operate effectively and efficiently to protect the American people. A preliminary injunction would displace and frustrate the President's decision about how to best address issues of national security, matters on which the courts typically defer to the President's judgment. The government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Plaintiffs, by contrast, have shown no irreparable harm. On balance, the harms to the parties thus favor denying a preliminary injunction.

## IV.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Injunctive Relief

For the reasons stated above, the Court can and should deny the Plaintiffs' motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post a bond commensurate with the scope of any injunction. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000).

### <u>CONCLUSION</u>

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: April 25, 2025                                 Respectfully submitted,

                                                      YAAKOV M. ROTH
                                                      Acting Assistant Attorney General
                                                      EMILY M. HALL
                                                      SARAH E. WELCH
                                                      Counsel to the Assistant Attorney General
                                                      Civil Division

                                                      ERIC HAMILTON
                                                      Deputy Assistant Attorney General

Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

 */s/ Lydia Jines*
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St., NW, Twelfth Floor
Washington, DC 20530
Tel: (202) 353-5652
Fax: (202) 616-8470
Email: Lydia.Jines@usdoj.gov

*Counsel for Defendants*