Leon Dayan, SBN 153162
Abigail V. Carter*
Ramya Ravindran*
Lane M. Shadgett*
J. Alexander Rowell*
**BREDHOFF & KAISER P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com

Daniel Feinberg, SBN 135983
Catha Worthman, SBN 230399
Anne Weis, SBN 336480
**FEINBERG, JACKSON, WORTHMAN & WASOW, LLP**
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Admitted *pro hac vice*

Attorneys for Plaintiffs (Additional Counsel listed in signature block)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Case No.: 3:25-cv-03070-JD<br><br><br>**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

ARGUMENT ............................................................................................................................... 1

I.    This Court Has Jurisdiction to Hear Plaintiffs' Claims ............................................... 1

II.   Plaintiffs' First Amendment Claim is Likely to Succeed ............................................ 4

      A.    The Exclusion Order Unconstitutionally Retaliates Against Plaintiffs ............ 4

      B.    The Exclusion Order Unconstitutionally Discriminates Based on Viewpoint ............... 6

III.  Plaintiffs' *Ultra Vires* Claim is Likely to Succeed ..................................................... 7

IV.   Plaintiffs' Fifth Amendment Claim is Likely to Succeed ........................................ 10

      A.    The Federal Government Cannot Make and then Repudiate a Binding Contract .......... 10

      B.    Plaintiffs and Their Members Did Not Receive Procedural Due Process ..................... 11

V.    Plaintiffs Have Demonstrated Irreparable Harm ....................................................... 12

VI.   The Balance of Harms and Public Interest Weigh in Favor of Plaintiffs ............... 15

VII.  Defendants' Request that Plaintiffs Post Bond Should Be Denied ......................... 15

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE Loc. 446 v. Nicholson*,
  475 F.3d 341 (D.C. Cir. 2007) ........................................................................................2, 3

*AFGE v. OPM*,
  2025 WL 1150698 (N.D. Cal. Apr. 18, 2025) ........................................................................15

*AFGE v. OPM*,
  2025 WL 900057 (N.D. Cal. Mar. 24, 2025) ..........................................................................4

*AFGE v. Reagan*,
  870 F.2d 723 (D.C. Cir. 1989) ...........................................................................................8

*AFGE v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ...........................................................................................3

*In re AFGE*,
  790 F.2d 116 (D.C. Cir. 1986) ..........................................................................................13

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ..........................................................................................10

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) ............................................................................................6

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) .........................................................................................................3

*Brodowy v. United States*,
  2006 WL 5631717 (Fed. Cl. July 11, 2006) ........................................................................12

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ...........................................................................................8

*Cole v. Young*,
  351 U.S. 536 (1956) ..........................................................................................................9

*Connick v. Myers*,
  461 U.S. 138 (1983) ..........................................................................................................4

*CTIA - The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ...........................................................................................14

*Dep't of Defense. v. AFGE Dist. 10*,
  No. 6:25-cv-00119-ADA (W.D. Tex.) ...........................................................................2, 10

*Dep't of Energy, Oak Ridge Operations & NAGE Local R5-181,*
    4 F.L.R.A. 644 (1980) .........................................................................................9, 10

*Dep't of Treasury v. NTEU Chapter 73,*
    No. 2:25-cv-00049 (E.D. Ky.) .......................................................................................2

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) .......................................................................................14

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................................................6

*HiQ Labs, Inc. v. LinkedIn Corp.,*
    31 F.4th 1180 (9th Cir. 2022) .....................................................................................14

*Int'l Union, United Gov't Sec. Officers of Am. v. Clark,*
    706 F. Supp. 2d 59 (D.D.C. 2010) .............................................................................11

*Johnson v. Couturier,*
    572 F.3d 1067 (9th Cir. 2009) .....................................................................................15

*Kreschollek v. S. Stevedoring Co.,*
    78 F.3d 868 (3d. Cir. 1996) ...........................................................................................3

*Lynch v. United States,*
    292 U.S. 571 (1934) .....................................................................................................11

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) .....................................................................................................12

*Murphy Co. v. Biden,*
    65 F.4th 1122 (9th Cir. 2023) .......................................................................................8

*Museum of Handcar Tech. LLC v. Transp. Agency for Monterey Cnty.,*
    2025 WL 1114458 (N.D. Cal. Apr. 14, 2025) ...........................................................14

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ........................................................................................................5

*NTEU v. Trump,*
    2025 WL 1218044 (D.D.C. Apr. 28, 2025) ........................................................ *passim*

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ........................................................................................................5

*Perry v. United States,*
    294 U.S. 330 (1935) .....................................................................................................11

*Phillips v. Marion Cnty. Sheriff's Off.,*
    494 F. App'x 797 (9th Cir. 2012) ...............................................................................11

*Rick's Mushroom Serv., Inc. v. United States*,
    521 F.3d 1338 (Fed. Cir. 2008)................................................................12

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ...............................................................15

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)..................................................................................7

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) ...............................................................15

*Small v. Avanati Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) .................................................12, 13, 14

*Stark v. Wickard*,
    321 U.S. 288 (1944)..................................................................................8

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994)...............................................................................2, 3

*U.S. Att'ys Off. S. Dist. of Tex. & AFGE Loc. 3966*,
    57 F.L.R.A. 750 (2002)............................................................................2

*Unger v. Nat'l Residents Matching Program*,
    928 F.2d 1392 (3d Cir. 1991)................................................................11

*United States v. Williams*,
    553 U.S. 285 (2008)..................................................................................9

**Statutes & Regulations**

5 U.S.C. § 7101................................................................................10, 15

5 U.S.C. § 7103................................................................................10, 11

5 U.S.C. § 7105.........................................................................................2

5 U.S.C. § 7106.......................................................................................11

5 U.S.C. § 7115.........................................................................................1

5 U.S.C. § 7118.........................................................................................3

5 U.S.C. § 7122.........................................................................................3

Exec. Order 14,215, 90 Fed. Reg. 10447 (Feb. 18, 2025) ......................2

**Other Authorities**

124 Cong. Rec. 29186 (1978)..................................................................8

*Primary*, *Black's Law Dictionary* (5th ed. 1979) ...........................................................................10

Erich Wagner, *VA Is Selectively Enforcing Trump's Order Stripping Workers of Union Rights*, Government Executive (Apr. 18, 2025) ...........................................................5

Order Suspending the Application of Section 1-402 or 1-404 or Exec. Order 12171, 90 Fed. Reg. 16427 (Apr. 17, 2025) ...................................................................4

The government's brief is telling for what it omits: any effort to address the President's express statements that acknowledge the retaliatory rationale behind the Exclusion Order. There is no need for "searching inquiries" into the Executive's motive when the Executive affirmatively provides those reasons in an official document issued contemporaneously with the executive action. Indeed, when that document is titled *Fact* Sheet, the Court can simply take the government at its word. Those words make clear that rather than applying the statutory criteria contained in Chapter 71, the Exclusion Order eliminated labor rights and protections for federal employees whose unions have opposed President Trump's agenda through First Amendment activity. That is both unconstitutional and exceeds the authority delegated by Congress in § 7103(b).

The government's attempt to minimize the effects of the Exclusion Order fares no better. Agencies are implementing the Order, causing substantial and ongoing harm to Plaintiffs and their members. The government has ceased payroll deduction guaranteed by 5 U.S.C. § 7115 at most Excluded Agencies—AFGE, for example, saw withheld dues drop by roughly 82 percent, reducing total dues related revenue by $2.9 million per pay period and necessitating significant staff layoffs. Plaintiffs' members are fearful of raising issues or voicing opposition to the President's policies as a result of the Order. And OPM has instructed agencies to refuse to recognize and negotiate with the union, process grievances, or provide official time to union representatives guaranteed by statute and in their CBAs. The Order thus significantly impairs Plaintiffs' ability to carry out their mission: to negotiate on employees' behalf and represent them in critical times such as when they are disciplined, fired, discriminated against, and more. The crippling effects of the Order cannot be dismissed as "speculation" or remedied at the end of this litigation.

## ARGUMENT

### I.    This Court Has Jurisdiction to Hear Plaintiffs' Claims

This case challenges the validity of executive action that purports to *remove* agencies and subdivisions from the coverage of Chapter 71. Chapter 71 contains all the statutory provisions granting the FLRA jurisdiction over ULP claims and exceptions to arbitration awards that Defendants assert Plaintiffs are required to bring in place of their claims here. *See* 5 U.S.C. § 7105(a)(2)(G), (H). Thus, Defendants' jurisdictional argument is a non-starter. Plaintiffs' claims

are not "of the type Congress intended to be reviewed" within the FLRA statutory scheme, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994), for the simple reason that in these circumstances, the FLRA has ruled that it lacks jurisdiction to hear such disputes. *See U.S. Att'ys Off. S. Dist. of Tex. & AFGE Loc. 3966*, 57 F.L.R.A. 750 (2002). When executive action takes a claim "outside the FLRA's purview," unions may seek judicial review of the "legality" of that action in federal district court. *AFGE Loc. 446 v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007). Thus, one federal court addressing a challenge to the validity of the same Exclusion Order concluded that it had jurisdiction to decide such issues because the FLRA administrative channel "is not available" to unions "for the simple reason that those agencies and subdivisions have been excluded from the FSLMRS's coverage by the very Executive Order at issue here." *NTEU v. Trump*, 2025 WL 1218044, at *5 (D.D.C. Apr. 28, 2025).

Outside of this litigation, the government agrees. The government has instructed agency heads to take the position that the FLRA cannot hear claims by a union representing excluded workers because it "no longer has standing to file a [ULP] charge or the FLRA to issue a complaint." Kelley Suppl. Decl. Ex. A at 1.[1] The government has also invoked the jurisdiction of the federal district court to resolve issues raised by Plaintiffs' claims when it suits its purpose. For example, it has filed two anticipatory lawsuits in federal district court, one before the Exclusion Order was even published, seeking declaratory relief that the Order is valid.[2]

So, as the government would have it, district courts have jurisdiction to decide the validity of the Executive Order—but only at the request of the government. Those same courts lack jurisdiction to decide that question at the request of unions harmed by the Order. Instead, says the government, the courts must redirect such unions to the FLRA—an agency that, according to the government, is required to deny standing to those unions. While Kafka would be proud, federal

---

[1] The FLRA will likely follow suit. According to a recent executive order addressing independent agencies, no executive branch employee "may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." Exec. Order 14,215, 90 Fed. Reg. 10447 §§ 1, 7 (Feb. 18, 2025).

[2] *See Dep't of Defense. v. AFGE Dist. 10*, No. 6:25-cv-00119-ADA (W.D. Tex.); *Dep't of Treasury v. NTEU Chapter 73*, No. 2:25-cv-00049 (E.D. Ky.). In *Dep't of Treasury*, the government claims it is not channeled because Treasury "is not subject to Chapter 71 after the President's Executive Order." Mot. for Summ. J. at 20, ECF No. 12, No. 2:25-cv-00049 (E.D. Ky. Apr. 18, 2025)

law does not work that way. Congress created a symmetrical regime in which the administrative channels for resolving disputes are equally open to unions and agencies when the dispute involves issues arising out of the grievance arbitration and unfair labor practice provisions in Chapter 71, *see* 5 U.S.C. §§ 7118, 7122, and equally closed otherwise. The discriminatory regime that Defendants advance is incompatible with the statute Congress passed.

Accordingly, Defendants' attempts to analogize this case to *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), miss the mark. That case did not involve an order purporting to exclude agencies from Chapter 71 coverage, so FLRA jurisdiction over agencies bound by the order remained. Here, that channel has been closed. Because Plaintiffs are "presumptively entitled to judicial review" of their claims that the Exclusion Order is invalid, they may seek relief in this Court. *Nicholson*, 475 F.3d at 348; *NTEU*, 2025 WL 1218044, at *6 (district court jurisdiction proper where "there is no 'special statutory review scheme' that is actually available" to the union).[3]

For these reasons, the Court need not turn to the *Thunder Basin* factors to decide whether the administrative review scheme "reaches the claim in question," *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). However, to the extent the Court weighs those factors, each points towards district court jurisdiction. Even assuming there *was* a pathway to the FLRA, Plaintiffs cannot obtain "meaningful judicial review" at the end of the process because their injury will be "impossible to remedy once the proceeding is over," *id.* at 190–91. *See infra* § V. In some instances, their very existence is threatened by the Exclusion Order. Kelley Suppl. Decl. ¶ 18-28; Erwin Suppl. Decl. ¶¶ 9-16; *see Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 874–85 (3d. Cir. 1996) (district court has jurisdiction due to severe irreparable injury resulting from administrative process). Plaintiffs' claims are also collateral to the types of claims brought before the FLRA because they challenge a "prior controlling event," the President's order excluding certain agencies from Chapter 71 entirely, instead of run-of-the-mill agency activity. *AFGE v. OPM*, 2025 WL

---

[3] Defendants' argument that even if the FLRA cannot decide Plaintiffs' claims, they must still be channeled to that agency because the Court of Appeals could consider those claims on review of the FLRA's decision, Gov't Br. 10, also "misses the point: the administrative process of the FSLMRS cannot and does not govern here because the Executive Order at issue removed the agencies and subdivisions in question from coverage of the FSLMRS." *NTEU*, 2025 WL 1218044, at *6; *see also Nicholson*, 475 F.3d at 347 (appellate review of FLRA decision not a viable path where agency "lacked authority to review" the underlying executive action).

900057, at *3 (N.D. Cal. Mar. 24, 2025). And it is Article III courts, not the FLRA, who possess the comparative expertise to resolve constitutional claims about the President's authority.

## II.    Plaintiffs' First Amendment Claim is Likely to Succeed

### A.  The Exclusion Order Unconstitutionally Retaliates Against Plaintiffs

As detailed in Plaintiffs' opening brief, the Fact Sheet accompanying the Exclusion Order expressly states that the Order was issued in response to "hostile Federal unions" who had "declared war on President Trump's agenda." Kelley Decl., Ex. 3 at 2-3. Leaving no room for doubt as to what this "hostile" activity was, the Fact Sheet quotes from an article published by AFGE detailing actions opposing a wide range of President Trump's policies such as filing lawsuits, lobbying members of Congress, and making public statements, and calls out unions who have filed grievances challenging "Trump policies." *Id.* at 3.[4] The White House further suggests that the dividing line between which employees would lose bargaining rights and which would keep them was whether the union representing those employees would "work with" the President. *Id*. And reinforcing that the Exclusion Order was based on union opposition to the President's agenda, and not the § 7103(b) statutory criteria, is both the massive overbreadth of the list of excluded agencies, *see infra* § III.2, as well as the jagged line drawing contained in the Order itself, *see* Memo in Supp. of Pls.' Mot. for Prelim. Inj. 22 ("Pls.' Br.").

Applying the directive that bargaining rights should be based on the union's support of the President's agenda, the Secretary of Veterans Affairs exercised authority delegated under the Exclusion Order and reinstated collective bargaining rights *by union*.[5] A VA spokesperson confirmed that these unions were selected for reinstatement because they had filed "no or few grievances," while Plaintiffs "AFGE, NAGE, NNU and SEIU by contrast are using their authority"

---

[4] Defendants unsurprisingly do not dispute that filing lawsuits, lobbying, and public statements are protected activity. While they assert that an employee grievance on matters of private concern may not be protected activity, Gov't Br. 26, they ignore that the grievances alleged to necessitate the Exclusion Order involve, by the President's own words, opposition to "Trump policies," and therefore do involve matters of public concern. Moreover, the *Pickering* doctrine applies to government actions as *employer*; it does not dilute First Amendment protection against retaliatory actions in the government's role as *sovereign*, such as the Exclusion Order. *See Connick v. Myers*, 461 U.S. 138, 147 (1983).

[5] *See* Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16427 (Apr. 17, 2025).

under the FSLMRS "to broadly frustrate the administration's ability to manage the agency."[6]

Thus, Plaintiffs have demonstrated the requisite chilling effect. Given the clear instruction to differentiate between unions based on their support of the President's agenda, unions would be chilled from engaging in future speech or petitioning opposing the President's policies. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."). And the record shows that employees covered by the Order are reluctant to criticize the administration or voice opposition to the President's policies as a result of the Order. *See* Braden Decl. ¶ 11; Nelson Decl. ¶ 11; Niemeier-Walsh Decl. ¶ 12; Ruddy Decl. ¶ 13; Green Decl. ¶ 15; B. White Decl. ¶ 11; Cameron Decl. ¶ 15; Robinson Decl. ¶ 23.

In response, Defendants make a series of arguments, all of which require the Court to disregard the clear contemporaneous statements explaining the rationale for the Exclusion Order. First, Defendants contend that the Order is entitled to a "presumption of regularity" because it is "facially valid" and "within the lawful authority of the executive." Defs.' Opp'n to Mot. for Prelim Inj. 23 ("Gov't Br."). This is both contradicted by the factual record, *see infra* at 8, and significantly misunderstands the law. Congress did not authorize the President to exclude agencies if the unions representing employees at those agencies engaged in speech and petitioning opposing the President's agenda. That would read the First Amendment out of the Constitution. This Order is one of the clearest examples of a facially *invalid* executive order because the President's improper motive is stated in an official document accompanying that very order. The government's position rests on the false premise that "national security" is equivalent to the President's agenda. If the security of the *nation* were threatened by private citizens expressing opposition to the President's domestic policy initiatives through legal channels, the First Amendment loses all substance. The law is in fact the opposite: political speech critical of the government occupies "the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982). No matter the scope of authority Congress gave to the President in § 7103, it cannot

---

[6] Erich Wagner, *VA Is Selectively Enforcing Trump's Order Stripping Workers of Union Rights*, Government Executive (Apr. 18, 2025), https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/.

encompass the power to punish organizations for engaging in constitutionally-protected activity.[7]

Next, Defendants claim there is no causal connection between Plaintiffs' protected activity and the Exclusion Order because temporal proximity "is not sufficient" and the President "would have taken the challenged action absent the asserted First Amendment activity." Gov't Br. 24. Both arguments are contradicted by the President's statements in the Fact Sheet, which expressly tie the Exclusion Order to Plaintiffs' First Amendment activities and acknowledges that exclusions are based on whether a union is "hostile" to the President's agenda or will "work with him." While temporal proximity can provide circumstantial evidence of retaliatory motive, here Plaintiffs have *direct* evidence of that motive. *See NTEU*, 2025 WL 1218044, at *11 (Fact Sheet contains "clear evidence of retaliatory motive").

Defendants then try a different approach, acknowledging that the Exclusion Order is based on the unions' speech and petitioning activities, but claiming that "the statute expressly permits just that sort of functional analysis with reference to union conduct." Gov't Br. 25. The extraordinary nature of Defendants' position cannot be overstated: Defendants ask this Court to find that opposing the President's domestic policies through *constitutionally protected* avenues is "incompatible with national security considerations." Gov't Br. 24. That "national security" could be defined as political support of the President is antithetical not only to the First Amendment but also "the system of government the First Amendment was intended to protect, a democratic system whose proper functioning is indispensably dependent on the unfettered judgment of each citizen on matters of political concern." *Elrod v. Burns*, 427 U.S. 347, 372 (1976).[8]

### B. The Exclusion Order Unconstitutionally Discriminates Based on Viewpoint

The same evidence that establishes the Exclusion Order's retaliatory motive also demonstrates that it impermissibly discriminates based on viewpoint. The Fact Sheet expressly

---

[7] Defendants fail to recognize that even if an agency *could* legitimately be excluded by properly applying the statutory criteria in § 7103(b), it is still illegal for the President to do so for retaliatory reasons. *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 869 (9th Cir. 2016) ("Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment.").

[8] Defendants' argument also ignores the fact that the "union activity" at issue does not only involve rights provided under Chapter 71, such as filing grievances, but also activity Plaintiffs have undertaken as private organizations, such as filing lawsuits.

draws a distinction between unions deemed "hostile" to the President's agenda and those who will "work with him," and makes clear that the President is willing to allow bargaining rights for the latter group. Thus, the Exclusion Order not only distinguishes between unions based on viewpoint, but it engages in the most egregious form of viewpoint discrimination: favoring speech supportive of the President over speech that is critical.

Defendants have little to say in response. Their main rejoinder is that "Plaintiffs lack a First Amendment right to collective bargaining." Gov't Br. 23. But that is not the First Amendment activity at issue here, nor does it have any bearing on whether the government can engage in viewpoint discrimination. A student organization has no constitutional right to have its printing costs paid by a university fund, but the government still may not deny this benefit based on the organization's viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995). Collective bargaining rights similarly cannot be eliminated due to a union's disfavored viewpoint.

Defendants' only other response is to baldly assert that "the Executive Order does not distinguish between unions." Gov't Br. 23. Defendants again ignore the President's own statements explaining the Exclusion Order and the Order's subsequent implementation, which clearly distinguish between unions based on their public views of the President's agenda. It cannot be ignored that employees represented by Plaintiffs lost their bargaining and representation rights while other employees working side-by-side *at the very same agency* maintain such rights. *See* Moore Decl. ¶¶ 4-23; Snow Decl. ¶¶ 4-18; Malone Decl. ¶¶ 4-23; *see also supra* at 4-5.

**III.    Plaintiffs' *Ultra Vires* Claim is Likely to Succeed**

Defendants advance two arguments in response to Plaintiffs' *ultra vires* claim: (1) this Court has no authority to decide this claim; and (2) the Exclusion Order properly applies the statutory criteria for exemption. Both arguments are contrary to fact and law.

**1.** Defendants claim that the Court "lacks authority to review the President's national security-related determinations," citing the few cases that examined narrower § 7103(b) exclusions made by prior presidents. Gov't Br. 13. But as Defendants acknowledge, those cases recognize that judicial review is available in "instances of constitutional dimension or gross violation of the statute," or when the exclusion is "'plainly beyond the bounds' of the governing statute." *Id.* at 14

& n.2. These are precisely the type of claims that Plaintiffs advance here, which "ask[] only that [courts] apply our familiar tools of statutory construction and fulfill our enduring duty to say what the law is." *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (cleaned up); *see also Stark v. Wickard*, 321 U.S. 288, 310 (1944) ("determining the limits of statutory grants of authority" is "entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction"); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996) ("[W]e think it untenable to conclude that there are no judicially enforceable limitations on presidential actions…so long as the President *claims* that he is acting pursuant" to statutory authority.).

Indeed, one federal court has already rejected the exact argument Defendants advance here, finding any "presumption of regularity" clearly rebutted because the vast overbreadth of the Exclusion Order and the contemporaneous explanatory statements demonstrate that the President was either "indifferent to the purposes and requirements" of the FSLMRS or "acted deliberately in contravention of them." *NTEU*, 2025 WL 1218044, at *9 (quoting *AFGE v. Reagan*, 870 F.2d 723, 728 (D.C. Cir. 1989)). Specifically, the court concluded that "the scope of the Executive Order—covering two-thirds of the federal workforce—and the Fact Sheet's characterization of unions and collective bargaining" are "directly contrary to Congress's conclusion that such labor policy and labor organizations are 'in the public interest," reflect a "retaliatory motive to punish unions," and suggest that the invocation of Section 7103(b) was "in furtherance of unrelated policy goals rather than based on the statutory criteria." *Id.* at *9, 11. Contrary to Defendants' assertions, this is not a case where it is necessary for a "searching inquiry" into the President's decision-making or "flyspecking" of national security considerations, Gov't Br. 14-15, because the President has expressly provided the impermissible motivations behind the Exclusion Order.

**2.** Defendants' argument that the Exclusion Order properly applies § 7103(b) also fails. In enacting the Civil Service Reform Act, Congress did not grant the President unfettered discretion to destroy the very scheme Congress created; to the contrary, Congress established a labor framework that "cannot be universally altered by any President," 124 Cong. Rec. 29186 (1978).

The government's position rests on a definition of national security that is directly contradicted by Supreme Court precedent. As explained in Plaintiffs' opening brief, in *Cole v.*

*Young*, 351 U.S. 536 (1956), the Supreme Court emphasized that "national security" in a statute governing federal worker protections means only activities "directly concerned with the protection of the Nation from internal subversion or foreign aggression, *and not those which contribute to the strength of the Nation only through their impact on the general welfare.*" *Id.* at 544 (emphasis added). As the Court cautioned, if "all positions in the Government could be said to be affected with the 'national security,'" that would allow exceptions to be used to "supersede" worker protections. *Id.* at 547. But this is exactly what Defendants have done here: if any connection to the nation's "economic" or "productive strength" qualifies as "national security," the term's meaning becomes so capacious as to allow the § 7103(b) exception to swallow the rule—exactly the outcome the Supreme Court rejected. Notably, Defendants' brief is silent on *Cole*.

The Fact Sheet and Defendants' briefing make clear that the Exclusion Order was impermissibly based on an overly broad definition of "national security." The Fact Sheet claimed that the FLRA "defines national security to include protecting America's economic and productive strength," and that definition is used to exclude agencies related to "domestic energy production." Kelley Decl. Ex. 3 at 1-2; *see also* Gov't Br. 16-17 (HHS exclusions). And Defendants' brief is filled with arguments on agency impact on general welfare. *See, e.g.*, Gov't Br. at 17 (FDA "facilitated the reopening of the American economy"); *id.* at 18 ("Treasury exists to promote the economic and productive strength of the United States"); *id.* at 20 (USITC's "responsibilities have a direct bearing on America's economic and productive strength.").[9] The FLRA, however, defined "national security" more restrictively than Defendants acknowledge, and it expressly cited *Cole v. Young*, confirming that a mere connection to the general welfare does not suffice. *See Dep't of Energy, Oak Ridge Operations & NAGE Local R5-181*, 4 F.L.R.A. 644 (1980); *NTEU*, 2025 WL

---

[9] Defendants also justify some exclusions as "investigative" functions, but under the canon of *noscitur a sociis*, this term is given "more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *NTEU*, 2025 WL 1218044, *13 n.4 ("investigative" "likely should be interpreted as having a national security valence in light of Section 7103(b)(1) as a whole"). The placement of "investigative" amidst "intelligence, counterintelligence…[and] national security," as well as the reference only to "national security" in § 7103(b)(2), shows that its definition cannot be stretched to cover "searching into patient[s]' symptoms to diagnose medical conditions," as Defendants contend, Gov't Br. 19. In any event, the Fact Sheet mentions only "agencies with national security missions" and is silent on "investigative" functions, showing the President did not in fact rely on this post-hoc justification.

1218044, at *15 (*Oak Ridge* "is significantly less supportive of the government's position than it may think."). Because the Exclusion Order applied "an overly broad interpretation of 'national security,'" that renders the Order *ultra vires*. *See NTEU*, 2025 WL 1218044, at *16.

Defendants' argument is additionally defective because it would read "primary" out of the statute. Defendants claim that if *some* part of agency work has a connection to national security, that is sufficient, but the statute requires that the agency have a *primary* function of national security. *See id.* at *14 ("even if an agency performs *some work* that implicates national security, that does not mean that the entire agency has 'a primary function' of 'national security work'"); *Primary*, *Black's Law Dictionary* (5th ed. 1979) ("First; principal; chief; leading"). For example, the fact that EPA policies may affect energy production sheds no light on its *primary* function of protecting human health and the environment. Relying on a causal chain where EPA policies change the type of energy produced at home, affect prices, and therefore cause carry-on effects to "economic and productive capacity," *see* Kelley Decl. Ex. 4, Waco Complaint ¶ 116-17, makes a mockery of both "primary" and "national security."

Finally, Defendants' own documents show that no determination was made that Chapter 71 "cannot be applied…consistent with national security requirements[.]" 5 U.S.C. § 7103(b)(2). The Fact Sheet demonstrates that exclusions were based on the speech and petitioning activity of unions representing employees at those agencies, *see* § II, *supra*, while Defendants' brief makes clear that the Exclusion Order is premised on a policy disagreement about the value of federal sector collective bargaining, *see* Gov't Br. 21-22. That policy judgment, however, rests with Congress, which expressly found that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). The President cannot override the statutory scheme by redefining "national security" to mean advancing the President's political agenda. *See*, *e.g.*, *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.").

**IV.   Plaintiffs' Fifth Amendment Claim is Likely to Succeed**

  **A.  The Federal Government Cannot Make and then Repudiate a Binding Contract**

  In their opening brief, Plaintiffs pointed to two foundational Supreme Court cases—*Lynch*

*v. United States*, 292 U.S. 571 (1934), and *Perry v. United States*, 294 U.S. 330 (1935)—to show that the exercise of sovereign power to rescind a government contract violates the Fifth Amendment. *See* Pls.' Br. 31-35 (citing cases). Tellingly, the government declines to even mention, let alone distinguish, those precedents. Instead, it cites to four other cases—three from outside this circuit—for the proposition that Plaintiffs lack a property right in the rescinded CBAs. Gov't Br. 27. Those cases are unconvincing for two independent reasons.

First, none of these cases involve the government using its sovereign authority to unilaterally alter or rescind a contract, as in *Lynch* and *Perry*. Here, Plaintiffs have not only been deprived of the government's performance of their CBAs—for which they would have legal recourse under the terms of those contracts—they have been deprived of the very idea that the government has any obligation to them at all.

Second, the CBAs here do create constitutionally protected property interests because they confer a "protected status"—that of exclusive bargaining representative for a negotiated term. *See Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1399 (3d Cir. 1991). And Plaintiffs' members have a constitutionally protected property interest in the substantive and procedural protections contained in the CBAs. *See Phillips v. Marion Cnty. Sheriff's Off.*, 494 F. App'x 797, 799 (9th Cir. 2012) (public employees have property interest in CBA's grievance and arbitration procedures). Defendants' argument that the CBAs do not grant a property interest because they are qualified by 5 U.S.C. § 7103(b) is flawed in multiple respects. Section 7103(b) does not by its terms authorize *retroactive* abrogation of existing contract rights; it identifies the circumstance where the President can exclude agencies from *prospective* collective bargaining. The FSLMRS contains a separate provision to address *emergency* situations, which has not been invoked here. *See* 5 U.S.C. § 7106. And even where CBA protections are qualified, such exceptions do not "eliminate the property interest created by that language." *See Int'l Union, United Gov't Sec. Officers of Am. v. Clark*, 706 F. Supp. 2d 59, 65-68 (D.D.C. 2010), *aff'd sub nom. Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25 (D.C. Cir. 2014).

### B. Plaintiffs and Their Members Did Not Receive Procedural Due Process

Plaintiffs, in their opening brief, showed that the rescission of Plaintiffs' CBAs without

notice or opportunity to respond violated the Due Process Clause of the Fifth Amendment. Pls.' Br. 35. The government, in its reply, does not take issue with that premise, instead arguing that Plaintiffs' due process rights are preserved "through a [post-deprivation] challenge to the recission in the FLRA." Gov't Br. 28. That argument fails for two reasons. First, no post-deprivation process is available because the FLRA lacks jurisdiction. *See supra* 1-3; *see also* Kelley Suppl. Decl. Ex. A (instructing agencies to take the position that the FLRA lacks jurisdiction to review arbitration awards or consider ULPs). And second, the government's brief seems to assume that post-deprivation process *always* suffices to satisfy the Due Process Clause. But for post-deprivation remedies to pass constitutional muster, they must survive the well-established balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). The government has not even attempted to make such a showing here, Gov't Br. 28, let alone one that would outweigh the ongoing harms to Plaintiffs.[10]

## V.    Plaintiffs Have Demonstrated Irreparable Harm

In their opening brief and supporting declarations, Plaintiffs demonstrated four separate categories of irreparable harm: (1) lost benefits of union representation; (2) lost bargaining power and inability to provide core services; (3) severe and ongoing financial harm; and (4) infringement on constitutional rights. Pls.' Br. 13-14, 37-38. Defendants did not contest Plaintiffs' factual evidence, nor did they submit evidence of their own.

**1.** Defendants have not disputed the significant harms Plaintiffs' members suffer from the loss of union representation and inability to enforce their CBA rights and benefits. The record contains extensive evidence supporting such harm. *See, e.g.*, Dargon Decl. ¶¶ 4-14; Fornnarino Decl. ¶¶ 7-13; Powell Decl. ¶¶ 8-10; Ruddy Decl. ¶¶ 7-11; Parker Decl. ¶ 10; Ury Decl. ¶¶ 27-33. The Ninth Circuit has recognized that this type of harm is irreparable. *Small v. Avanati Health Sys., LLC*, 661 F.3d 1180, 1191-92 (9th Cir. 2011). Defendants have no answer on this point.

---

[10] The government makes a passing argument that Plaintiffs' claims should be characterized as breach of contract claims and pursued at the Court of Federal Claims. Gov't Br. 28. That is incorrect because (a) Plaintiffs, as discussed above, are not making a claim for breach of contract but rather challenging the legality of the March 27 Exclusion Order, and (b) the CBAs in this case, both by their own terms and under the law governing federal sector collective bargaining, are not "money mandating." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008); *see also Brodowy v. United States*, 2006 WL 5631717, at *3-4 (Fed. Cl. July 11, 2006) (holding that a federal sector CBA is "not a contract within the meaning of the Tucker Act").

**2.** Defendants' only response to the harm Plaintiffs are suffering due to their loss of exclusive bargaining representative status is to label such harm "speculative." Gov't Br. 7. But OPM expressly advised that the Exclusion Order means "unions lose their status" as exclusive representatives at the Excluded Agencies, Kelley Decl. Ex. 2 at 3, and agencies have followed that directive by refusing to engage in collective bargaining, abide by contractual obligations, or honor the grievance process. *See, e.g.*, Lanham Decl. ¶ 14; Holly Decl. ¶ 18; Kim Decl. ¶¶ 8-9; Niemeier-Walsh Decl. ¶¶ 10-11; B. White Decl. ¶¶ 10-11; J. White Decl. ¶ 8; Sutton Suppl. Decl. ¶¶ 6-8; Erwin Suppl. Decl. ¶ 8. While Defendants state in passing that OPM has "advised agencies not to terminate any" CBAs, Gov't Br. 5, recent guidance in fact instructs agencies to refuse to recognize and negotiate with the union, process grievances, allow employees to have a union representative present during disciplinary meetings, or provide official time to union representatives. Kelley Suppl. Decl. Ex. A. Such harm is irreparable because "a delay in bargaining weakens support for the union, and a [retroactive] order cannot remedy this diminished level of support." *Small*, 661 F.3d at 1192; *see also NTEU*, 2025 WL 1218044, at *18 ("[T]he period of time when union representation is suspended will having lasting and irreparable effects on employees' interest and participation in the union."). Indeed, the irreparable nature of losing bargaining rights is particularly acute given Defendants' use of the Order to facilitate massive reductions in force without regard to CBA protections. Neimeier-Walsh Suppl. Decl. ¶¶ 4-6 (RIF of approx. 97% of NIOSH bargaining unit); Fornnarino Decl. ¶ 13; Erwin Suppl. Decl. ¶ 7. Even if these rights are restored, Plaintiffs will have forever lost the right to advocate for those members. As such, to be effective, any relief "must come quickly." *In re AFGE*, 790 F.2d 116, 117-18 (D.C. Cir. 1986).

**3.** Defendants also dismiss as speculative Plaintiffs' ongoing financial harm, but the record evidence is extensive on this point. In their opening brief, Plaintiffs demonstrated that agencies were already beginning to cease payroll dues deduction. Pls.' Br. 14, 38. The harm has grown more dire as more agencies implement the Exclusion Order. In the most recent pay period, AFGE's dues from payroll deduction—which made up two-thirds of its total dues revenue pre-Exclusion Order—dropped by roughly 82 percent. Kelley Suppl. Decl. ¶¶ 23-24; *see also* Erwin Suppl. Decl. ¶ 12 (NFFE payroll dues deductions dropped by 58% in most recent pay period). As a result, AFGE

has approved a significant reduction-in-force to remain financially solvent, cutting its staff by nearly 60 percent. *Id.* ¶¶ 29-32. These layoffs, which have already begun, will cause permanent and irreversible damage to the union—the lost institutional knowledge, experience, and goodwill of members who rely on AFGE's services is irreparable. *Id.* ¶¶ 33-35. As the Ninth Circuit has held, this "significant change in their programs and a concomitant loss of funding…constitute irreparable injuries." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

Defendants attempt to minimize these losses by asserting that members are still free to join the union and use alternative means to pay dues, but this conveniently overlooks the primary reason people join a union: to support the exclusive representative who bargains on their behalf. Kelley Suppl. Decl. ¶ 26-28; Blake Decl. ¶ 14; *Small*, 661 F.3d at 1193 ("Whether or not the employer bargains with a union chosen by his employees is normally decisive of its ability to secure and retain its members."). And although Defendants speculate that lost dues could be recovered in future FLRA proceedings, even if that were correct, AFGE faces the "threat of being driven out of business" in the meantime, itself an irreparable harm. *HiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022); *see also NTEU*, 2025 WL 1218044, at *19 (significant financial losses from Exclusion Order is irreparable harm because it "threatens the very existence" of the union).

**4.** To address Plaintiffs' constitutional injuries, Defendants cite *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019), for the proposition that "mere assertion of First Amendment rights" is insufficient to show irreparable injury. Defendants neglect to mention that in *CTIA*, the court found no First Amendment violation, and thus there could be no irreparable First Amendment injury. At the same time, the court emphasized that "[i]rreparable harm is relatively easy to establish in a First Amendment case," and Plaintiffs have proven irreparable injury as instructed by *CTIA* "by demonstrating the existence of a colorable First Amendment claim." *Id.* (internal quotations omitted); *see also Museum of Handcar Tech. LLC v. Transp. Agency for Monterey Cnty.*, 2025 WL 1114458, at *9 (N.D. Cal. Apr. 14, 2025) (applying this standard to retaliation claim). Defendants' focus on whether there is a First Amendment right to collective bargaining misses the point. The harm here is the ongoing chilling effect on Plaintiffs and their members, who are curtailing their political speech for fear of retaliation. *See supra* at 5.

1   **VI.     The Balance of Harms and Public Interest Weigh in Favor of Plaintiffs**

2           Defendants contend that the public interest weighs against an injunction because the "clear

3   congressional purpose" of the FSLMRS was for agencies "relevant to national security" to operate

4   "without the constraints of collective bargaining." Gov't Br. 29. That assertion is both directly

5   contradicted by Congress's express finding that "labor organizations and collective bargaining in

6   the civil service are in the public interest," 5 U.S.C. § 7101(a), and erroneously "presuppose[s]

7   that the President's decisions are in fact 'national security' determinations" which as shown above

8   is not the case. *NTEU*, 2025 WL 1218044, at *20. It is well-settled that the government is not

9   harmed "from an injunction that merely ends an unlawful practice or reads a statute as required to

10  avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

11  **VII.    Defendants' Request that Plaintiffs Post Bond Should Be Denied**

12          Federal Rule of Civil Procedure 65(c) "invests the district court 'with discretion as to the

13  amount of security required, if any.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).

14  Defendants request the Court order a bond for unspecified "'costs and damages sustained' by

15  Defendants" without explanation or any supporting evidence. Gov't Br. 29. In light of the public

16  interest and the harms that would emerge from requiring sizeable bonds to enforce constitutional

17  rights, this court should require no bond or only nominal bond. *See AFGE v. OPM*, 2025 WL

18  1150698, at *16 (N.D. Cal. Apr. 18, 2025) ($1 bond per union plaintiff); *NTEU*, 2025 WL

19  1218044, at *21 (no bond); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th

20  Cir. 2005) (requiring no more than nominal bond "is perfectly proper in public interest litigation").

21                                              **CONCLUSION**

22          For the foregoing reasons, Plaintiffs request that the Court grant their motion for a

23  preliminary injunction and enjoin the enforcement and implementation of the Exclusion Order.

24      Dated: May 7, 2025                              Respectfully submitted,

25                                                      */s/ Ramya Ravindran*

26      Daniel Feinberg, SBN 135983                     Leon Dayan (SBN 153162)
        Catha Worthman, SBN 230399                      Abigail V. Carter*
27      Anne Weis, SBN 336480                           Ramya Ravindran*
        FEINBERG, JACKSON, WORTHMAN                     Lane M. Shadgett*
        & WASOW, LLP                                    J. Alexander Rowell*
28      2030 Addison Street, Suite 500                  BREDHOFF & KAISER P.L.L.C.

Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Counsel for Plaintiffs*

Rushab B. Sanghvi (SBN 302809)
Andres M. Grajales*
American Federation of Government
Employees, AFL-CIO
80 F Street NW
Washington, D.C. 20001
Tel: (202) 639-6426
SanghR@afge.org
Grajaa@afge.org
*Pro hac vice*

*Counsel for Plaintiff American Federation
of Government Employees (AFGE)*

Nicole Daro (SBN 276948)
National Nurses United
155 Grand Ave.
Oakland, CA 94612
Tel: (510) 207-8291
ndaro@calnurses.org

*Counsel for Plaintiff NNOC/NNU*

Sarah E. Suszczyk*
National Association of
Government Employees, Inc.
159 Thomas Burgin Parkway
Quincy, MA 02169
Tel: (617) 376-7239
ssuszczyk@nage.org
*Pro hac vice*

*Counsel For Plaintiff National Association
of Government Employees (NAGE)*

805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com
*Pro hac vice*

*Counsel for Plaintiffs*

Teague P. Paterson (SBN 226659)
Matthew S. Blumin*
American Federation of State, County, and
Municipal Employees, AFL-CIO
1625 L Street NW
Washington, D.C. 20036
Tel: (202) 775-5900
Fax: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
*Pro hac vice*

*Counsel for Plaintiff American Federation of
State County and Municipal Employees, AFL-
CIO (AFSCME)*

Steven K. Ury (SBN 199499)
Service Employees International Union, AFL-
CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

*Counsel for Plaintiff Service Employees
International Union, AFL-CIO (SEIU)*

Yvette M. Piacsek*
General Counsel
National Federation of Federal Employees,
IAM, AFL-CIO
1225 New York Avenue NW, Suite 450
Washington, D.C. 20005
Tel: (202) 216-4428
ypiacsek@nffe.org
*Pro hac vice*

*Counsel for Plaintiff National Federation of Federal Employees, IAM, AFL-CIO (NFFE)*