Leon Dayan, SBN 153162
Abigail V. Carter*
Ramya Ravindran*
Lane M. Shadgett*
J. Alexander Rowell*
**BREDHOFF & KAISER P.L.L.C.**
805 Fifteenth Street NW, Suite 1000
Washington, D.C. 20005
Tel. (202) 842-2600
Fax (202) 842-1888
ldayan@bredhoff.com
acarter@bredhoff.com
rravindran@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com
*Pro hac vice*

Daniel Feinberg, SBN 135983
Catha Worthman, SBN 230399
Anne Weis, SBN 336480
**FEINBERG, JACKSON, WORTHMAN & WASOW, LLP**
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
catha@feinbergjackson.com
anne@feinbergjackson.com

*Attorneys for Plaintiffs* (Additional Counsel not listed)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No.: 3:25-cv-03070-JD<br><br>**SUPPLEMENTAL DECLARATION OF EVERETT KELLEY** |

**SUPPLEMENTAL DECLARATION OF EVERETT KELLEY**

I, Everett Kelley, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the elected National President of the American Federation of Government Employees, AFL-CIO ("AFGE"), a national labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state, Puerto Rico, Washington, D.C., and the Indo-Pacific region. AFGE federal employee members include health care workers caring for our nation's veterans in the Department of Veterans Affairs, workers protecting human health and the environment, scientists conducting critical research, civilian employees in the Department of Defense supporting our military personnel and their families, correctional officers maintaining safety in federal facilities, health care workers serving on military bases, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

3.      AFGE is the largest federal-sector union in the United States.

4.      I have been National President of AFGE since 2020. Prior to that, I served in other national and local union leadership roles. I was also a federal government employee for 34 years, working at Anniston Army Depot in Alabama. I have been a proud member of AFGE since 1981.

5.      By virtue of my job duties, I am familiar with AFGE's finances. I regularly review monthly dues statements and membership figures. It is important that I know the information in those reports because the amount of revenue received by AFGE and its affiliates determines the union's capacity to organize and represent employees.

6.      Per the AFGE Constitution, the National President is also a member of the 15-person National Executive Committee ("NEC"). The NEC is the governing body that makes policy decisions for the national union. I was present at the NEC meeting on April 24, 2025, at which the NEC determined that the catastrophic drop in revenue caused by the Executive Order and OPM Memorandum meant that AFGE would need to lay off more than half of its staff

1   nationwide.

2   **The Executive Order Has Crippled AFGE's Ability to Advocate for its Members**.

3         7.    AFGE estimates that approximately 660,000 (more than three-quarters) of the

4   federal employees it represented prior to the March 27, 2025, Executive Order are employed at

5   agencies and subdivisions that were affected by the Executive Order. Those employees,

6   according to both the Executive Order and the OPM Memorandum that was issued on the same

7   day, no longer have the right to collectively bargain with their employer by and through AFGE.

8         8.    AFGE has been harmed by the Executive Order in several ways. First, absent

9   relief from the Order, many of AFGE's local affiliates and national councils will likely cease to

10  exist. Hundreds of bargaining units will either be eliminated completely as a result of the

11  sweeping loss of bargaining rights across the government.

12        9.    The Executive Order has also deprived AFGE of the authority to bargain on

13  behalf of employees at excluded agencies, including the right to receive advance notice of, and

14  engage in mid-term bargaining over, changes to terms and conditions of employment at those

15  agencies. Nor can AFGE enforce the substantive and procedural protections AFGE bargained for

16  in its collective-bargaining agreements with the affected agencies. And when excluded agencies

17  violate or ignore the substantive and procedural protections in those agreements—as they are

18  already doing, at OPM's instruction—AFGE will be unable to pursue grievances or appeal to the

19  FLRA.

20        10.    Those rights are especially important now because the administration has

21  announced plans to undertake large-scale reductions-in-force ("RIFs") across the government.

22  Indeed, those planned RIFs are the very first item highlighted in the "Effective and Efficient

23  Government" section of the OPM Memorandum, which instructs excluded agencies that they

24  should plan and implement those RIFs "without regard to provisions in terminated CBAs." I am

25  personally aware of several RIF processes that are already underway at the excluded agencies

26  where AFGE represents employees, including at the Department of Health and Human Services

27  and the Department of State. Stripped of its bargaining rights, AFGE cannot safeguard its

28  members' rights or enforce the RIF procedures it previously negotiated with the affected

1   agencies. In other words, even if AFGE eventually obtains relief, it could return to find many of

2   its bargaining units severely reduced or even cleaned out entirely.

3          11.    After I signed my initial declaration in this case on April 3, 2025, the Chief

4   Human Capital Officers Council ("CHCOC"), an interagency forum led by the OPM Director,

5   distributed a Frequently Asked Questions document ("FAQs") instructing agencies how to

6   implement the Executive Order and OPM Memorandum. The FAQs were initially distributed to

7   the affected agencies on April 8, 2025, then updated on April 22, 2025. A true and correct copy

8   of the April 22, 2025, version of the FAQs is attached to this declaration as Exhibit A.

9          12.    The FAQs expressly instruct affected agencies and subdivisions to ignore the

10  rights and obligations of their unionized employees, as set forth in both Chapter 71 and in their

11  collective-bargaining agreements with unions like AFGE. For example, the FAQs instruct

12  agencies to refuse to process grievances, Ex. A at A3, A4, A19, A25, withdraw from dispute

13  resolution procedures, *id.* at A5, suspend all bargaining, *id.* at A15, A28, A31, and rescind union

14  office space and official time, *id.* at A18. Crucially, the FAQs specifically advise the affected

15  agencies that they may make unilateral changes to terms and conditions of employment without

16  consulting with or bargaining with unions like AFGE. See *id.* at A24. Even if AFGE obtains

17  relief from the Executive Order in the future, it will have lost its opportunity to bargain over

18  those changes.

19         13.    Across the government, excluded agencies have complied with the instructions in

20  the FAQs. Agencies are refusing to process grievances (including by placing ongoing grievances

21  in abeyance), taking the position that the FLRA lacks jurisdiction to adjudicate appealed

22  arbitration awards and ULPs, refusing to meet with AFGE representatives, rescinding official

23  time and union office space, and refusing to withhold and allot voluntary dues from employee

24  paychecks. Bargaining has stopped. In short, AFGE is no longer able to perform the basic role of

25  a union at the affected agencies and subdivisions, to the detriment of more than a half-million

26  federal employees.

27  **The Executive Order Has Damaged AFGE's Ability to Represent Employees.**

28         14.    As a direct result of the Executive Order, AFGE is the bargaining representative

1  for about 660,000 fewer federal employees than prior to March 27, 2025. As I wrote in my first

2  Declaration, a union's bargaining power derives from the number of employees it represents at

3  an agency. Accordingly, the Executive Order has severely diminished the ability of AFGE and

4  its affiliates to represent workers at the affected, including those who work for subdivisions

5  whose Chapter 71 rights have not been stripped away.

6      15.    That decrease in bargaining power are compounded by the fact that Section 7 of

7  the Executive Order specifically contemplates that other agencies and subdivisions (particularly

8  those that are represented by "hostile" federal unions) will also be excluded from coverage under

9  Chapter 71—a not-so-subtle threat that AFGE in particular remains vulnerable to further

10 retribution.

11     16.    Many leaders and rank-and-file members of AFGE have contacted me to express

12 fear that if the union continues to speak out against the Executive Order and OPM

13 Memorandum—or any of the administration's policies—that more AFGE members could lose

14 their unions in retaliation. I am also aware that many local affiliates that were not directly

15 affected by the Executive Order and OPM Memorandum have become more cautious about

16 raising workplace issues in the wake of the order, let alone speaking out in public about the

17 administration's policies.

18     17.    I am also personally concerned that the administration may further retaliate

19 against AFGE.

20 **The Financial Impact of the Executive Order is an Existential Threat to AFGE.**

21     18.    As a public sector union, AFGE is financed almost exclusively by voluntary dues.

22 A majority of AFGE's dues-paying members work at the excluded agencies. Revenue from

23 voluntary dues made up more than 90% of AFGE's operating budget in 2024. The Exclusion

24 Order and OPM Memorandum, by immediately stripping union representation from

25 approximately 660,000 employees that were previously represented by AFGE, and by ordering

26 the cessation of the primary method through which AFGE collects dues from employees at the

27 affected agencies, has created a sudden and catastrophic drop in AFGE's revenues.

28     19.    To provide some background: in addition to empowering federal workers to

organize and select an exclusive representative, the FSLMRS requires agency payroll providers to deduct voluntary union dues from employees' pay upon request and remit that money to their union. This process is commonly referred to as "dues allotment."

20.    The vast majority of AFGE's collective-bargaining agreements—and all of its national contracts that were negotiated directly with an agency—include a belt-and-suspenders provision that also requires the allotment of voluntary dues.

21.    When the Executive Order excluded the affected agencies and subdivisions from Chapter 71, it eliminated the statutory requirement that the affected agencies allot dues to AFGE. The OPM Memorandum, which was issued on the same day as the Executive Order, went further, stating that the administration's policy is to affirmatively cease all dues allotment for those employees, regardless of whether they are separately mandated by a collective-bargaining agreement: "[w]hen a covered agency terminates its CBAs, those contractual commitments no longer apply, and the covered agency should terminate allotments except where required by statute."

22.    In the weeks since the Executive Order was issued, excluded agencies and subdivisions across the government have followed OPM's instructions, taken the position that the statutory and contractual requirement to allot dues no longer applies to them, and ceased dues allotment. Although there has been some initial uncertainty on the part of the affected agencies in how to implement the Order, over the past weeks AFGE's dues allotment has slowed to a relative trickle.

23.    For the two-week pay period ending March 28, 2025—the day after the issuance of the Executive Order—AFGE received a total of $4,195,052 in withheld dues from various federal employers, a substantial portion of which AFGE then distributed to affiliate locals and councils in order fund their operations. In total, allotted dues accounted for about two-thirds of all dues-related revenue received by AFGE for that pay period.

24.    By contrast, in the most recent pay period, ending April 25, 2025, AFGE received only $752,686 in allotted dues, a reduction of more than 82%. Although AFGE has made a concerted effort to offset a portion of those losses by convincing members to pay dues by other

1    means, AFGE's total dues-related revenue, for the April 25, 2025, pay period alone, decreased

2    by more than $2.9 million as compared to the pay period ending on March 28.

3        25.    If losses continue on that trajectory over the next year, AFGE and its affiliates

4    would lose over $75 million in revenue to fund its operations—a number that does not include

5    lost revenues for those locals who choose to collect dues directly.

6        26.    A substantial portion of those losses will be both unavoidable and unrecoverable,

7    for several reasons:

8        27.    First, based on more than three decades of experience as a union member and

9    leader, I understand that AFGE's members do not pay dues out of charity, but in exchange for

10   the value they receive from the union's services as exclusive representative. Surely many

11   members will decline to pay voluntary dues to AFGE when AFGE is no longer empowered to

12   bargain on employees' behalf, enforce a collective-bargaining agreement, or be the exclusive

13   representative in workplace disputes.

14       28.    Second, although AFGE is permitted to collect dues directly from employees

15   whose dues are no longer allotted following the Executive Order and is working to transition as

16   many members as possible to that system, AFGE will not be able to effect that transition at scale.

17   For one thing, the affected members who are most inclined to make that transition have already

18   done so. Also, as explained above, employees have less reason to pay dues to an organization

19   that cannot serve as their exclusive representative. Finally, reaching out to now-unrepresented

20   employees and convincing them to sign up for direct payment of dues is a massive and time-

21   intensive organizing project that will be impossible given AFGE's revenue loss and resulting

22   cuts to the necessary staff.

23   **The Order Has Already Forced AFGE to Undertake a Crippling Reduction in Force.**

24       29.    On April 24, 2025, the National Executive Council held an emergency meeting in

25   Washington, D.C. to discuss the Executive Order and the resulting collapse in the union's

26   revenue. I was personally present at that meeting.

27       30.    At that meeting, the NEC approved a massive reduction-in-force of AFGE's

28   operating staff—cutting its staff from 355 budgeted positions to just 151, a reduction of nearly

Supplemental Declaration of Everett Kelley, No. 3:25-cv-03070-JD                6

1   60%. The NEC stated that the reduction in force was necessary for the union "to remain

2   financially solvent."

3        31.    In other words, less than one month after the Executive Order was issued, and

4   before the union has even felt its full effects, AFGE has already been forced to authorize the

5   layoff of more than half of its staff. In its 93-year history, AFGE has never been forced to make

6   such a drastic reduction in its own capacity.

7        32.    AFGE has already begun the process of laying off staff members in accordance

8   with the NEC's directive.

9        33.    These layoffs will have immediate effects on AFGE's ability to perform its core

10  functions, even for those federal employees who have not yet been affected by the Executive

11  Order.

12       34.    Here are some examples of reductions of key staff, as reflected in AFGE's current

13  plans for the reduction in force that was ordered by the NEC:

14            a.    National Organizers. Absent preliminary relief, AFGE will be forced to

15       reduce its Membership and Organizing Department by more than 75%. Those cuts will

16       primarily consist of National Organizers. Although National Organizers are employed by

17       the Office of the President, they operate throughout the country to increase and maintain

18       membership in the union. National Organizers are subject-matter experts on matters

19       involving union petitions, election procedures, and other issues related to organizing

20       labor unions in the public sector. Organizers also serve as liaisons between field staff,

21       locals, and headquarters. National Organizers would also be responsible for overseeing

22       and coordinating the transition of dues payment from the pre-Executive-Order dues

23       allotment process to direct contributions—a task that would be a massive lift under the

24       best circumstances, but which will be nearly impossible for the newly-downsized

25       department.

26            b.    District Staff. Absent preliminary relief, AFGE will also be forced to

27       reduce its District-level staff by more than 50%, from 121 positions to 56. Some of those

28       reductions will be to attorneys in the field. Many will be to AFGE's National

Representatives. That loss will be devastating for AFGE's members across the country, who rely on the District Staff that are assigned to their region. Attorneys in the field provide legal guidance to local affiliates and their members, to ensure compliance and help represented employees navigate legal issues that may arise in the course of representation. National Representatives oversee governance of the locals in their assigned district, investigate unfair labor practices and internal disciplinary matters, represent employees in complex grievances and arbitrations, provide training and education to local officers, and advise on the negotiation and content of CBAs and side letters with agency employers. From the point of view of represented employees, District Staff are the day-to-day face of the national union. The loss of half of their number will cripple AFGE's ability to serve both its members and the non-member employees it represents.

      c.     Field Services and Education. Absent immediate relief, AFGE will be forced to reduce its Field Service and Education staff by approximately 75%. These employees fall into two primary roles. Many are experts in bargaining, often leading the bargaining process for AFGE's largest, council-level contracts. Those contracts are nationwide, requiring a negotiator with the bandwidth and expertise to understand the issues for locals at different locations across the country. Other Field Service and Education employees are education specialists. AFGE has nearly 1,000 locals, and at least 15,000 union leaders in a variety of official and unofficial roles. These employees are responsible for conceiving and delivering a coordinated union leader campaign, then tracking the results of that program. Without an effective training program, AFGE's leadership structure will be unable to effectively represent both its members and the non-members it represents.

      d.     In addition to the above, AFGE has been forced to order further reductions, including deep cuts to the back-office staff at headquarters, from human resources to IT. In one case, AFGE was forced to lay off an employee who had worked at AFGE for 31 years.

35.    These reductions represent permanent and irreversible damage to AFGE. Even if AFGE's revenues are restored at some point in the future, it will be unable to rebuild the institutional knowledge and experience it is losing right now. Nor will it be able to recover the goodwill of members who experience AFGE's reduced ability to provide representation.

36.    The NEC pronouncement provides that should "circumstances change" as to the Executive Order, the reduced "staffing levels will be reevaluated by the NEC."

37.    As the National President of AFGE, I am aware that if things continue on their current course, there is a genuine danger that AFGE will cease to exist in its current form, possibly within months. In short, I believe the Executive Order is an existential threat to AFGE.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: May 7, 2025

*Everett B Kelley*

Everett B. Kelley

# Exhibit A

**Frequently Asked Questions**

**Executive Order 14251:**
**"Exclusions from Federal Labor-Management Relations Programs"**

**Q1:** What do agencies need to do to terminate applicable CBAs?

**A1:** Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016).

**Q2:** Should agencies decertify bargaining units of covered agencies or subdivisions?

**A2: No,** agencies should not file any decertification petitions until litigation regarding *Exclusions* has been resolved. **Only after the litigation is final and the Administration has assessed the implications of its outcome** should agencies consider filing Federal Labor Relations Authority (FLRA) petitions.  Upon the conclusion of the litigation as conveyed by the White House Counsel's Office and OPM, agencies may file decertification clarifying that bargaining units include only those positions not exempted from collective-bargaining requirements under *Exclusions*. Agencies should consult their General Counsels for updates on the litigation, and before taking steps to file a decertification petition in compliance with the *Exclusions* order.

**Q3:** Should agencies amend current filings for exceptions to arbitration awards where an arbitrator ordered relief for a bargaining unit covered under *Exclusions*?

**A3:** Agencies should ask the FLRA to hold these cases in abeyance pending the outcome of litigation, where practicable. In cases with pending deadlines for submissions, agencies should ask the FLRA to suspend or extend those deadlines until the conclusion of the litigation. If the FLRA does not suspend deadlines or hold cases in abeyance agencies should take the position that the union lacks standing as it is not recognized as a result of *Exclusions*.

**Q4:** In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

**A4:** Yes. The statement should mention, and agencies should identify  for the appropriate FLRA regional office, the Administration's position that the relevant agency or agency subdivision is no longer subject to provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* order. Under that position, the union no longer has standing to file a charge or the FLRA to issue a complaint.

**Q5:** Should agencies and agency subdivisions covered by *Exclusions* continue to participate in the FLRA's Collaboration and Alternative Dispute Resolution Office (CADRO) with labor unions representing police officers, security guards, and firefighters? What about bargaining units comprised                          of                          other                          occupations?

**A5:** Agencies may continue collective bargaining activities, including dispute resolution efforts with CADRO and other third-party proceedings with unions representing police officers, security

guards, and firefighters, provided that these unions continue to be recognized consistent with *Exclusions*. However, for matters involving a dispute for any unit that represents positions now excluded under Executive Order 12171, as amended, agencies should continue those dispute resolution activities only if they are doing so independently of any requirements of a CBA and not relying on any provisions of Chapter 71 to compel their participation.

**Q6:** Should agencies change the bargaining unit status codes on employees' SF-50s?

**A6:** Not at this time. Agencies should wait until litigation is resolved before doing so.

**Q7:** What is meant by the term "subdivision?"

**A7:** The term "subdivision" refers to any organization, office, or component that is subordinate to an agency or department head, as well as any division within those organizations, offices, or components.

**Q8:** What is meant by Section 2 of Executive Order 14251 (*Exclusions*) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"

**A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

**Q9**: What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?

**A9:** Agencies should preserve the rights of employees not excluded from collective bargaining including by continuing to participate in third-party procedures (e.g., arbitrations) that are focused solely on conditions of employment, contractual and statutory obligations, or other matters limited to these employees. For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance. If agencies need further guidance, please contact OPM at awr@opm.gov.

**Q10:** If an employee is no longer permitted to join or form a labor organization under the FSLMRS, may he or she strike against the Government while serving as a federal employee?

**A10:** Under 5 U.S.C. § 7311, employee strikes against the Government of the United States are prohibited for all Federal employees, irrespective of whether they are in a bargaining unit.

**Q11:** Can grievances initially filed under a negotiated grievance process (5 U.S.C. 7121) be transitioned to an administrative grievance process?

**A11:** Yes. Agencies may transfer a grievance initially filed under a negotiated grievance procedure to its internal administrative grievance procedure provided the matter is not excluded by the agency's administrative grievance procedure and the grievant timely requests to transition to the administrative grievance procedure.

**Q12:** Are unions ineligible as employee representatives under the FSLMRS permitted to establish consultative relationships with agencies pursuant to 5 C.F.R. Part 251?

**A12:** OPM's regulations "[provide] a framework for consulting and communicating with **non-labor organizations** representing Federal employees and with other organizations on matters related to agency operations and personnel management." *See* 5 C.F.R. Part 251 (emphasis added). A union is a "labor organization," as defined in 5 U.S.C. 7103(a)(4), and is therefore, not covered by 5 C.F.R. Part 251 whether they represent bargaining unit employees at an agency or not.

**Q13:** With announcement of the new Executive Order, *Exclusions*, are covered agencies still required to submit data to OPM regarding taxpayer-funded union time (TFUT), collective bargaining costs, and other labor relations data points?

**A13:** Yes. Please continue to collect and timely submit agency labor relations data as requested, even if the agency or subdivision therein is now exempted from the provisions of the FSLMRS.

**Q14:** What should we do with agreements that are pending Agency Head Review (AHR) and cover newly excluded agencies, subdivisions, or partial groups?

**A14:** Agencies should exercise their agency head authority under 5 U.S.C. § 7114(c) to disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision. Agencies should cite to *Exclusions* or, if applicable, the presidential memorandum *Limiting Lame-Duck Collective Bargaining Agreements That Improperly Attempt to Constrain the New President*, as their basis for disapproval. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would. Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by Executive Order 14251 and that the agreement has no applicability to other employees.

**Q15:** For agencies that are currently bargaining with unions, are there any concerns with solidifying and executing agreements such as tentative agreements or memoranda of understandings or agreements (MOUs or MOAs)?

**A15:** Agencies should suspend such negotiations until the conclusion of litigation, meaning bargaining sessions should be placed on hold along with implementation of changes to conditions of employment that were being bargained. Where agencies need only execute an agreement through a ministerial act (e.g., signing an agreement), agencies may proceed to do so provided that any such agreement is consistent with the policy priorities of the Trump Administration.

**Q16:** In Section 2 of *Exclusions,* 1-419 states: "The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management: (a) Office of the Chief Information Officer (OCIO). (b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty." Does this apply to all OCIO offices within an agency not listed in *Exclusions*?

**A16:** This provision applies only to CIO offices in the Executive Departments (*see* 5 U.S.C. 101), OPM, and the Social Security Administration, as well as the subordinate agencies and offices

under those Departments/agencies.

**Q17**: What does information resources management mean as used in Section 2 of *Exclusions*?

**A17**: The Paperwork Reduction Act defines "information resources management" at 44 U.S.C. § 3502(7), as "the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public."

## April 22, 2025 Additional Questions and Answers

**Q18:** How should agencies handle union time and office space provided to union representatives who are no longer in a recognized unit?

**A18:** Agencies and subdivisions covered by *Exclusions* must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by labor unions for representational activities and repurpose those resources for agency business only. Employees of covered agencies and subdivisions who were previously authorized to use taxpayer-funded union time are no longer permitted use of such time and should only be conducting agency-assigned work during their scheduled duty time. Supervisors should not approve any time and attendance records that include requests for and use of taxpayer-funded union time. For agencies and subdivisions not subject to exclusion from collective bargaining, agencies can allow for use of union time and office space as they normally would.

**Q19:** What if an arbitration is already scheduled for an agency or subdivision now excluded under Executive Order 14251?

**A19:** The agency should request that the arbitrator hold the case in abeyance pending the outcome of litigation regarding *Exclusions*. If unable to delay the hearing, the agency should take the position that in accordance with *Exclusions,* the union is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

**Q20:** How does *Exclusions* impact unions' consultation rights under the FSLMRS?

**A20:** The FSLMRS grants labor unions consultation rights under 5 U.S.C. §§ 7113 and 7117(d) on substantive changes to conditions of employment at the national, subnational, and government-wide basis, respectively. Agencies should assess and determine whether labor unions meet the requirements under 5 C.F.R. Part 2426 and take appropriate action with the appropriate FLRA Regional Office where it believes labor unions no longer meet the eligibility criteria for consultation rights. Before taking action, agencies should consult their General Counsel and coordinate with the Department of Justice.

**Q21:** Section 7 of *Exclusions* requires all agency heads with employees covered by Chapter 71, to identify any agency subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work, that are not covered by Executive Order 12171, as amended. Does this only apply to agencies defined in 5 U.S.C. 101?

**A21:** Section 7 is not limited to those agencies defined under 5 U.S.C. 101 or those listed in *Exclusions*. Rather, every agency head should review their respective missions and identify any

subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work.

**Q22:** Some employees no longer have union dues or other fees deducted from their government paychecks for union-provided benefits/insurance (e.g., dental, vision, etc.). Is this cessation of payroll deductions considered a life-changing event that would allow employees to opt into federal benefits coverage?

**A22:** Employees should consult with the union or insurance provider from whom they were receiving benefits (i.e., non-FEDVIP plans) regarding coverage questions. If confirmed to have lost coverage, this would be considered a Qualifying Life Event that allows enrollment in a FEDVIP plan outside of Open Season. The individual has from 31 days before to 60 days after the event to enroll.  More information is available here: Dental and Vision | BENEFEDS.

**Q23:** May agencies communicate with unions representing employees who are still recognized under Executive Order 14251 (e.g., police officers, security guards, firefighters) or otherwise still recognized under 5 U.S.C. 71?

**A23:** Yes. Unions who have bargaining unit employees that are not excluded under the Executive Order, maintain recognition under Chapter 71 of Title 5, U.S. Code. Therefore, normal labor-management communication and engagement should continue.

**Q24:** How should an agency handle an impending change in conditions of employment for employees now excluded by the Executive Order? How should an agency respond to a union inquiry regarding a change in conditions of employment?

**A24:** An agency or subdivision covered by *Exclusions*, can implement the change without completing negotiations. Agencies may respond to a demand to bargain by a labor union by acknowledging receipt and informing the union that it will hold in abeyance their request pending the outcome of litigation over Executive Order 14251.

**Q25:** What should an agency do if it receives a grievance from the union for an individual or unit that is no longer recognized in accordance with *Exclusions*?

**A25:** For units that are no longer recognized within a covered agency or subdivision, agencies should acknowledge receipt, inform the union that the grievance is being held in abeyance pending litigation for *Exclusions*, and provide a date the agency plans to update them. For grievances that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct their negotiated grievance procedures as they normally would.

**Q26:** Should an agency continue to allow union representation in Weingarten meetings and formal discussions with employees excluded under Executive Order 14251?

**A26:** No. Agencies should continue to invite unions to formal discussions and honor requests for Weingarten meeting representation only for employees <u>not</u> excluded from collective bargaining under Executive Order 14251.

**Q27:** If a CBA is set to rollover for units no longer recognized, but the agreement has also not

been terminated, what do we do?

**A27:** In this circumstance, the agency may notify the union that it is terminating the CBA and that any negotiations regarding a successor agreement are being held in abeyance due to *Exclusions* and associated litigation.

**Q28:** If an agency notified a union prior to *Exclusions* that it was terminating a labor-management forum and the union requests to negotiate, how should the agency respond?

**A28:** On March 27, 2025, OPM issued guidance requiring agencies to abolish labor-management forums, committees, and councils at the agency-wide and organizational levels. Many of these forums were established under Executive Order 14119, which was rescinded under Executive Order 14236 in March 2025. The guidance also noted that where the establishment or use of labor-management forums, committees, and councils are incorporated into the terms of any CBA, agencies should seek to renegotiate those terms at the earliest practicable juncture consistent with the policies of this Administration. If a unit that is no longer recognized under *Exclusions* seeks to negotiate over the termination of a forum, the agency should deny the request to bargain since the unit is no longer recognized.

**Q29:** The agency has received unsolicited messages from unions requesting consideration under Section 4 of *Exclusions*, which requires the Departments of Defense and Veterans Affairs to submit any suspensions of *Exclusions* application to the Federal Register within 15 days of the order. How should the agency respond?

**A29:** The agency should acknowledge receipt only and not make any statements regarding the substance of the communication.

**Q30:** Are all OCIOs or equivalents excluded from collective bargaining?

**A30:** Executive Order 14251 excludes the OCIO in "agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code," and in the Social Security Administration and OPM.

**Q31:** Should agencies respond to union Requests for Information (RFIs) from units that are now excluded in accordance with the *Exclusions* order?

**A31:** If the RFI is filed as a request under 5 U.S.C. 7114(b)(4), agencies should hold the request in abeyance pending the outcome of the litigation.

**Q32:** How should agencies respond to questions regarding union dues?

**A32:** If an excluded employee asks about continuing union dues, the agency should inform the employee that union dues allotments through a government payroll provider are not authorized at this time and that if they wish to continue paying union dues nonetheless, they may contact their union.

**Q33:** How should agencies handle union dues allotments?

**A33:** In taking steps to implement *Exclusions*, agencies may pause the collection of union dues

allotments for those agencies or subdivisions identified in *Exclusions* while litigation is ongoing. However, agency payroll providers should not unilaterally terminate all union dues allotments without first consulting with their customer agencies. Instead, agency payroll providers should contact their customer agencies to identify which labor unions and employees are excluded from collective bargaining by *Exclusions* and limit the termination of dues allotments to those unions and employees.